UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00453-PAB-KLM

MICHAEL BILINSKY, Individually and on Behalf of All Others
Similarly Situated,

        Plaintiff,

v.

GATOS SILVER, INC.,
STEPHEN ORR,
ROGER JOHNSON,
PHILIP PYLE,
JANICE STAIRS,
ALI ERFAN,
IGOR GONZALES,
KARL HANNEMAN,
DAVID PEAT,
CHARLES HANSARD, and
DANIEL MUÑIZ QUINTANILLA,

        Defendants.

---

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES LAWS

---

**TABLE OF CONTENTS**

I.   SUMMARY OF THE ACTION .................................................................................. 1

II.  JURISDICTION AND VENUE .............................................................................. 9

III. BACKGROUND ALLEGATIONS .......................................................................... 10

     A.   Resource and Reserve Classifications in Mining Technical Reports ..................... 10

     B.   Mining Disclosure Regulations ........................................................................... 11

     C.   Gatos Develops CLG ........................................................................................... 14

     D.   Production at CLG Commences, and Defendants Quickly Learn That
          the Existing Resource Model Is Unreliable ......................................................... 15

     E.   Gatos Hastily Procures the False 2020 Technical Report ....................................... 17

     F.   The October 2020 IPO at $7.00/Share ................................................................ 19

     G.   December 2020:  Gatos First Reports Earnings as a New Public Company
          and Begins to Tout New Exploration .................................................................. 21

     H.   After Being Expressly Told of the Errors, Defendants Deliberately
          Decide Not to Disclose Them .............................................................................. 23

     I.   March 2021:  Gatos Files Its First 10-K; at Investor Day, Defendants
          Confirm CLG Production Is on Track .................................................................. 26

     J.   Knowing about the Materially False Resources and Reserves,
          Defendants Boost Gatos's Share Price with New Exploration ............................... 28

     K.   In May and June 2021, Chief Geologist Pyle and Huerta Make
          Massive Insider Sales and Reap Large Profits ....................................................... 30

     L.   Andres Joins Gatos and Advances the Company's Internal Probe
          of the Errors ....................................................................................................... 33

     M.   Gatos Conducts a Second Offering in July 2021 at $14.00/Share,
          Double the IPO Price .......................................................................................... 34

     N.   Gatos Continues to Claim Strong Production Results and Reiterates
          Its Resources and Reserves; COO Kinyon Abruptly Departs ............................... 35

O.   As Production Continues, the Materially False Reserves and LOM
     Lead to Materially Understated Expenses and Materially Overstated
     Net Income in Violation of GAAP ................................................................ 37

P.   Defendants' Scheme Unravels ...................................................................... 49

IV.  SECURITIES ACT ALLEGATIONS .......................................................................... 59

A.   Securities Act Parties .................................................................................... 59

     1.   Securities Act Plaintiffs ...................................................................... 59

     2.   Securities Act Defendants.................................................................... 60

B.   The 2020 Registration Statement and IPO.................................................... 62

C.   The 2020 Registration Statement Contained Material Misstatements
     and Omissions................................................................................................ 62

     1.   Materially False and Misleading Statements Concerning
          CLG's Resources, Reserves, and LOM .............................................. 63

     2.   Materially False and Misleading Statements Concerning
          Definitions and Methodology ............................................................. 66

     3.   Materially Misleading Statements Concerning Risk Factors
          That Were a Known Certainty ............................................................. 70

     4.   Materially False Statements Concerning Financial Performance
          and Compliance with GAAP ............................................................... 72

     5.   Materially False Statements Concerning Impairment Testing........................... 73

     6.   Material Omissions in Violation of Item 303 ................................................. 74

D.   The 2021 Registration Statement and July 2021 Offering......................................... 76

E.   The 2021 Registration Statement Contained Material Misstatements
     and Omissions................................................................................................ 77

     1.   Materially False and Misleading Statements .................................................... 78

     2.   Material Omissions in Violation of Item 303 ................................................. 82

F.   The Individual Defendants Failed to Perform Reasonable Diligence
     in Connection with the IPO and July 2021 Offering .............................................. 83

G.    Gatos's Share Price Collapses by the Time of Suit .................................................. 86

V.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT ........................................... 86

COUNT I ................................................................................................................................. 86

COUNT II ............................................................................................................................... 88

VI.   EXCHANGE ACT ALLEGATIONS ................................................................................ 90

A.    Exchange Act Parties ........................................................................................... 90

1.    Plaintiffs ................................................................................................... 90

2.    Exchange Act Defendants ....................................................................... 90

B.    Exchange Act False and Misleading Statements .................................................. 92

1.    Exchange Act Materially False and Misleading Statements Reiterating
CLG's Resources, Reserves, and LOM ............................................................ 92

2.    Exchange Act Materially False and Misleading Statements Concerning
Definitions and Methodology ............................................................................ 99

3.    Exchange Act Materially Misleading Statements Concerning
Risk Factors That Were a Known Certainty ................................................... 101

4.    Exchange Act Materially False Statements Concerning
Financial Performance and Compliance with GAAP ...................................... 102

5.    Exchange Act Materially False Statements Concerning
Impairment Testing .......................................................................................... 109

6.    Exchange Act Materially False Statements Concerning
Disclosure Controls and Internal Controls over Financial Reporting ............. 110

7.    Exchange Act Materially False Statements Concerning
Purported New Drilling and Success in Upgrading CLG's Resources ............ 111

8.    Exchange Act Material Omissions in Violation of Item 303 .......................... 113

C.    Additional Allegations of Scienter ..................................................................... 114

1.    The Exchange Act Defendants Were Motivated to Conceal the
Known Overstatements of Resources and Reserves While
Pursuing New Exploration ............................................................................... 114

iii

2.   Senior Executives' Unusual, Highly Profitable Insider Stock Sales
     Near Peak Share Prices Support a Strong Inference of Scienter .................... 115

3.   Former Employee Allegations ......................................................... 117

4.   Orr and Johnson Admitted Making Material Misstatements to
     Gatos's Lenders ......................................................................... 121

5.   The Exchange Act Defendants Spoke Repeatedly About the
     Purported Reliability of the Resources and Reserves ...................................... 121

6.   Continuous Access to Information and Contemporaneous Red Flags............. 123

7.   Core Operations ......................................................................... 124

8.   The Magnitude and Duration of the Fraud ...................................................... 125

9.   The Terminations of Gatos's CEO, CFO,  Chief Geologist, and
     COO Support Scienter ..................................................................... 126

10. Corporate Scienter ..................................................................... 128

D.   Loss Causation......................................................................... 129

E.   Presumption of Reliance and Fraud-on-the-Market Doctrine ............................... 130

VII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT.......................................... 132

       COUNT III.............................................................................. 132

       COUNT IV............................................................................... 133

VIII.  CLASS ACTION ALLEGATIONS ............................................................ 133

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS
       CAUTION DOCTRINE ..................................................................... 136

X.     JURY DEMAND........................................................................... 137

XI.    PRAYER FOR RELIEF .................................................................... 137

## GLOSSARY OF TERMS

| Term | Definition |
|---|---|
| 2020 Registration Statement | Gatos's registration statement for the IPO (including the documents incorporated by reference therein), filed by Gatos on Form S-1 on October 27, 2020, and declared effective on October 27, 2020 |
| 2020 Technical Report | "NI 43-101 Technical Report: Los Gatos Project, Chihuahua Mexico," prepared by Tetra Tech Inc., dated July 1, 2020, and filed as Exhibit 96.1 to the 2020 Registration Statement |
| 2021 Registration Statement | Gatos's registration statement for the July 2021 Offering (including the documents incorporated by reference therein), filed by Gatos on Form S-1 on July 12, 2021, and declared effective on July 15, 2021 |
| Andres | Dale Andres, Gatos's President from June 1, 2021 to April 7, 2022, and Gatos's CEO and a member of the Board of Directors from April 7, 2022 to present |
| Angola | Kenneth Angola, Gatos's mine planner for CLG from May 2019 to December 2020 |
| ASC | Accounting Standards Codification |
| Board | Gatos's Board of Directors |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class | As to claims under the Securities Act, all persons and entities who, in domestic transactions or on the NYSE, purchased or otherwise acquired Gatos common stock pursuant or traceable to the 2020 Registration Statement or 2021 Registration Statement, and were damaged thereby; and<br><br>As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired Gatos common stock listed on the NYSE, or who, in domestic transactions, purchased or otherwise acquired publicly traded call options on Gatos common stock or sold publicly traded put options on Gatos common stock, from December 9, 2020 through January 25, 2022, both inclusive, and were damaged thereby. |
| Class Period | December 9, 2020 through January 25, 2022, both inclusive |
| CLG | Cerro Los Gatos silver, lead, and zinc mine located in Chihuahua, Mexico |
| COO | Chief Operating Officer |
| Credit Agreement | Gatos's $50 million revolving credit agreement with certain lenders, dated July 12, 2021 and amended March 7, 2022 |
| Deswik software | Software used to prepare CLG's Life of Mine plan |

| Term | Definition |
|---|---|
| Dilution | The amount of waste or low-grade mineralized rock that is mined together with the ore |
| Dowa | Dowa Metals and Mining Co., Ltd. |
| Electrum | The Electrum Group LLC |
| Erfan | Defendant Ali Erfan, a member of Gatos's Board since May 2019 |
| Exchange Act | The Securities Exchange Act of 1934 |
| Exchange Act Defendants | Defendants Gatos Silver, Inc., Stephen Orr, Roger Johnson, and Philip Pyle |
| FE | Former Employees of Gatos who are referenced herein and identified as FE- |
| Final 2020 Prospectus | The final prospectus supplement filed by Gatos with the SEC pursuant to Rule 424(b)(4) on October 29, 2020 and dated October 27, 2020 |
| Final 2021 Prospectus | The final prospectus supplement filed by Gatos with the SEC pursuant to Rule 424(b)(4) on July 15, 2021 and dated that same day |
| g/t | Grams per tonne |
| GAAP | U.S. Generally Accepted Accounting Principles |
| Gatos or the Company | Defendant Gatos Silver, Inc. |
| Gonzales | Defendant Igor Gonzales, a member of Gatos's Board since June 2020 |
| Grade | The concentration of the desired metal within the mined ore |
| Hanneman | Defendant Karl Hanneman, a member of Gatos's Board since October 2019 |
| Hansard | Defendant Charles Hansard, a member of Gatos's Board since October 2020 |
| Huerta | Luis Felipe Huerta, Sunshine Silver Mining & Refining Corp.'s (now Gatos) Project Director from 2015 to October 2020, and Gatos's Vice President, Mexico from October 2020 to present |
| Indicated mineral resource | The "part of a mineral resource for which quantity and grade or quality are estimated on the basis of adequate geological evidence and sampling.  The level of geological certainty associated with an indicated mineral resource is sufficient to allow a qualified person to apply modifying factors in sufficient detail to support mine planning and evaluation of the economic viability of the deposit.  Because an indicated mineral resource has a lower level of confidence than the level of confidence of a measured mineral resource, an indicated mineral resource may only be converted to a probable mineral reserve."  17 C.F.R. § 229.1300. |
| Individual Defendants | Defendants Stephen Orr, Roger Johnson, Janice Stairs, Ali Erfan, Igor Gonzalez, Karl Hanneman, David Peat, Charles Hansard, and Daniel Muñiz Quintanilla |

| Term | Definition |
|------|------------|
| Inferred mineral resource | The "part of a mineral resource for which quantity and grade or quality are estimated on the basis of limited geological evidence and sampling. The level of geological uncertainty associated with an inferred mineral resource is too high to apply relevant technical and economic factors likely to influence the prospects of economic extraction in a manner useful for evaluation of economic viability. Because an inferred mineral resource has the lowest level of geological confidence of all mineral resources, which prevents the application of the modifying factors in a manner useful for evaluation of economic viability, an inferred mineral resource may not be considered when assessing the economic viability of a mining project, and may not be converted to a mineral reserve." 17 C.F.R. § 229.1300. |
| IPO | Gatos's initial public offering of common stock, completed on October 27, 2020 |
| Johnson | Defendant Roger Johnson, Gatos's CFO from 2011 to May 21, 2022 |
| July 2021 Offering | The secondary offering of Gatos's common stock completed on July 15, 2021 |
| Kinyon | John Kinyon, Gatos's Vice President of Operations from April 2012 to September 2020, and Gatos's COO from September 2020 to August 16, 2021 |
| LGJV | Los Gatos Joint Venture, a joint venture entered into by Gatos and Dowa on January 1, 2015 to develop the Los Gatos District |
| Life of Mine or LOM | The time period over which mineral reserves will be extracted from a mining project |
| Linebarger | David Linebarger, an outside consultant retained by Gatos who identified errors in the 2020 Technical Report |
| Los Gatos District | The property in Chihuahua, Mexico (including CLG) to which the LGJV has been granted mineral concessions and owns certain surface rights |
| M&I | Measured and indicated mineral resources |

| Term | Definition |
|------|-----------|
| Measured mineral resource | The "part of a mineral resource for which quantity and grade or quality are estimated on the basis of conclusive geological evidence and sampling.  The level of geological certainty associated with a measured mineral resource is sufficient to allow a qualified person to apply modifying factors, as defined in this section, in sufficient detail to support detailed mine planning and final evaluation of the economic viability of the deposit.  Because a measured mineral resource has a higher level of confidence than the level of confidence of either an indicated mineral resource or an inferred mineral resource, a measured mineral resource may be converted to a proven mineral reserve or to a probable mineral reserve."  17 C.F.R. § 229.1300. |
| Mineral reserve | "[A]n estimate of tonnage and grade or quality of indicated and measured mineral resources that, in the opinion of the qualified person, can be the basis of an economically viable project.  More specifically, it is the economically mineable part of a measured or indicated mineral resource, which includes diluting materials and allowances for losses that may occur when the material is mined or extracted."  17 C.F.R. § 229.1300. |
| Mineral resource | "[A] concentration or occurrence of material of economic interest in or on the Earth's crust in such form, grade or quality, and quantity that there are reasonable prospects for economic extraction.  A mineral resource is a reasonable estimate of mineralization, taking into account relevant factors such as cut-off grade, likely mining dimensions, location or continuity, that, with the assumed and justifiable technical and economic conditions, is likely to, in whole or in part, become economically extractable.  It is not merely an inventory of all mineralization drilled or sampled."  17 C.F.R. § 229.1300. |
| NI 43-101 | Canadian National Instrument 43-101—Standards of Disclosure for Mineral Projects |
| NPV | Net present value |
| NYSE | New York Stock Exchange |
| Officer Defendants | Defendants Stephen Orr, Roger Johnson, and Philip Pyle |
| Ordinary Kriging | A geostatistical interpolation technique |
| Orr | Defendant Stephen Orr, Gatos's CEO from 2011 to April 7, 2022 |
| Peat | Defendant David Peat, a member of Gatos's Board since September 2011 |
| Plaintiffs | Lead Plaintiff Bard Betz and Named Plaintiff Jude Sweidan |
| Probable mineral reserve | "[T]he economically mineable part of an indicated and, in some cases, a measured mineral resource."  17 C.F.R. § 229.1300. |

| Term | Definition |
|---|---|
| Proven mineral reserve | "[T]he economically mineable part of a measured mineral resource and can only result from conversion of a measured mineral resource." 17 C.F.R. § 229.1300. |
| PSLRA | The Private Securities Litigation Reform Act of 1995 |
| Pyle | Defendant Philip Pyle, Gatos's Chief Geologist from 2011 to April 5, 2022 |
| Quintanilla | Defendant Daniel Muñiz Quintanilla, a member of Gatos's Board since April 2021 |
| Recovery | The proportion of valuable material physically recovered in the processing of ore |
| Scott | Tony Scott, Gatos's Vice President of Evaluations and Technical Services from January 10, 2022 to present |
| SEC | U.S. Securities and Exchange Commission |
| SEC Mining Modernization Rules | Amendments to the SEC's disclosure rules that became effective on January 1, 2021, and include a new subpart 1300 to Regulation S-K that governs disclosure for mining registrants |
| Securities Act | The Securities Act of 1933 |
| Securities Act Defendants | Defendants Gatos Silver, Inc., Stephen Orr, Roger Johnson, Janice Stairs, Ali Erfan, Igor Gonzalez, Karl Hanneman, David Peat, Charles Hansard, and Daniel Muñiz Quintanilla |
| SOX | The Sarbanes-Oxley Act of 2002 |
| Stairs | Defendant Janice Stairs, a member of Gatos's Board since October 2019, and the Chairman of Gatos's Board since October 2020 |
| Stantec | Stantec Inc., an outside consultant retained by Gatos that identified errors in the 2020 Technical Report |
| Tetra Tech | Tetra Tech, Inc. |
| Tonne | A metric ton, equal to 1,000 kilograms or 2,204.6 pounds |
| TPD | Tonnes per day |
| TSX | Toronto Stock Exchange |
| **Earnings Calls and Periodic Reports Filed with the SEC** | |
| 3Q2020 10-Q | Gatos's quarterly report for the third quarter of 2020 filed on Form 10-Q on December 9, 2020 |
| 3Q2020 Earnings Call | Gatos's quarterly investor conference call regarding its financial results for the third quarter of 2020, held on December 9, 2020 |
| Dec. 16, 2020 8-K | Gatos's Form 8-K filed with the SEC on December 16, 2020 |
| 2020 10-K | Gatos's annual report for 2020 filed on Form 10-K on March 29, 2021 |
| 1Q2021 10-Q | Gatos's quarterly report for the first quarter of 2021 filed on Form 10-Q on May 7, 2021 |
| 1Q2021 Earnings Call | Gatos's quarterly investor conference call regarding its financial results for the first quarter of 2021, held on May 7, 2021 |

| Term | Definition |
|---|---|
| 2Q2021 10-Q | Gatos's quarterly report for the second quarter of 2022 filed on Form 10-Q on August 9, 2021 |
| 3Q2021 10-Q | Gatos's quarterly report for the third quarter of 2021 filed on Form 10-Q on November 8, 2021 |

Lead Plaintiff Bard Betz ("Lead Plaintiff") and Named Plaintiff Jude Sweidan (with Lead Plaintiff, "Plaintiffs"), on behalf of themselves and the members of the Class, allege in this consolidated securities class action (i) fraud-based claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") for a class period of December 9, 2020 through January 25, 2022, both inclusive (the "Class Period"), and (ii) strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 against Gatos Silver, Inc. ("Gatos") and certain of its current and former employees and officers.[1]

The allegations are based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel. Lead Counsel's investigation included, among other things, a review and analysis of Gatos's SEC filings, transcripts of public conference calls, press releases issued by Gatos, and interviews with former employees of Gatos conducted by investigators retained by Lead Counsel.

## I.    SUMMARY OF THE ACTION

1.    This case does not arise from missed predictions, forecasts, or unforeseeable risks. Instead, it arises from what Defendants publicly stated about Gatos's mineral resources and reserves at the Cerro Los Gatos ("CLG") mine versus the truth that existed at the time they made their statements. Defendants used the inflated resource and reserve figures to entice Class members to purchase over $156 million in stock in Gatos's October 2020 IPO. Even after an expert confirmed for Defendants in January 2021 that their resource and reserve statements were

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Terms attached hereto. Emphasis added unless otherwise stated.

materially false, Defendants deliberately chose not to disclose the truth. Instead, Defendants reiterated their false and misleading statements to drive up Gatos's share price. In May and June 2021—near Gatos's peak share price—insiders (including Gatos's Chief Geologist) dumped their Gatos stock for millions of dollars in profits. Just weeks later, in July 2021, Defendants returned to the public markets and used their deliberately false statements to raise another $118 million from Class members through a secondary public offering. The scheme collapsed in January 2022—just 15 months after Gatos's IPO—when Gatos (under new management) admitted the errors, causing its share price to plummet 69% and its CEO, CFO, and Chief Geologist simultaneously to enter "retirement."

2.      Seizing the momentum from historically high silver prices, Gatos went public in October 2020—the largest precious metals IPO in a decade. For years before the IPO, then-CEO Stephen Orr ("Orr") and then-Chief Geologist Philip Pyle ("Pyle") had been intimately involved with CLG, a silver, lead, and zinc deposit located in Mexico; Pyle co-discovered the deposit. In 2011-2012 and 2017, they commissioned technical reports and a feasibility study to determine the resources and reserves at CLG. Limited production began in November 2018, and full production commenced in September 2019.

3.      Defendants' production experience quickly demonstrated that the resource model for CLG was inaccurate. In 2018, for example, the Company's first effort to extract ore revealed a discrepancy to the model, causing concern about the accuracy and consistency of the model. Managers and personnel who worked at the CLG mine regularly remarked that the model was not accurate. Orr, Pyle, then-CFO Roger Johnson ("Johnson"), then-Chief Operating Officer John Kinyon ("Kinyon"), and other executives attended monthly meetings where they personally toured

the CLG mine, inspected core samples, and were presented with detailed reports by managers on every aspect of the mine's operation, including construction progress, mining results, and costs.

4.     Despite the evidence that the resource model was unreliable, Defendants hastily commissioned a July 2020 technical report (the "2020 Technical Report") from Tetra Tech, Inc. ("Tetra Tech"), a supposedly independent engineering firm, that used the same unreliable resource model for CLG.  Defendants needed the 2020 Technical Report to push forward with the October 2020 IPO, in which Gatos offered over 24 million shares of stock and obtained net proceeds of $156.1 million.

5.     In connection with the IPO, Gatos adopted the 2020 Technical Report and filed it with the SEC.  Based on the 2020 Technical Report, Defendants claimed that CLG held 9,617,631 tonnes of reserves and 14,077,885 tonnes of resources.[2]  These figures were not forward-looking predictions or forecasts.  Rather, they were representations of present fact—the amount of ore that CLG purportedly contained as of July 1, 2020—that Gatos claimed were based on "specific geological evidence and knowledge," "detailed and reliable" information, and "appropriate techniques."  Indeed, nearly two-thirds of the purported reserves were in the "proven," or most stringent, category.  These figures were crucial to investors because the CLG mine is Gatos's sole source of revenue and profit.  However, the resource and reserve figures that Defendants publicly touted were materially overstated and false when made.

6.     Before the IPO, Gatos personnel had internally identified errors in the work of the employee responsible for the Life of Mine plan, Kenneth Angola.  By the end of 2020, Gatos

---

[2] "Tonne" refers to a metric ton, equal to 1,000 kilograms or 2,204.6 pounds.

3

executives were discussing the impact of those errors on the 2020 Technical Report. In December 2020, Angola abruptly resigned. In January 2021, Gatos secretly engaged an outside consultant, David Linebarger, to conduct an independent review. In short order, Linebarger issued a written report concluding that the reserves at CLG were 20% less than the 2020 Technical Report had claimed.

7.     In January 2021, Pyle, Kinyon, and Luis Felipe Huerta (Vice President, Mexico) ("Huerta") received Linebarger's written report and participated in multiple conference calls on the matter; Kinyon and Pyle briefed Orr and Johnson on the errors. Gatos and its most senior executives thus had no basis—much less a reasonable one—to believe the numbers in the 2020 Technical Report were accurate; they had been specifically told that they were not.

8.     In these circumstances, the securities laws require timely disclosure. Indeed, Linebarger's report prompted Huerta to write Pyle and Kinyon (among others) in January 2021 to urge immediate disclosure of the errors in the 2020 Technical Report. Kinyon responded by email that the Company would not do so. Thus, with direct knowledge of the material errors and overstatements, Defendants made a deliberate decision not to disclose the truth to investors. Instead, Defendants sought to maintain the Company's inflated share price and access to the capital markets.

9.     To that end, Gatos's SEC filings every quarter continued to reiterate the overstated reserves, and Gatos stated in March and July 2021 that there had been no "material change" in the resources and reserves. These statements were false when made. Gatos's failure to disclose the known misstatement of resources and reserves also violated SEC regulations that expressly require mining companies to disclose "when there is a material change" in resources and reserves "from

the last technical report summary filed for the property," 17 C.F.R. § 229.1302(b)(2)(i), or when a previously filed report "is not current" with respect to "[a]ll material assumptions and information" regarding the resources and reserves. 17 C.F.R. § 229.1304(f)(2).

10.    Moreover, during a May 7, 2021 earnings call, CEO Orr falsely claimed that the Company had performed a reconciliation proving that the resource model used in the 2020 Technical Report was "very reliable," even as the internally known facts showed the exact opposite.

11.    Only days later, Pyle and Huerta—while fully aware of the overstated reserves and the decision not to disclose the truth—began selling nearly 200,000 shares at artificially inflated prices. These highly profitable sales (shown below) occurred from May 11, 2021 to June 14, 2021, near Gatos's all-time peak share price, and reaped over $1.91 million in profits. Before these sales, neither insider had sold any Gatos shares since the IPO. Neither would do so again.



12.      On July 9, 2021, Gatos's share price reached an all-time peak of $19.43—nearly triple its $7.00 offering price in the October 2020 IPO.   On July 12, 2021, Gatos secured a $50 million credit agreement.  It did so by providing Gatos's lenders with "an overestimation of the mineral reserves at the [CLG] Mine" that was "incorrect when made or furnished" (as Orr and Johnson eventually admitted in a March 2022 amendment that restricted Gatos's credit facility). A few days later, on July 15, 2021, Gatos raised over $118 million based on a further stock offering that reiterated the false resource and reserve figures and again claimed there was no "material change" from the 2020 Technical Report.

13.      While Defendants' false and misleading public statements continued, Dale Andres—appointed as Gatos's President in June 2021—internally determined that the Company faced a 30% to 50% reduction in its remaining reserves.  A second consultant, Stantec, also started work by June or July 2021 and, by October 2021, corroborated Linebarger's finding of an error in the 2020 Technical Report.  In August 2021, Kinyon was terminated.

14.      Finally, on January 25, 2022, Gatos publicly admitted that the 2020 Technical Report contained "errors" and "should not be relied upon"; Gatos faced a 30% to 50% reduction in its reserves and found "indications that there is an overestimation in the existing resource model"; and Gatos may be required to restate its financial statements for prior periods.  On this news, Gatos's share price plummeted 69% in a single day.

15.      Lead Counsel's investigation has revealed two root causes for Gatos's admitted overstatement of resources and reserves:  First, the 2020 Technical Report used the same resource model that Gatos already knew to be inaccurate in light of its production experience since 2018. Second, the 2020 Technical Report calculated reserves based on Gatos's Life of Mine plan, which

was fatally flawed.  The Life of Mine plan wrongly extended the ore and mineralization beyond the boundaries of the deposit that the model had identified, adding it to "waste blocks" that had no evidence of mineralization.  This error had far-reaching implications that significantly inflated the claimed reserves in the 2020 Technical Report.

16.     The stated 30% to 50% reduction in reserves is highly material:  it indicates the loss of silver, zinc, lead, and gold worth *$1.3 billion to $2.2 billion* (at January 25, 2022 prices), and that CLG's ore will run out up to *five years* earlier than originally claimed.  Gatos has also revealed that it may need to take an impairment charge—*i.e.*, write off a portion of the value of its reserves—in its financial statements.  Indeed, stripped of over a billion dollars in reserves, Gatos is a fundamentally different business.

17.     Further, Defendants' statements were contrary to known, existing facts at the time they were made, and the admitted "errors" in the 2020 Technical Report are a matter of objective fact.  Its use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, and its false extension of mineralization to the "waste blocks" that had no evidence of mineralization, were both errors of present fact that were directly contrary to both the inherent geological characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018.  The errors had long been known to Gatos's senior management.  That Gatos finally admitted the "errors" at the end of the Class Period—a full year after receiving Linebarger's report—is not the result of any unforeseen event.  Rather, it is the product of Defendants' deliberate decision to conceal the truth.

18.     Gatos also revealed on January 25, 2022 that it may need to issue a financial restatement—which only occurs when financial statements were materially false when issued.

That is because the overstated resources and reserves infected Gatos's public financial statements and caused them to violate U.S. Generally Accepted Accounting Principles (GAAP). Specifically, Gatos reported production and depreciation expenses and net income on the false premises that CLG had 9.6 million tonnes of reserves and could be mined for 11 years. With the smaller reserves and shorter life of mine, however, actual expenses were materially higher than reported. The expense errors caused Gatos to materially overstate net income by over $50 million from 2019 to Q3 2021—or up to *48%* of net income at the Company level and up to *848%* at the level of Gatos's mining joint venture. These material misstatements falsely changed losses to profits. Their correction wipes out the joint venture's profits in all but one quarter.

19. Already, the material misstatements of Gatos's financial performance during the Class Period have led Gatos to admit "material weaknesses in its internal controls over financial reporting related to the mineral reserve reporting errors." This admitted material weakness in internal controls demonstrates that CEO Orr's and CFO Johnson's statutorily mandated certifications, stating that they had identified and disclosed any such material weaknesses, were materially false.

20. Shortly after the scheme's collapse, Gatos's three most senior executives abruptly departed: on April 5, 2022, CEO Orr, CFO Johnson, and Chief Geologist Pyle all announced their "retirements" (with Orr immediately replaced by Andres as CEO). Since then, Gatos has failed to file its Form 10-K for 2021 and Forms 10-Q for the first two quarters of 2022.

21. The Securities Act of 1933 (the "Securities Act") imposes non-fraud liability for material misstatements and omissions in a registration statement. As the issuer, Gatos is strictly liable—regardless of intent—because the Registration Statements for Gatos's IPO and July 2021

offering incorporated the 2020 Technical Report's false resource and reserve figures and contained other material misstatements and omissions. The remaining Securities Act Defendants (defined below)—Orr, Johnson, and the Gatos directors who signed the false Registration Statements—are liable for their negligence.

22.     Plaintiffs also assert fraud-based claims under the Exchange Act on behalf of investors who (1) purchased or otherwise acquired Gatos common stock, (2) purchased or otherwise acquired publicly traded call options on Gatos common stock, or (3) sold publicly traded put options on Gatos common stock, between December 9, 2020 and January 25, 2022, both inclusive, and were damaged thereby.

## II.    JURISDICTION AND VENUE

23.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and the rules and regulations promulgated thereunder, including Rule 10b-5 (17 C.F.R. § 240.10b-5).

24.     This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. § 77v) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

25.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

26.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).  Many of
the acts and transactions giving rise to the violations of law complained of herein occurred in this
District.  In addition, Gatos maintained its corporate headquarters and principal executive offices
in this District throughout the Class Period.

III.     **BACKGROUND ALLEGATIONS**

A.     **Resource and Reserve Classifications in Mining Technical**
**Reports**

27.     At the exploration stage of a mining project, potential mineral deposits are
identified.  Once a discovery is made, a "feasibility study" is conducted to determine the project's
economic potential.  If the results of the feasibility study are favorable, the company then raises
capital to develop the mine through either private financing or the public markets.

28.     Mineral resources and reserves are crucial to the value of a new mining company
and its stock, since they establish the amount of minerals that can be extracted and sold to generate
revenue and profit.

29.     Mining companies cannot simply make up their own resource and reserve figures
through subjective, seat-of-the-pants estimates.  Instead, as detailed below, the securities laws
require mining companies to follow stringent requirements for publicly disclosing resources and
reserves.  To do so, mining companies must provide detailed technical reports authored by so-
called "qualified persons."

30.     Such technical reports use extensive geological, drilling, and metallurgical analyses
of the deposit to determine the extent and quality of mineralization and the portion that can be
economically extracted.  Based on these analyses, technical reports classify specific amounts of

ore (*i.e.*, rock containing the desired metals) as resources and reserves, typically in millions of tonnes.

31.     In addition, technical reports also identify the amount of metal contained in the ore by reporting the "grade" or concentration of each metal (which may be given as grams per tonne (g/t)), and the absolute amounts of each metal (by weight).

32.     Another key metric is the life of mine, or "LOM," which refers to the time period over which all proven and probable reserves will be extracted from the project.

**B.     Mining Disclosure Regulations**

33.     Under U.S. Securities and Exchange Commission rules, resources are the portion of a mineral deposit with "reasonable prospects for economic extraction" and must be determined based on "specific geological evidence and knowledge," while reserves are the "economically mineable part" of resources.  Both resources and reserves must be adequately supported by a technical report prepared by a "qualified person."

34.     Gatos publicly stated that it has "chosen to voluntarily comply with the SEC Mining Modernization Rules," and that the 2020 Technical Report was "prepared in accordance with the requirements of the SEC Mining Modernization Rules and NI 43-101."  The "SEC Mining Modernization Rules" refer to amendments and a subpart 1300 to Regulation S-K governing disclosure for mining registrants, which became effective on January 1, 2021.  "NI 43-101" refers to Canadian National Instrument 43-101—Standards of Disclosure for Mineral Projects.

35.     The SEC Mining Modernization Rules require mineral resources to be subdivided, "in order of increasing geological confidence, into inferred, indicated, and measured mineral resources."  17 C.F.R. § 229.1302(d)(1)(iii)(A).  Similarly, "[w]hen determining mineral reserves,

a qualified person must subdivide mineral reserves, in order of increasing confidence, into probable mineral reserves and proven mineral reserves, as defined in § 229.1300." 17 C.F.R. § 229.1302(e)(2).

36. These categories are defined as follows (17 C.F.R. § 229.1300):

(a) *Mineral resource* is a concentration or occurrence of material of economic interest in or on the Earth's crust in such form, grade or quality, and quantity that there are reasonable prospects for economic extraction. A mineral resource is a reasonable estimate of mineralization, taking into account relevant factors such as cut-off grade, likely mining dimensions, location or continuity, that, with the assumed and justifiable technical and economic conditions, is likely to, in whole or in part, become economically extractable. It is not merely an inventory of all mineralization drilled or sampled.

    i. *Inferred mineral resource* is that part of a mineral resource for which quantity and grade or quality are estimated on the basis of limited geological evidence and sampling. The level of geological uncertainty associated with an inferred mineral resource is too high to apply relevant technical and economic factors likely to influence the prospects of economic extraction in a manner useful for evaluation of economic viability. Because an inferred mineral resource has the lowest level of geological confidence of all mineral resources, which prevents the application of the modifying factors in a manner useful for evaluation of economic viability, an inferred mineral resource may not be considered when assessing the economic viability of a mining project, and may not be converted to a mineral reserve.

    ii. *Indicated mineral resource* is that part of a mineral resource for which quantity and grade or quality are estimated on the basis of adequate geological evidence and sampling. The level of geological certainty associated with an indicated mineral resource is sufficient to allow a qualified person to apply modifying factors in sufficient detail to support mine planning and evaluation of the economic viability of the deposit. Because an indicated mineral resource has a lower level of confidence than the level of confidence of a measured mineral resource, an indicated mineral resource may only be converted to a probable mineral reserve.

    iii. *Measured mineral resource* is that part of a mineral resource for which quantity and grade or quality are estimated on the basis of conclusive geological evidence and sampling. The level of geological certainty associated with a measured mineral resource is sufficient to allow a qualified person to apply modifying factors, as defined in this section, in

sufficient detail to support detailed mine planning and final evaluation of the economic viability of the deposit. Because a measured mineral resource has a higher level of confidence than the level of confidence of either an indicated mineral resource or an inferred mineral resource, a measured mineral resource may be converted to a proven mineral reserve or to a probable mineral reserve.

(b) *Mineral reserve* is an estimate of tonnage and grade or quality of indicated and measured mineral resources that, in the opinion of the qualified person, can be the basis of an economically viable project.[3] More specifically, it is the economically mineable part of a measured or indicated mineral resource, which includes diluting materials and allowances for losses that may occur when the material is mined or extracted.

   i. *Probable mineral reserve* is the economically mineable part of an indicated and, in some cases, a measured mineral resource.

   ii. *Proven mineral reserve* is the economically mineable part of a measured mineral resource and can only result from conversion of a measured mineral resource.

37.    These categories are shown below in order of increasing geological confidence:

| Mineral resources | Inferred |
|---|---|
| | Indicated |
| | Measured |
| Mineral reserves | Probable |
| | Proven |

38.    Under the SEC Mining Modernization Rules, registrants must file a summary of the technical report "as an exhibit to the relevant registration statement or other Commission filing

---

[3] "*Economically viable*, when used in the context of mineral reserve determination, means that the qualified person has determined, using a discounted cash flow analysis, or has otherwise analytically determined, that extraction of the mineral reserve is economically viable under reasonable investment and market assumptions."

when disclosing for the first time mineral reserves or mineral resources."
17 C.F.R. § 229.1302(b)(2)(i).

C.    **Gatos Develops CLG**

39.    Gatos (then known as Sunshine Silver Mines Corporation) was formed in 2011, backed by The Electrum Group LLC ("Electrum"), a New York-based investment firm focused on metals and mining.  Gatos was formed to explore and mine a property in Chihuahua, Mexico called the Los Gatos District.  Electrum principally funded Gatos through the exploration and development stages, including participating in private funding rounds in 2017 and 2019 before the IPO, and remains Gatos's largest shareholder today.

40.    Gatos's entire business is focused on the Los Gatos District.  Gatos (through a predecessor company) acquired rights to the Los Gatos District in April 2006, then obtained environmental permits for drilling, which began in 2008.

41.    Pyle was involved with CLG by 2008 and co-discovered the deposit.  During a March 18, 2021 virtual Investor Day, CEO Orr stated: "There's no person more qualified than Phil [Pyle] to speak about the Los Gatos district, because he was the co-discoverer of the district and has been involved in the project longer than any other manager in the company."  At the same event, Pyle stated that he had "over 13 years with the projects," spanning "the exploration stages," as well as "the feasibility study stage, the development stage and our production stage."

42.    Orr, Pyle, and Johnson joined Gatos in 2011, with Orr becoming CEO and Director, Pyle becoming Vice President of Exploration and Chief Geologist, and Johnson becoming CFO.  Kinyon joined in 2012 as Vice President of Operations (and later became Chief Operating Officer).

43.     On January 1, 2015, Gatos entered into a joint venture (the "LGJV") with Dowa

Metals and Mining Co., Ltd. ("Dowa"), a Japanese metals company, to develop the Los Gatos

District.  Dowa signed an earn-in agreement with Gatos to acquire a 30% interest in the project by

paying $50 million over two years.

44.     In 2011-2012 and 2017, Gatos commissioned technical reports and a feasibility

study regarding the Los Gatos District, focusing on CLG.  In connection with these reports, Tetra

Tech developed a resource model.

### D.    Production at CLG Commences, and Defendants Quickly Learn That the Existing Resource Model Is Unreliable

45.     Underscoring the importance of a reliable resource model, silver, lead, zinc and

other minerals at CLG exist in the form of narrow veins with highly variable size and orientation.

46.     Limited production at CLG began in November 2018, and on September 1, 2019,

CLG began commercial production.  By the end of 2019, over 357,000 tonnes had been mined.

47.     This production experience quickly demonstrated that the resource model for CLG

was inaccurate.  Before the 2020 Technical Report was issued, FE-2—the mine manager at CLG

from September 2017 to June 2022—repeatedly heard from colleagues and managers that the Tetra

Tech resource model was not accurate, with managers regularly questioning why ore was not being

found in the expected locations at CLG based on the Tetra Tech resource model.

48.     For example, when the Company first extracted ore in 2018, the orebody was not

where the model indicated, causing concern about the accuracy and consistency of the model

(FE-2).  There were recurring differences between the short-term and long-range plans for CLG,

due in part to the disparity between the Tetra Tech model and what was actually in the ground

(FE-2).  The information from the resource model did not match well with the Company's actual

mining experience, which complicated mine planning, reduced efficiency, and forced Gatos to mine from the top (highest elevation) down, contrary to the stated plan (FE-2).

49.     Similarly, FE-1, a process manager at CLG from January 2016 to September or October 2019, learned from multiple miners that in late 2018 or into 2019, the mining operations at CLG had reached certain areas underground with less ore than predicted.

50.     These issues were known in late 2018 or early 2019 to Gatos's senior executives, who received a robust flow of information about CLG's performance and were intimately involved in its operations.  Orr, Johnson, Pyle, and Kinyon regularly visited the CLG mine and, from at least 2016 to 2022, met with other senior Gatos personnel on a monthly basis (FE-1, FE-2).  Further, Pyle visited Chihuahua multiple times per month, and stayed for one to two weeks each visit, while Huerta (Vice President, Mexico) was based in Chihuahua and regularly visited the mine (FE-1).

51.     Gatos's monthly executive meetings were held in person in Chihuahua before COVID (FE-1, FE-2), and later held electronically via Microsoft Teams (and recorded beginning in early 2021) (FE-2).  Before COVID, the monthly meetings lasted two days, with the first day held at a hotel in Chihuahua, where each manager presented a progress report on his area of responsibility (FE-1).  The second day involved traveling to the CLG mine and reviewing the activity on site; the executives looked at core samples on every visit (FE-1).  Subjects covered in the meetings included construction progress, mining results, and costs (FE-1, FE-2).

52.     The monthly executive meetings also included PowerPoint presentations from various managers at the mine, which were circulated in advance by email, including to Orr, Johnson, Pyle, and Kinyon, for commentary (FE-1, FE-2).  Minutes were prepared for each meeting and signed by the executives in attendance (FE-1).

### E.     Gatos Hastily Procures the False 2020 Technical Report

53.     Silver prices began to rise sharply in the spring of 2020.  Despite the known unreliability of Tetra Tech's existing resource model, in July 2020, Gatos obtained the 2020 Technical Report from Tetra Tech.  As detailed below, not only did the 2020 Technical Report continue using the same techniques that made the prior resource model unreliable, but it was infected by additional errors.

54.     First, the 2020 Technical Report stated that it provided "a Resource update based on drilling that has been completed since the [feasibility study] was finished in 2017."

55.     In this regard, based on drilling at CLG through July 2019, core samples were analyzed to determine their mineral content.  According to the 2020 Technical Report, "Mineral Resources were estimated from 2,356 samples intersecting modeled veins, sourced from 426 diamond drill holes."

56.     This data was then used to construct a three-dimensional model of the underground veins using a geostatistical interpolation technique known as "Ordinary Kriging."  Linebarger would advise Gatos in January 2021 that Tetra Tech had improperly used Ordinary Kriging instead of an alternative method (FE-2), and this technique contributed to the overstatement of CLG's resources.  Ultimately, the resource model wrongly assumed that CLG was a consistent, uniform deposit, contrary to the actual deposit's veins of highly variable size and orientation.

57.     The modeled veins were then divided into measured, indicated, and inferred resources based on various criteria.  The resulting resource figures—with an effective date of September 6, 2019—are shown below:

| Classification | Tonnes | AgEq g/t | Ag g/t | Pb % | Zn % | Au g/t | Cu % | AgEq toz M | Ag toz M | Pb lbs M | Zn lbs M | Au toz K | Cu lbs M |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Measured | 5,774,314 | 652 | 324 | 2.9 | 5.8 | 0.39 | 0.11 | 121 | 60 | 375 | 744 | 72 | 13 |
| Indicated | 4,586,507 | 489 | 202 | 2.5 | 5.2 | 0.28 | 0.11 | 72 | 30 | 251 | 528 | 42 | 12 |
| **Measured and Indicated** | **10,360,822** | **576** | **269** | **2.7** | **5.5** | **0.34** | **0.11** | **193** | **90** | **626** | **1,272** | **114** | **25** |
| Inferred | 3,717,063 | 361 | 107 | 2.8 | 4.0 | 0.28 | 0.14 | 43 | 13 | 231 | 330 | 34 | 12 |

58. <u>Second</u>, the September 2019 resource information was used to calculate CLG's reserves. In this regard, the 2020 Technical Report stated that reserves are "the portion of the Measured and Indicated Resource that can be mined economically. Economic criteria and mining constraints (based on the selected mining methods) are applied to the Resource blocks to define mineable blocks. Mineral Reserves are determined after applying dilution and recovery factors to these mineable blocks."[4]

59. These calculations yielded 9,617,631 tonnes of reserves as of July 1, 2020, of which 6,360,890 tonnes—nearly two-thirds—were in the highest category of "Proven."[5]

| Classification | Tonnes | Ag (g/t) | Au (g/t) | Pb (%) | Zn (%) |
|---|---|---|---|---|---|
| **Proven** | **6,360,890** | **332** | **0.36** | **2.77** | **5.55** |
| **Probable** | **3,256,740** | **254** | **0.34** | **2.74** | **5.86** |
| **Proven + Probable** | **9,617,631** | **306** | **0.35** | **2.76** | **5.65** |

60. As stated in the 2020 Technical Report, Tetra Tech used an "updated mine plan . . . to calculate updated Reserves." This mine plan was provided by Gatos and purportedly verified by Tetra Tech: as the 2020 Technical Report explains, "[t]he mine plan has been generated by MPR [LGJV] staff and verified by Tetra Tech for the calculation of Reserves."

---

[4] Dilution is the amount of waste or low-grade mineralized rock that is mined together with the ore; recovery is the proportion of valuable material physically recovered.

[5] The reserve calculations excluded 655,746 tonnes of "material mined at the project since mining started in November 2018" through June 30, 2020.

61.     The Life of Mine plan that Tetra Tech used to calculate CLG's reserves was fatally flawed.  The Life of Mine plan was prepared under Pyle and Kinyon's supervision by Kenneth Angola (a Gatos mine planner from May 2019 to December 2020) (FE-2).  Angola used the Company's Deswik software to wrongly expand the area of ore and mineralization beyond the boundaries of the deposit from the Tetra Tech model, thereby attributing mineralization to the "waste blocks" that had no evidence of mineralization (FE-2).  This was directly contrary to both the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG.  This error resulted in a significant overstatement of reserves in the 2020 Technical Report (FE-2).  The error was especially large because the geology of the CLG mine was known to consist of long, thin vein-type deposits, meaning that the wrongly added "waste blocks" added proportionally large mineralization relative to the actual deposit (FE-2).

62.     Based on an economic analysis of the "Proven" and "Probable" reserves, in the Final 2020 Prospectus (defined below), Gatos claimed that the CLG mine would have a life of mine (LOM) of 11 years and yield 72 million ounces of silver, 679 million pounds of zinc, 442 million pounds of lead, and 45,500 ounces of gold.  Gatos further claimed that this volume and duration of metal production gave the CLG project a net present value (NPV) of $653 million.

**F.     The October 2020 IPO at $7.00/Share**

63.     Despite the known unreliability of the resource model and materially overstated 2020 Technical Report, Defendants Orr, Johnson, and Pyle decided to take Gatos public as silver

19

prices continued to increase in late 2020.  Orr alluded to this motivation in a discussion with

SmithWeekly Research,[6] stating:

> And over the last 10 years we've acquired a mineral rights package
> totaling over 103,000 contiguous hectares.  And on these mineral
> rights we've discovered 14 separate zones of mineralization. . . .
> And we were then able to construct and commission our first mine
> on one of these zones of the 14 we discovered, and that mine is
> called Cerro Los Gatos.  And we did all of this while remaining
> private for a decade.  Then, ***as interest in silver and silver equities
> began increasing, we decided this was the time to do a public
> listing***.

64.    Pursuant to a registration statement on Form S-1 (the "2020 Registration

Statement"), Gatos completed its IPO on October 27, 2020, offering 24,644,500 shares of common

stock at $7.00 per share and receiving total net proceeds of $156.1 million.  According to the

Company, this was the largest precious metals IPO in a decade.

65.    In the IPO, Gatos positioned itself as a production-stage mining company with

high-grade, proven reserves.  Based on the false 2020 Technical Report, the 2020 Registration

Statement claimed that CLG contained 14 million tonnes of resources (of which 10.4 million

tonnes were measured and indicated) and "9.6 million diluted tonnes of proven and probable

mineral reserves," comprised of "6.4 million diluted tonnes of proven mineral reserves" and "3.3

million diluted tonnes of probable mineral reserves."  Based on these overstated reserves, Gatos

stated that the CLG mine is expected to produce 12.2 million payable silver equivalent ounces

annually for 11 years, generating an after-tax free cash flow of approximately $76 million per year.

66.    Analysts praised the purportedly above-average quality and duration of the CLG

mine and explicitly valued Gatos based on CLG's stated resources and reserves.  For example, on

---

[6] https://www.youtube.com/watch?v=w4gL1Pxtbn4 (posted April 13, 2021).

November 23, 2020, RBC wrote that "[o]ur constructive outlook on Gatos reflects the above average quality of CLG," highlighting that "[i]n our view, Cerro Los Gatos is a higher-quality mine with above-average margins" and "mine life (11-year reserve life vs. ~7 years for primary silver mines)."  Similarly, on November 24, 2020, BMO wrote that "[i]n conjunction with the IPO, Gatos released an ***updated reserve/resource statement for Cerro Los Gatos, which forms the basis for our valuation***," noting the "***sizable reserve already established*** at Cerro Los Gatos" and indicating that "we view Cerro Los Gatos as a ***long-lived asset*** relative to other silver mines."

### G. December 2020:  Gatos First Reports Earnings as a New Public Company and Begins to Tout New Exploration

67.     The Class Period under the Exchange Act begins on December 9, 2020, when Gatos filed its quarterly report for the third quarter of 2020 on Form 10-Q (the "3Q2020 10-Q") and held a related investor earnings call.

68.     The 3Q2020 10-Q reiterated the false reserve figures from the 2020 Technical Report, stating that CLG "contains approximately 9.6 million diluted tonnes of proven and probable mineral reserves," with "approximately 6.4 million diluted tonnes of proven mineral reserves" and "approximately 3.3 million diluted tonnes of probable mineral reserves."

69.     In the 3Q2020 10-Q, Defendants Orr and Johnson certified that Gatos had "effective" disclosure controls and procedures, and that Gatos had not experienced any changes to its internal control over financial reporting "that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting."  Orr and Johnson also certified that the 3Q2020 10-Q "fairly presents in all material respects the financial condition, results of operations and cash flows" of the Company, and that they had disclosed all significant

21

deficiencies and material weaknesses in internal controls, and any fraud. Orr and Johnson would repeat these certifications each quarter throughout the Class Period.

70.    On the December 9, 2020 earnings call (the "3Q2020 Earnings Call"), CEO Orr highlighted the results that the Company had achieved from operating the CLG mine. Orr stated: "The metal recoveries have been excellent. Silver is almost exactly at the expected recovery from [the] feasibility study. Zinc is slightly above the feasibility study expectation and lead is actually 2% higher," adding that "we've been very pleased with the ore grades that we're getting out of the underground mine now."

71.    Defendants also sought to promote new exploration to demonstrate additional upside to the market—a crucial objective given that Gatos's existing resources and reserves were materially overstated.

72.    To that end, on December 16, 2020, Gatos issued a press release titled "Gatos Silver Announces Initiation of Exploration Drilling in the Los Gatos Region," which stated that Gatos was initiating a new drilling program at CLG to "convert a substantial portion of the current inferred resources to M&I and discover additional inferred resources. Once completed, the Company intends to incorporate the additional M&I resources into a new mine plan that will increase the proven and probable reserves and further support a possible expansion of Cerro Los Gatos' production rate from 2,500 tpd to 3,000 tpd." In the press release, Orr stated that "[w]e are looking forward to deploying a portion of Gatos Silver's recently raised funds to continue building upon our exploration success through identifying additional areas of mineral endowment and further upgrading the existing resource inventory." These statements misleadingly omitted the crucial fact that the existing 2020 Technical Report was materially overstated and false.

73.    With apparently strong production results and promising exploration work under way, by December 31, 2020, Gatos's share price reached $13.03 per share—nearly double its IPO price of $7.00/share just two months earlier.

**H.    After Being Expressly Told of the Errors, Defendants Deliberately Decide Not to Disclose Them**

74.    In parallel to these developments, Gatos was specifically advised of errors in the 2020 Technical Report.

75.    The errors in the Life of Mine plan provided to Tetra Tech also affected an updated mine plan Gatos was preparing (FE-2). Before the October 2020 IPO, FE-2 and other Gatos personnel identified errors in the updated mine plan, including an overstated amount of zinc, and Angola admitted that he had used the wrong formula (FE-2). In December 2020, Angola abruptly resigned, leaving his computer and belongings at the CLG mine (FE-2). By the end of 2020, Kinyon, Huerta, FE-2 and others at Gatos exchanged emails discussing whether Angola's errors affected the 2020 Technical Report (FE-2).

76.    In January 2021, Gatos secretly engaged an outside consultant, David Linebarger, to conduct an independent review (FE-2). In his January 2021 report, Linebarger identified several errors in the updated mine plan (FE-2). Further, Linebarger determined that there was an error in the 2020 Technical Report, such that the actual reserves were 20 percent less than the 2020 Technical Report represented, including because Angola had used the Deswik software to wrongly expand the area of ore and mineralization beyond the boundaries of the deposit (FE-2). In this regard, the report indicated that Linebarger had verified his conclusions with a senior representative from Deswik (FE-2). Linebarger also indicated that Tetra Tech had improperly used Ordinary Kriging instead of an alternative method (FE-2).

77.     Gatos's senior management—including Orr, Johnson, Pyle, and Kinyon—was quickly briefed on the errors in the 2020 Technical Report.  In January 2021, Linebarger emailed his report to Pyle, Kinyon, and Huerta (and FE-2), and Pyle, Kinyon, and Huerta (with FE-2) participated in conference calls, with and without Linebarger, to discuss the report (FE-2).  Kinyon and Pyle met with Orr and CFO Johnson to update them on the errors, and in January 2021, Johnson was also copied on emails about the errors in the 2020 Technical Report (FE-2).

78.     Further, Gatos quickly confronted Tetra Tech about the errors.  In January or February 2021, after Linebarger identified the 20 percent error, Gatos held a conference call with Tetra Tech (FE-2).  The participants included Kinyon, Pyle, Huerta, and FE-2 from Gatos, Linebarger, and Dante Ramirez-Rodriguez and Kira Johnson from Tetra Tech (FE-2).  Gatos had emailed Tetra Tech a copy of Linebarger's report in advance (FE-2).  During the call—which did not go well—the Gatos managers relayed Linebarger's findings and challenged the errors in the 2020 Technical Report; Tetra Tech verified that the error existed (FE-2).  Further calls between Tetra Tech, Huerta, Kinyon, and Pyle occurred thereafter, including a call the next day that was scheduled to include Pyle and Kinyon (FE-2).

79.     Despite Linebarger's findings and Gatos's extensive internal discussion of the errors, Defendants did not disclose the truth to investors:  that the 2020 Technical Report contained an error of at least 20 percent.

80.     Instead, Defendants made a deliberate decision to hide the truth from the market and not disclose the known overstatements and errors.  In this regard, in January 2021, after receiving Linebarger's report, Pyle, Kinyon, Huerta, and FE-2 held a conference call, and Huerta

followed up with an email to the same group urging immediate disclosure of the errors in the 2020 Technical Report, and Kinyon responded by email that the Company would not do so (FE-2).

81.     Defendants were highly motivated to conceal the truth because they hoped that new exploratory drilling would yield additional resources and reserves to offset the impact of the known overstatements.  To that end, Orr, Johnson, Pyle, and Kinyon decided to attempt to offset the errors in the previously disclosed resources and reserves by adding new, positive data from drilling that was not included in the 2020 Technical Report (FE-2).  Their goal was to allow Gatos to add additional data in hopes of avoiding a major drop in share price (FE-2).

82.     This deliberate decision to conceal known, material errors and misstatements was unlawful and went far beyond mere mismanagement.  As detailed below, while knowing about the errors in the 2020 Technical Report, Defendants publicly confirmed and reiterated the false resource and reserve figures, falsely claimed that the resource model used in the 2020 Technical Report was "very reliable," and misleadingly touted positive results of further drilling.

83.     Further, staying silent was not an option because SEC regulations explicitly required Gatos promptly to disclose that the 2020 Technical Report was overstated and false.

84.     The SEC Mining Modernization Rules require disclosure "***when there is a material change*** in the mineral reserves or mineral resources from the last technical report summary filed for the property," 17 C.F.R. § 229.1302(b)(2)(i), or when a previously filed technical report "is not current" with respect to "[a]ll material assumptions and information pertaining to the disclosure of a registrant's mineral resources and mineral reserves."  17 C.F.R. § 229.1304(f)(2).  In failing to disclose the known misstatement of resources and reserves, Gatos violated these explicit requirements.

25

85.     Moreover, Item 303 of SEC Regulation S-K required Gatos to disclose known trends or uncertainties that have had, or that Gatos reasonably expects will have, a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. Even if Defendants had not fully quantified the errors or the exact magnitude of the 2020 Technical Report's overstatement, at minimum, disclosure was required because the 20 percent error that Linebarger identified in January 2021 was a known uncertainty that Gatos reasonably expected would have a material unfavorable impact on the Company's revenues, net sales, and income.

**I.      March 2021:  Gatos Files Its First 10-K; at Investor Day, Defendants Confirm CLG Production Is on Track**

86.     Defendants' scheme required them to continue assuring the market that the 2020 Technical Report remained valid and to report steady production results, while periodically revealing positive information about new exploration.

87.     On March 18, 2021, Gatos held a virtual Investor Day where Pyle gave a lengthy presentation.  Pyle assured investors that the Company had accurately modeled the CLG deposit, stating that "during the construction of the exploration decline[,]" Gatos "did [further] drilling to better confirm the actual location of mineralization and sure enough ***it was spot-on from the model Tetra Tech created for us***…. ***The only surprise was it, it was a little bit higher grade than what we had projected it to be***."  Pyle also emphasized the mining work to date, declaring that "[w]e have over 16 kilometers of underground workings" and "we've been mining since November 2018, so we've got about 2.5 years of mining behind us."  In making these positive statements, Pyle made no mention of the fact that when Gatos first extracted ore, the actual location of the orebody was not where the model indicated.  Nor did Pyle reveal that he had already been advised

that the 2020 Technical Report contained an error of 20 percent, or that he had personally confronted Tetra Tech about the issue.

88.    Consistent with the Company's strategy of attempting to offset the known overstatements of resources and reserves, Pyle also promoted Gatos's ongoing exploration with the goals of (a) upgrading inferred resources into measured and indicated resources, and (b) upgrading resources into reserves. He proclaimed that "we'll be able to create more reserves, based on the drilling that we've [sic] already taken place." Further, with reference to the ten years that purportedly remained in CLG's LOM, Pyle declared that "***I'm sure that we'll have additional mineralization [that] will take it out well beyond 10 years***. . . . I tell people that I can never retire because I've got exploration programs for years in advance within this district."

89.    On March 29, 2021, Gatos filed its first annual report on Form 10-K for the year 2020 (the "2020 10-K") and held an earnings call. Gatos's 2020 10-K falsely reiterated, based on the 2020 Technical Report, that the CLG mine contains "9.6 million diluted tonnes of proven and probable mineral reserves," including 6.4 million tonnes of "proven mineral reserves."

90.    Crucially, the 2020 10-K also stated that "We believe that activity at the CLG subsequent to the effective date of the mineral resource estimates [September 6, 2019] would not result in a material change to the information contained in the Los Gatos Technical Report." This statement was outright false because Gatos's most senior executives knew at the time that the 2020 Technical Report contained an error of at least 20 percent. As a result, there was no basis to claim that activity since September 2019 "would not result in a material change" to the 2020 Technical Report's resource and reserve figures. The failure to disclose the known, material error also violated the SEC requirements to disclose "a material change in the mineral reserves or mineral

resources" and disclose when a previously filed technical report "is not current" with respect to "[a]ll material assumptions and information pertaining to" resources and reserves.

91.     During the March 29, 2021 earnings call, Orr declared that Gatos "achieved record silver, zinc and lead recoveries through the processing plant, and the third and fourth quarters of 2020 were profitable."  Further, Orr noted that metal recoveries had improved:  "The silver recovery now exceeds the expected recovery from the feasibility study, zinc recovery has achieved our expectations and lead recovery also now has exceeded expectations."

**J.     Knowing about the Materially False Resources and Reserves, Defendants Boost Gatos's Share Price with New Exploration**

92.     In contrast to their deliberate decision to conceal the known overstatements in CLG's existing resources and reserves, throughout the first half of 2021, Defendants repeatedly touted promising new exploration and the prospect of further resources and reserves:

- March 11, 2021:  Gatos issued a press release titled "Gatos Silver Commences Drilling at Its 100% Owned Santa Valeria Project"; Orr stated that this was "another strategic milestone" and emphasized "the extensive geologic understanding accumulated over the past decade at Cerro Los Gatos."

- April 15, 2021:  Gatos issued a press release titled "Gatos Silver Extends Mineralization at Cerro Los Gatos," reporting on a new "90-hole campaign" that was "focused on converting inferred resources in the SE and NW zones along strike of the CLG deposit."  Orr stated:  "The early drill results from the reactivated definition drilling program are extremely encouraging and demonstrate continuity in both the SE and NW from the CLG reserve. The discovery of a new SE zone vein also indicates that metal grades are increasing at depth."

- May 7, 2021:  Gatos filed its Form 10-Q for the first quarter of 2021 (the "1Q2021 10-Q"), filed a related Form 8-K, and held an investor earnings call.  The 1Q2021 10-Q repeated the false resource and reserve figures from the 2020 Technical Report and stated that another 209,832 tonnes of reserves had been mined for the three months ended March 31, 2021.  In the May 7, 2021 press release, Orr stated that the CLG mine was "performing above expectation as development during Q1 allowed CLG to access higher grade ore zones, yielding above budget metal production and revenue."  The press release further stated that the LGJV was "successfully converting the 3.7 million tonnes of inferred resource" at CLG "to measured and indicated," and

that the results of new drilling "will be incorporated into the CLG resource model and a new mine plan by early 2022."

93.     The litany of positive public statements boosted Gatos's share price and set the stage for highly profitable insider stock sales, as detailed below.

94.     In addition, Orr vigorously defended the resource model used in the 2020 Technical Report, despite knowing at the time that it produced overstated and false results.  During the Company's May 7, 2021 earnings call (the "1Q2021 Earnings Call"), a BMO analyst asked about the grade of production in Q2 versus Q1, and "the trend through the next couple of quarters here and even into 2022."  Orr responded that "[n]ow that we are into those higher grade areas, ***the grades are pretty much exactly what the resource model said they would be***. So I mentioned we were – for the month of April, we were 331 grams per tonne, and that's exactly where we expected that we would be."

95.     The BMO analyst further inquired about whether "the lower grade areas" were also "reconciling well to the model."  Orr confirmed the accuracy of the model, stating that "***we actually did a reconciliation to the resource model for all of the mining we did in 2020.***  And interestingly enough, we actually ended up mining more silver than the resource – modestly ***more*** silver than the resource model indicated…. [T]he takeaway for us was that the resource is turning out – ***our calculation is turning out to be very reliable, which is terrific news***."  At the time of this May 7, 2021 statement, Orr knew of the errors in the 2020 Technical Report (FE-2).  By this point, Linebarger had advised Gatos in writing of a 20 percent error, the Company had raised the issue with Tetra Tech, and Orr was receiving internal updates from Kinyon and Pyle about the error.

96.     With no reason to question Orr's declaration that the resource model was "very reliable," analysts praised Gatos's positive production results.  On May 7, 2021, BMO increased

its price target on Gatos from $10.00 to $11.50, writing that the "outlook for Q2 is looking better, with grades showing improvement in April and early May," and "[w]e have increased our grade expectations going forward to align production/costs with full-year guidance." On May 27, 2021, Canaccord Genuity initiated coverage with an $18.50 price target, noting that "April 2021 was reported to be the best [month] to date, with 2,620tpd mined and a record monthly silver grade of 331g/t Ag. During the Q1/21 earnings call, management noted that May was off to a comparable start, with a similar outlook for the remainder of the year."

97.     On May 13, 2021, Gatos issued another positive press release claiming "additional mineralization [at CLG] both on the Southeast ("SE") and Northwest ("NW") extensions of the deposit beyond the present reserve blocks," as well as "the commencement of drilling at the CLG's Esther zone." Orr praised the findings and stated that "[w]e expect to issue an updated NI 43-101 resource report in the first quarter of 2022."

98.     Buoyed by these statements, Gatos's share price continued to climb, increasing 16.19% on May 15, 2021 alone. By May 28, 2021, Gatos's share price reached $17.04.

**K.    In May and June 2021, Chief Geologist Pyle and Huerta Make Massive Insider Sales and Reap Large Profits**

99.     Having successfully boosted Gatos's share price to record highs, on May 11, 2021, Chief Geologist Pyle and Huerta (Vice President, Mexico) began for the first time to sell their Gatos common stock. During a compressed one-month period, these insiders reaped large profits by exercising nearly 200,000 stock options at below-market prices and immediately selling the shares at market prices inflated by Defendants' misstatements and omissions.

100.     Specifically, from May 11, 2021 through June 14, 2021, Pyle and Huerta collectively sold 191,390 shares of Gatos common stock for $3.35 million and reaped over $1.91 million in profits.  These highly profitable sales occurred near Gatos's all-time peak share prices.

101.     These insider sales are especially remarkable because both Pyle and Huerta had direct knowledge of the errors and overstatements in the 2020 Technical Report.  Both had personally received Linebarger's report and participated in the calls with Tetra Tech.  They were also at the center of Defendants' plan to conceal the known errors and overstatements.  In January 2021, Huerta emailed Pyle and Kinyon to urge the immediate disclosure of the errors in the 2020 Technical Report, and Kinyon responded by email that the Company would not do so.  After this email exchange, Huerta and Pyle knew they had an opportunity to line their own pockets by selling shares at inflated prices before the truth was revealed.

102.     The sales were also unusual and inconsistent with the executives' normal trading patterns:  before these sales, neither had exercised any Gatos options or sold any shares since the IPO, and after June 14, 2021, neither did so again.  Further, none of the sales were conducted through a Rule 10b5-1 insider trading plan, which may have required sales at a predetermined time.  Instead, these sales were entirely discretionary.

103.     Further, had Defendants timely disclosed the material event that had occurred by January 2021 (Linebarger's report of a material error in the 2020 Technical Report), they would not have been able to sell any shares.  Specifically, Gatos indicated that its "executive officers" had "signed lock-up agreements for a period of 180 days following the [October 27, 2020] date of this prospectus, subject to extension in the case of an earnings release or material news or a material event relating to us."  Accordingly, by concealing the "material event" concerning the 2020

Technical Report, Pyle and Huerta ensured that the lock-up period would expire in April 2021, allowing them to sell shares at a profit while Gatos's share price remained artificially inflated.

104.    Each executive's insider transactions in Gatos common stock between the IPO and the end of the Class Period, and the resulting proceeds and profits, are set forth below:[7]

**Philip Pyle (Chief Geologist):  Insider Transactions in Gatos Common Stock**

| Date | Acquisition (A)/Option Exercise (O)/Sale (S) | Shares Sold or (*Acquired*) | Share Price | Sale Proceeds or (*Acquisition Cost*) | Remaining Shares and Vested Options |
|---|---|---|---|---|---|
| 10/30/2020 | A | 8,464 | $ 5.60 | $ (47,398.40) | 381,344 |
| 5/11/2021 | O | 15,000 | $ 7.00 | $ (105,000.00) | 381,344 |
| 5/11/2021 | S | (15,000) | $ 12.03 | $ 180,450.00 | 366,344 |
| 5/24/2021 | O | 10,000 | $ 7.00 | $ (70,000.00) | 366,344 |
| 5/24/2021 | S | (10,000) | $ 15.59 | $ 155,900.00 | 356,344 |
| 6/10/2021 | O | 58,334 | $ 7.00 | $ (408,338.00) | 356,344 |
| 6/10/2021 | S | (58,334) | $ 19.31 | $ 1,126,429.54 | 298,010 |
| 6/14/2021 | O | 26,971 | $ 7.00 | $ (188,797.00) | 298,010 |
| 6/14/2021 | S | (26,971) | $ 18.09 | $ 487,905.39 | 271,039 |

| | |
|---|---|
| **Total Shares Sold** | **110,305** |
| **Gross Sale Proceeds** | **$ 1,950,684.93** |
| **Shares Sold as a % of Total Shares and Vested Options** | **29%** |
| **Estimated Total Realized Profits** | **$ 1,178,549.93** |

---

[7] These transactions are drawn from the Forms 3 and 4 that each insider filed with the SEC. Huerta's initial holdings and option exercise prices, reported on Form 3 on October 27, 2020, were adjusted to account for the Company's 1-for-2 reverse stock split effected on October 30, 2020, as reported on the Form 4 for Pyle filed on October 30, 2020.  All "Remaining Shares and Vested Options" figures exclude options with exercise prices above market prices.

**Luis Felipe Huerta (Vice President, Mexico): Insider Transactions in Gatos Common Stock**

| Date | Acquisition (A)/Option Exercise (O)/Sale (S) | Shares Sold or (Acquired) | Share Price | Sale Proceeds or (Acquisition Cost) | Remaining Shares and Vested Options |
|---|---|---|---|---|---|
| 5/25/2021 | O | 300 | $ 7.00 | $ (2,100.00) | 120,535 |
| 5/25/2021 | S | (300) | $ 16.63 | $ 4,989.00 | 120,235 |
| 5/27/2021 | O | 19,700 | $ 7.00 | $ (137,900.00) | 120,235 |
| 5/27/2021 | O | 15,785 | $ 7.00 | $ (110,495.00) | 120,235 |
| 5/27/2021 | O | 300 | $ 9.00 | $ (2,700.00) | 120,235 |
| 5/27/2021 | S | (35,785) | $ 16.15 | $ 577,927.75 | 84,450 |
| 6/3/2021 | O | 11,632 | $ 9.00 | $ (104,688.00) | 84,450 |
| 6/3/2021 | S | (11,632) | $ 16.63 | $ 193,440.16 | 72,818 |
| 6/7/2021 | O | 20,568 | $ 9.00 | $ (185,112.00) | 72,818 |
| 6/7/2021 | O | 12,800 | $ 9.00 | $ (115,200.00) | 72,818 |
| 6/7/2021 | S | (33,368) | $ 18.61 | $ 620,978.48 | 39,450 |

| | |
|---|---|
| **Total Shares Sold** | **81,085.00** |
| **Gross Sale Proceeds** | **$ 1,397,335.39** |
| **Shares Sold as a % of Total Shares and Vested Options** | **67%** |
| **Estimated Total Realized Profits** | **$ 739,140.39** |

**L.    Andres Joins Gatos and Advances the Company's Internal Probe of the Errors**

105.    On June 1, 2021, Gatos announced that Dale Andres had joined the Company as President, effective June 1, 2021. Gatos's press release praised Andres as "one of the Americas' most accomplished mining executives."

106.    Andres continued Gatos's internal probe into the 2020 Technical Report's errors and overstated resources and reserves. In June or July 2021, Gatos engaged Stantec to update the 2020 Technical Report (FE-2). Together with Roberto Lira (Gatos's new mine planner, who

replaced Angola), Candy Martinez (Database Administrator), and FE-2, Andres attended an

October 2021 meeting at the Stantec office in Chandler, Arizona where Stantec corroborated

Linebarger's finding that there was a 20 percent error in the 2020 Technical Report (FE-2). While

Stantec had started work by June or July 2021, Gatos would not publicly reveal their involvement

until January 25, 2022, when Gatos issued a press release stating that "independent engineering

consultants" were reviewing the overstatement of resources and reserves.

107.    Internally, together with Tony Scott (Vice President, Evaluations and Technical

Services), Andres calculated that Gatos faced a potential reduction in reserves of 30% to 50%, as

Gatos finally disclosed on January 25, 2022 (FE-2).

> ### M.    Gatos Conducts a Second Offering in July 2021 at
> $14.00/Share, Double the IPO Price

108.    By July 2021, with Gatos's share price near its all-time peak, Defendants—while

knowing that Gatos had materially overstated its resources and reserves—seized the opportunity

to raise additional capital from the public markets through a new stock offering

(the "July 2021 Offering").

109.    To prime the pump, on July 7, 2021, Gatos released positive second-quarter

production results. The Company's press release claimed "strong operating performance in Q2 at

the CLG mine which produced a quarterly record of 240,047 ore tonnes." CEO Orr praised the

"excellent Q2 performance" and "record metals production," stating that "[m]ine development

during Q2 accessed the expected higher-grade ore forecast to be mined during 2021 and the plant

production averaged a record 2,535 tonnes per day, above the design capacity of 2,500 tonnes per

day. Record recoveries for silver, lead and zinc achieved in the quarter were also well above

design." Analysts praised these results, with CIBC citing a "positive update for the company" and

RBC stating that "CLG delivers on all fronts in 2Q," citing results "well above our forecasts" and noting the "expected higher grade ore starting to be delivered from the mine."

110.    On July 12, 2021, Gatos filed its registration statement on Form S-1 (the "2021 Registration Statement"), which was declared effective on July 15, 2021. The 2021 Registration Statement incorporated the false 2020 Technical Report and Gatos's 2020 10-K, 1Q2021 10-Q and several Forms 8-K. As a result, it included the same materially false and misleading statements and omissions as the 2020 Registration Statement, as well as further misstatements, including the false statement that "activity at the CLG subsequent to the effective date of the mineral resource estimates would not result in a material change to the information contained in the Los Gatos Technical Report." The facts known to Defendants at the time showed the exact opposite: the 2020 Technical Report contained an error of at least 20 percent.

111.    In the July 2021 Offering, Gatos offered over 9.2 million shares, priced at $14.00/share, and raised over $118 million in net proceeds.

112.    In the wake of the July 2021 Offering, RBC raised its price target on Gatos from $15.00 to $18.00 and upgraded the Company to "Outperform," praising the "increased flexibility to accelerate exploration and expansion plans following the recent equity financing and expected debt retirement," while Canaccord Genuity raised its price target from $18.50 to $20.00.

## N.    Gatos Continues to Claim Strong Production Results and Reiterates Its Resources and Reserves; COO Kinyon Abruptly Departs

113.    After the July 2021 Offering, Gatos continued to affirm its resources and reserves to investors. On August 9, 2021, Gatos filed its Form 10-Q for the second quarter of 2021 (the "2Q2021 10-Q"), filed a related Form 8-K, and held an earnings call. The 2Q2021 10-Q

reiterated the false resources and reserves from the 2020 Technical Report, while the press release included in the Form 8-K noted that the quarter marked a "substantial improvement in the profitability of the LGJV." Indeed, Gatos reported $18.3 million in equity income from the LGJV in the quarter—a $26.4 million improvement compared to the $8.1 million loss Gatos reported in 2Q2020.

114. During the August 9, 2021 earnings call, CEO Orr emphasized the "integrity" of CLG: "Now that Cerro Los Gatos is performing, now that the deposit is performing, I think it's given the market a great deal of confidence in the integrity of the asset itself." Orr also continued to promote the new drilling program, stating that "we're having such good success converting the remaining 3.7 million tonnes inferred resource into measured and indicated [resource]," and that "[i]n the second half of this year [2021], we will be completing a new resource model and life-of-mine plan update." Orr made no mention of the fact that the Company's existing resources, reserves, and life of mine were materially overstated and false.

115. Analysts praised the results in this apparently successful quarter. RBC wrote on August 9, 2021 that "Gatos remains our top pick among silver-focused producers," highlighting "very strong" operating results. Canaccord Genuity cited a "notable improvement in all metrics" quarter on quarter and reiterated its $20.00 price target.

116. On August 10, 2021, the day after releasing second-quarter results, Gatos issued another positive press release on exploration, titled "Gatos Silver Continues to Extend Cerro Los Gatos Mineralization and Confirm Continuity of the Esther Deposit," which reported results from 21 additional drill holes and assays.

117.    On August 16, 2021, Gatos announced the departure—effective immediately—of COO Kinyon, who had personally overseen the management of the CLG mine.  Gatos's press release offered no reason for Kinyon's abrupt departure, and stated that the LGJV operations would now "report directly to Dale Andres, President of the Company."   In reality, Kinyon was terminated at Andres's urging (FE-2).   Confirming that Kinyon's departure from Gatos was involuntary, his separation agreement was not executed until September 1, 2021, two weeks later.

118.    On November 8, 2021, Gatos filed its Form 10-Q for the third quarter of 2021 (the "3Q2021 10-Q"), with a related Form 8-K, and held an earnings call.  The 3Q2021 10-Q reiterated the 2020 Technical Report's false reserve figures.   During the November 8, 2021 earnings call, Orr reported that the Company's exploration program was "converting the remaining 3.7 million tonnes of inferred resource that exists along the northwest and southeast extensions of the Cerro Los Gatos deposit" and "will most likely extend into early 2022."

119.    On November 15, 2021, Gatos filed a "shelf" registration statement on Form S-3 for an offering of up to $500 million in common stock, preferred stock, debt, warrants, and other securities.  While the registration statement was deemed effective on November 24, 2021, none of these securities would be issued.

O.    **As Production Continues, the Materially False Reserves and LOM Lead to Materially Understated Expenses and Materially Overstated Net Income in Violation of GAAP**

120.    The 2020 Technical Report's overstated reserves and LOM led Gatos to materially misstate expenses and net income (profit) for over two years in violation of U.S. GAAP.  The impact of these misstatements increased over time as production continued at CLG.

121.    Given its materially false financial statements, Gatos has publicly admitted that it is "reviewing the financial statement impact of a revision in its mineral resources and reserves" and "may be required to restate its financial statements" for "prior periods."  Under ASC 250-10-20, a restatement is the revision of "previously issued financial statements to reflect the correction of an error in those financial statements."  Restatements mean that the prior financial statements contained a material error, such as the incorrect application of GAAP or the "oversight or misuse of facts that existed at the time the financial statements were prepared."  (*Id.*)

122.    As background, Gatos's SEC filings contained (a) financial statements for the LGJV and (b) financial statements for Gatos, which reported Gatos's share of the LGJV's activities using the "proportional consolidation" method.  The LGJV was Gatos's sole source of revenue during the Class Period, and in turn, the LGJV's revenue was wholly dependent on the CLG mine.

123.    Driven by the errors in the 2020 Technical Report, depletion and depreciation expenses and resulting income were materially misstated at both the LGJV and Company levels.  Specifically, for the period from 2019 to Q3 2021, Gatos understated expenses by up to *89%* and, as a result, misstated net income (loss) by up to *848%* at the LGJV level and up to *48%* at the Company level.  These GAAP violations presented investors with a materially false picture of Gatos's actual financial condition, as detailed below.

124.    **Overstated Reserves Led to Understated Depletion Expense:**  Once a mine establishes proven and probable mineral reserves, GAAP allows the mine to capitalize subsequent development costs, such as costs to build access ways, shafts, and other infrastructure.  These subsequent development costs are recorded as assets on the balance sheet.  Depletion expense reduces the capitalized development costs as the reserves are extracted from the mine.

125.     Proper accounting for depletion expenses is critical to a mine's financial statements. Mine development costs became the most significant asset on the LGJV's balance sheet, constituting $203 million of its total assets of $469 million as of December 31, 2020.

126.     Gatos applied the units of production method to calculate depletion expense.  The units of production method calculated depletion expense based on the volume of mineral reserves processed each reporting period divided by the total estimated proven and probable reserve tonnes. Gatos stated that upon the commencement of production at the CLG mine on September 1, 2019, "capitalized development costs would be depleted on the units of production basis determined by the proven and probable mineral reserves for [the] project."

127.     Thus, depletion expense in a given period equals (a) capitalized development cost multiplied by (b) the units-of-production ratio (production in that period divided by total proven and probable reserves).  This formula is shown below:

$$\text{Depletion Expense} = \text{Development Cost} \times \frac{\text{Units Produced}}{\text{Reserves}}$$

128.     For example, if a company had $200 million in development costs, extracted 1 million tonnes in the first year of production, and had 10 million tonnes of reserves, its depletion expense for the year would be $20 million:

$$\$20 \text{ million Depletion Expense} = \$200 \text{ million Development Cost} \times \frac{1 \text{ million Units Produced}}{10 \text{ million Reserves}}$$

129.     The denominator in this formula—the proven and probable reserves—is crucial because overstatements of reserves cause depletion expense to be understated.  In the example above, if actual reserves were 6 million tonnes (rather than 10 million), actual depletion expense in the first year would be $33.3 million (not $20 million)—about 67% higher:

$$\text{\$33.3 million Depletion Expense} = \text{\$200 million Development Cost} \times \frac{\text{1 million Units Produced}}{\text{6 million Reserves}}$$

130.    Here, based on the false 2020 Technical Report, Gatos incorrectly used 9.6 million

tonnes as the denominator to report its financial results from 2019 through 2021—substantially

larger than CLG's actual proven and probable reserves during those periods.

131.    The overstatement of reserves caused Gatos to materially understate the LGJV's

depletion expense.  The table below shows the LGJV depletion expense Gatos reported from 2019

to Q3 2021:[8]

| LGJV Depletion Expense | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| *$s in millions* | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Total** |
| Depletion Expense | $7.3 | $5.0 | $4.1 | $5.0 | $5.0 | $4.9 | $5.7 | $5.7 | $42.7 |

132.    Gatos's January 25, 2022 press release indicates an expected reduction of 30% to

50% of the remaining metal content, resulting in proven and probable reserves of between 5.4 and

7.1 million tonnes as of the date of the 2020 Technical Report.[9]

133.    Correcting the denominator in the depletion expense formula to 5.4 to 7.1 million

tonnes shows that Gatos materially understated the LGJV's depletion expense by as much as $19.0

---

[8] Gatos reported the LGJV's depletion expense (a) on a standalone basis annually for 2019 and 2020, and (b) together with depreciation expense (described below) in its quarterly financial statements.  Depletion expense was 47% and 43% of total depletion and depreciation expense in 2019 and 2020.  This table uses the 43% figure and Gatos's quarterly disclosures of the tonnes mined or milled (processed) to calculate quarterly depletion expense for 2020, and calculates quarterly depletion expense for 2021 using 45%, the midpoint of 2019 and 2020 reported depletion expense.  For recalculating depreciation expense (described below), the remaining expense is treated as depreciation.

[9] The 2020 Technical Report claimed 9.6 million tonnes of proven and probable reserves, and Gatos depleted 1.3 million of this amount from July 1, 2020 through December 31, 2021, leaving 8.3 million tonnes purportedly remaining.  Reducing this figure by 30% to 50%, and adding the 1.3 million tonnes already mined, yields the corrected reserve figure of 5.4 to 7.1 million tonnes.

million to $37.8 million from 2019 through Q3 2021, meaning that actual depletion expenses were

as much as *44% to 89%* higher than the $42.7 million total reported over this period.

134.    With a 30% reduction in reserves (to 5.4 million tonnes), the impact of the error by

quarter is as follows:



135.   With a 50% reduction in reserves (to 7.1 million tonnes), the impact of the error is:



136.   **Overstated Life of Mine Led to Understated Depreciation Expense:**   The LGJV's property, plant, and equipment (PPE) constitute one of its most significant assets.   As of December 31, 2020, PPE was approximately 42% of the LGJV's total assets—approximately $197 million.   PPE consists primarily of infrastructure and improvements and plant and equipment.

137.   Gatos stated in the 2020 10-K that the LGJV's PPE was being depreciated, at least in part, based on the "end of the proven and probable reserves mine life."

138.   The relationship between depreciation and life of mine (LOM) is shown below:

$$\text{Depreciation in period} = \frac{\text{Property, plant, and equipment}}{\text{Life of Mine (in years)}}$$

139.   Overstatements of LOM—the denominator in the formula above—understate depreciation.

140.    Here, the 2020 Technical Report falsely indicated an 11-year LOM for CLG. However, CLG's actual LOM is substantially shorter—in the range of six to eight years, based on Gatos's January 25, 2022 press release.  That is because the 11-year LOM was based on 9.6 million tonnes of reserves and the extraction of about 873,000 tonnes per year.  Using the same extraction rate, reducing reserves to 5.4 to 7.1 million tonnes eliminates 2.85 to 4.75 years from the LOM. Similarly, on January 26, 2022, analysts at CIBC and RBC calculated LOM reductions of three to five years.

141.    The overstatement of LOM caused Gatos to materially understate the LGJV's depreciation expense.  The table below shows the LGJV depreciation expense Gatos reported from 2019 to Q3 2021:[10]

| LGJV Depreciation Expense | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *$s in millions* | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Total** |
| Depreciation Expense | $8.2 | $6.7 | $5.5 | $6.8 | $6.8 | $6.0 | $7.0 | $7.0 | $54.0 |

---

[10] These figures use Gatos's reported quarterly depletion and depreciation expense and remove the depletion component described above.

142.    The chart below illustrates the understatement of the LGJV's depreciation expense using the midpoint of the revised LOM range (seven years).



143.    In total, from 2019 to Q3 2021, Gatos materially understated the LGJV's depreciation expense by as much as approximately $30.1 million, meaning that actual depreciation expense was as much as **56%** higher than the $54.0 million reported over this period.

144.    **Understated Expenses Inflated Net Income (Profits):**  By understating both depletion and depreciation expense in violation of GAAP, Gatos falsely inflated net income (profit) or decreased net loss.

145.    At the LGJV level, net income/loss was impacted on a dollar-for-dollar basis.  For example, in Q2 2020, the LGJV's depletion expense was understated by as much as $3.6 million, while depreciation expense was understated by as much as $3.1 million, for a total of up to

$6.7 million in understated expenses. This $6.7 million understatement in expenses falsely

decreased the LGJV's Q2 2020 net loss from $21.2 million to $14.5 million, in violation of GAAP.

146. The table below corrects the LGJV's reported net income/(loss) for the depletion

and depreciation expense errors:

| Errors in LGJV Net Income/Loss | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *$s in millions* | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Total** |
| LGJV Reported Income/(Loss) | ($22.1) | ($23.9) | ($14.5) | $7.8 | $2.9 | $6.9 | $29.3 | $5.5 | ($8.1) |
| Corrected Income/(Loss) [30% Reduced Reserves and 7-year LOM] | ($30.0) | ($30.0) | ($19.4) | $1.7 | ($3.3) | $1.2 | $22.8 | ($1.0) | ($57.9) |
| Corrected Income/(Loss) [50% Reduced Reserves and 7-year LOM] | ($33.2) | ($32.2) | ($21.2) | ($0.5) | ($5.5) | ($0.9) | $20.3 | ($3.5) | $(76.8) |

147. These errors are illustrated in the chart below:



148.    At the Company level, the understated expenses impacted Gatos's equity income/loss in affiliates and net income/loss in proportion to Gatos's percentage interest in the LGJV (51.5% through March 10, 2021 and 70% thereafter).

149.    The impact of the understated expenses on the Company's equity income/loss in affiliates is shown below, based on either a 30% or 50% reduction in remaining reserves:

| Errors in Gatos Equity Income/Loss in Affiliates | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $s in millions | 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Total |
| Gatos Income/(Loss) from Affiliate | ($12.9) | ($13.4) | ($8.1) | $3.4 | $0.5 | $2.7 | $18.3 | $1.6 | ($7.9) |
| Corrected Income/(Loss) [30% Reduced Reserves and 7-year LOM] | ($16.9) | ($16.6) | ($10.6) | $0.3 | ($2.7) | ($0.2) | $13.7 | ($3.0) | ($35.9) |
| Corrected Income/(Loss) [50% Reduced Reserves and 7-year LOM] | ($18.6) | ($17.7) | ($11.5) | ($0.8) | ($3.8) | ($1.3) | $12.0 | ($4.7) | ($46.6) |

150.    These errors are illustrated in the chart below:



151.    Finally, the misstated income/(loss) from affiliates impacted Gatos's previously reported net income (loss).  The impact of the understated expenses on the Company's net income/loss is shown below, based on either a 30% or 50% reduction in remaining reserves:

| Errors in Gatos Net Income/Loss | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *$s in millions* | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Total** |
| Gatos Net Income/(Loss) | ($37.8) | ($17.8) | ($12.1) | ($1.2) | ($9.3) | ($1.6) | $13.5 | ($15.0) | ($81.4) |
| Corrected Income/(Loss) [30% Reduced Reserves and 7-year LOM] | ($41.9) | ($20.9) | ($14.7) | ($4.3) | ($12.4) | ($4.5) | $8.9 | ($19.6) | ($109.5) |
| Corrected Income/(Loss) [50% Reduced Reserves and 7-year LOM] | ($43.5) | ($22.1) | ($15.6) | ($5.5) | ($13.6) | ($5.6) | $7.2 | ($21.3) | ($120.1) |

152.    These errors are illustrated in the chart below:



153.    The falsely reported financial metrics above were quantitatively material at both the LGJV and Company levels and changed losses to profits in several quarters.  At the LGJV level, for example, Q4 2020 had a reported LGJV profit of $2.9 million, but in reality had a loss of up to $5.5 million—an error of up to $8.4 million, or ***290%*** of the falsely reported LGJV profit

for the quarter. At the Company level, for example, in Q1 2021 Gatos reported $2.7 million in equity income in affiliates, but in reality had a loss of up to $1.3 million—an error of $4.0 million, or 149% of the falsely reported equity income in affiliates for the quarter. Similarly, in Q2 2021, the Company reported net income of $13.5 million, but in reality had net income as low as $7.2 million—an error of 47%.

154.    Over the two-year period from 2019 to Q3 2021, the errors resulted in a cumulative understatement of net losses by at least $50 million—and up to $68.7 million—at the LGJV level. This is a misstatement of up to *848%* compared to the LGJV's reported losses of $8.1 million over the same period. At the Gatos level, the errors understated cumulative net losses in affiliates by up to $38.7 million from 2019 to Q3 2021—a misstatement of up to *490%* compared to Gatos's reported losses in affiliates of $7.9 million over the same period. The errors also understated Gatos's cumulative net losses by up to $38.7 million from 2019 to Q3 2021—a misstatement of 48% compared to Gatos's reported net losses of $81.4 million over the same period. In short, net losses would have been dramatically larger at both the LGJV and Company levels if the reserves and LOM had been properly reported.

155.    Moreover, the errors falsely turned multiple quarters of losses to profits and accelerated the LGJV's purported shift to profitability. With a 50% reduction in remaining reserves, the LGJV has had only a *single* profitable quarter (Q2 2021), contrary to the Company's public statements claiming that the LGJV has been consistently profitable since Q3 2020. The disparity between the LGJV's reported profits and actual losses by quarter is shown below:

| Errors Falsely Turned LGJV Net Loss into Income | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *$s in millions* | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Total** |
| LGJV Reported Income/(Loss) | ($22.1) | ($23.9) | ($14.5) | $7.8 | $2.9 | $6.9 | $29.3 | $5.5 | ($8.1) |
| Corrected [50% Reduced Reserves and 7-year LOM] | ($33.2) | ($32.2) | ($21.2) | **($0.5)** | **($5.5)** | **($0.9)** | $20.3 | **($3.5)** | **$(76.8)** |

As shown in red above, correcting Gatos's GAAP violations wipes out the LGJV's profits in all but one quarter.

### P.    Defendants' Scheme Unravels

156.    On January 10, 2022, Gatos issued a press release reporting fourth-quarter 2021 production results.  The press release was uniformly positive:  it stated that Gatos was "very pleased to report record silver production and plant throughput" from the CLG mine, and that "[s]ilver production in Q4 was 2.3 million ounces and increased 35% compared to the third quarter 2021 ("Q3"), due primarily to higher mined silver ore grades as well as higher throughput and recoveries"; Orr praised the "outstanding Q4 performance."  The press release indicated that Gatos "will host a webcast and conference call to discuss its Q4 and year-end 2021 financial results on March 9, 2022 at 12:00 p.m. Eastern Time."

157.    The March 9, 2022 earnings call never occurred.  Internally, despite the highly positive January 10 press release, Defendants had reached a crucial inflection point.  Andres and Scott had internally calculated that Gatos faced a potential reduction in reserves of 30% to 50% (FE-2).  Moreover, Gatos had yet to demonstrate sufficient new resources to dilute the impact of the material overstatements, as Orr, Johnson, Pyle, and Kinyon had advocated, and Andres had forced Kinyon's departure several months earlier, as detailed above.

158.    Meanwhile, the obligation to file Gatos's full-year 2021 financials was looming, the financial statement impact of the LGJV's misstated expenses and income was increasing, and

Gatos was being subjected to its auditors' scrutiny.  Further, Gatos faced SEC regulations that required disclosure of a "material change" in resources and reserves—a requirement that could no longer be ignored after a full year of delay and the Company's secret engagement of two consultants who quickly confirmed the errors in the 2020 Technical Report.

159.    Finally, on January 25, 2022, Gatos issued a press release stating:

> During the Company's resource and reserve update process for the Los Gatos Joint Venture ("LGJV"), which included a detailed reconciliation of recent production performance, ***the Company concluded that there were errors in the technical report entitled "Los Gatos Project, Chihuahua, Mexico" with an effective date of July 1, 2020 (the "2020 Technical Report"), as well as indications that there is an overestimation in the existing resource model.***

> On a preliminary basis, the Company estimates a potential ***reduction of the metal content of CLG's mineral reserve ranging from 30% to 50%*** of the metal content remaining after depletion.  Since the 2020 Technical Report, depletion is 1.3 million tonnes grading 284 g/t silver, 3.9% zinc, 2.3% lead and 0.3 g/t gold that has been processed from July 1, 2020 to December 31, 2021.  At this time, the Company cannot accurately quantify the exact magnitude of the reduction, and ***the mineral resource and reserve estimates in the 2020 Technical Report should not be relied upon***.

> The Company is working with independent engineering consultants to better understand the magnitude of the overestimation, including conducting a detailed reconciliation of production to previous models and reserve calculation estimates, as well as creating a new Life of Mine ("LOM") plan.  The Company is working expeditiously to complete this reconciliation.  Given the complex nature of the reconciliation, Gatos Silver anticipates that it will complete its work in the second half of 2022.

> The Company has identified that CLG's geological structures and mineral veins are more complex than previously modeled, with the size and orientation of the mineral veins more variable than expected.  The Company has been successful in mining these veins through 2021.  Gatos Silver expects continued strong performance in 2022.  While the reconciliation work is ongoing, the Company

continues to take steps to strengthen its technical capability and
capacity, as well as enhance existing review processes.

160. The estimated reduction of "30% to 50% of the metal content remaining after
depletion" indicates the loss of 2.49 million to 4.15 million tonnes of reserves, or 26% to 43% of
the original figure of 9.6 million tonnes.  This equals a reduction of silver, zinc, lead, and gold
content worth *$1.3 billion to $2.2 billion* at January 25, 2022 prices.[11]

161. Further, as explained above, with a 26% to 43% reduction in reserves, CLG will
be exhausted three to five years earlier than the 11-year LOM Gatos claimed in the IPO.

162. Contrary to the press release's implication, Defendants did not suddenly determine
in late January 2022 that the 2020 Technical Report contained "errors."  Rather, these were the
same "errors" identified by Linebarger in January 2021—a full year earlier—which Defendants
consciously decided not to disclose at the time.  Further, the "independent engineering consultants"
referenced in the press release as reviewing the overstatement of resources and reserves were from
Stantec and had corroborated Linebarger's finding in October 2021.

163. Nor did Defendants suddenly learn in January 2022 "that CLG's geological
structures and mineral veins are more complex than previously modeled, with the size and
orientation of the mineral veins more variable than expected."  The geology was not a surprise, as

---

[11] The reserves and grades stated in the 2020 Technical Report indicate purported metal content of
2.94 billion grams silver, 543,396 tonnes zinc, 265,447 tonnes lead, and 3.37 million grams gold.
Gatos's January 25, 2022 press release indicated a "potential reduction of the metal content of
CLG's mineral reserve ranging from 30% to 50% of the metal content remaining after depletion."
Reducing reserves by 30% to 50% of the metal content remaining after the depletion described in
the press release indicates the loss of 772 million to 1.29 billion grams silver; 147,809 to 246,348
tonnes zinc; 70,664 to 117,773 tonnes lead; and 892,851 to 1.49 million grams gold.  This metal
content is worth $1.3 billion to $2.2 billion at January 25, 2022 prices of $0.7654/gram (silver),
$2,359/tonne (lead), $3,615/tonne (zinc), and $59.415/gram (gold).

variability in "the size and orientation of the mineral veins" is a fundamental geological characteristic of narrow-vein silver deposits. Indeed, Gatos had drilled CLG since 2008 and mined CLG since 2018, and long known of the deposit's variable nature, as FE-1 and FE-2 confirmed; on the March 11, 2021 earnings call, Orr emphasized "the extensive geologic understanding accumulated over the past decade at Cerro Los Gatos."

164. The real reason for the errors was that the 2020 Technical Report used an unreliable methodology and falsely extended CLG's ore and mineralization beyond the boundaries of the deposit, and therefore yielded resources and reserves that were materially overstated when the 2020 Technical Report was issued. As detailed above, Defendants had long known—yet deliberately chose to conceal—these existing facts. Indeed, it is telling that Gatos's January 25, 2022 press release used the word "errors"—a term of art that means a document was false when issued. For example, accounting standards define a financial statement "error" as "[a]n error . . . resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that *existed at the time* the financial statements were prepared." (ASC 250-10-20.)

165. The January 25, 2022 press release also revealed that material overstatements of resources, reserves, and LOM could (a) constitute an event of default under Gatos's credit facility, (b) require Gatos to take an impairment charge in current or prior periods, (c) impact depreciation and amortization expense, either prospectively or in prior periods, and (d) require Gatos to restate its financial statements for prior periods:

> *If it is determined the 2020 Technical Report materially overestimated resources and reserves, it could constitute an event of default* under the Company's credit facility, and the Company would intend to seek a waiver from its lender. The Company has

$13 million outstanding under its credit facility as of December 31, 2021, and believes it has sufficient liquidity to manage the process.

The Company is also reviewing the ***potential financial statement impact of a revision in its mineral resources and reserves***.  It has commenced an impairment analysis to determine if the potential resource and reserve reduction could ***lead to an impairment charge in current or prior periods***.  In addition, any change in CLG's LOM could ***impact depreciation and amortization expense either prospectively or in prior periods***.  If the Company determines that any of these changes should have been reflected in prior periods, ***the Company may be required to restate its financial statements for those periods***.  No determination has been made that a restatement is necessary.

166.    Gatos's share price immediately dropped 69% on January 26, 2022, and dropped another 11% on January 27, 2022.  The market was stunned by the Company's sudden, highly material reduction of the reserves, resources, and LOM after over two years of commercial production, Defendants' regular confirmation of the claimed resources and reserves, and Orr's specific assurance in May 2021 that the Company had conducted a reconciliation and concluded that the resource model was "very reliable."

167.    Canaccord Genuity slashed its price target from $15.50 to $4.00, assuming a 50% reduction in metal content and an additional 10% grade dilution; BMO reduced its price target from $12.50 to $4.00 based on a 40% reduction in metal content.  "Obviously ***this is a materially negative event***," wrote an RBC analyst on January 26, 2022, and "it seems likely that a comprehensive re-modelling of CLG is necessary."  The analyst concluded that "[u]ntil the structures and veins are well understood, and there is confidence in being able to continue to mine them economically (or at all?), ***it is difficult to be certain of even the presumed 4.2-5.8mt left***."

168.    Further, analysts questioned the reduction in light of the Company's prior positive statements and production results.  On January 26, 2022, Canaccord Genuity asked:  "[h]ow did

the reconciliation of H2/20 and 2021 production identify the errors associated with the overestimation" given that "production during that timeframe met guidance, and management's outlook that 2022 production is not expected to be impacted"?

169.    The negative consequences of Gatos's admittedly overstated reserves and resources and their financial statement impact continued to unfold in rapid succession.

170.    <u>First</u>, the overstated reserves triggered two events of default under the Company's $50 million credit facility.  Gatos filed a Form 8-K on March 7, 2022 reporting that the Company and its lenders had entered an amendment to their July 12, 2021 credit agreement (the "Credit Agreement").  The amendment—signed by CEO Orr and CFO Johnson on behalf of Gatos—states that Gatos "has advised that ***certain errors have been identified in the Financial Model*** delivered by [Gatos] to the Administrative Agent in connection with the Credit Agreement, including an ***overestimation of the mineral reserves*** at the [CLG] Mine."[12]

171.    The amendment signed by Orr and Johnson acknowledges that the "overestimation of the mineral reserves" at the CLG mine "has caused, or is likely to cause," two Events of Default.  Crucially, Gatos "acknowledged" that these Events of Default were caused by (a) "representations or warranties made by, or for and on behalf of, [Gatos] in the Credit Agreement or in any other

---

[12] The Credit Agreement (filed with the SEC on July 12, 2021) defines "Financial Model" as "the most recent financial projection (in Excel format) detailing a forecast of the development, operation and maintenance of (i) the Mine, and (ii) any other mines or mining operations that may be acquired or developed by the Obligors from time to time, and shall encompass a detailed mine plan and schedule for ore tonnes and grade, waste movements, treatment schedule, production of saleable product, capital, operating, and reclamation costs, together with reasonable estimates of cash flows and other costs and expenses (including corporate costs) with respect to each of the foregoing and covering the Life of Mine period."

document, agreement or instrument delivered pursuant to the Credit Agreement or referred to in the Credit Agreement or any material information furnished in writing to the Administrative Agent by [Gatos] or [the LGJV entities] *having been incorrect when made or furnished*" and (b) the occurrence of a "*Material Adverse Change*" under the Credit Agreement.[13]

172.    These admissions by Defendants Gatos, Orr, and Johnson confirm that Gatos materially overstated its reserves, and that Gatos's overstated reserves were "incorrect when made or furnished," which was no later than the July 12, 2021 date of the Credit Agreement (three days before the July 15, 2021 Offering).  Indeed, as detailed above, Gatos's January 25, 2022 press release stated that "[i]f it is determined the 2020 Technical Report materially overestimated resources and reserves, it could constitute an event of default."  The fact that two Events of Default occurred confirms that, in the words of Gatos's press release, "the 2020 Technical Report materially overestimated resources and reserves."

173.    The amendment further states that the "Lenders would not have agreed to extend the amount of the Credit Limit to [Gatos] on the terms of the Credit Agreement if the Mineral Reserve Overestimate had been known by the Lenders at the time the Credit Agreement was entered into and require an updated Financial Model to determine, in their sole discretion, if they will lower [Gatos's] Credit Limit based on the updated Financial Model described below."  In other words, given the material reduction in Gatos's reserves, the lenders were unwilling to extend the full $50 million in credit they had previously extended to Gatos on the same terms.  The

---

[13] Under the Credit Agreement, a Material Adverse Change is "any change of circumstances or event which causes a Material Adverse Effect," defined to include "a material adverse effect" on "the business, operations, property, assets or financial condition of [Gatos] and/or the [LGJV entities] taken as a whole."

amendment thus requires Gatos to provide "an updated Financial Model," including "an updated mineral reserve statement," by September 30, 2022. Unless the lenders are satisfied with the updated information, Gatos's credit limit shall be automatically reduced by $5 million per quarter, beginning in the first quarter of 2023 and reaching zero on June 30, 2024.

174. Second, Gatos's three most senior executives were ousted on the same day. On April 7, 2022, Gatos filed a Form 8-K stating: "On April 5, 2022, Stephen Orr informed the Company and its board of directors that he intends to retire from serving as the Company's Chief Executive Officer and as a member of the Company's board of directors, effective April 7, 2022," to be replaced by Andres in both roles. Further, "on April 5, 2022, Roger Johnson informed the Company that he intends to retire from serving as the Company's Chief Financial Officer, effective May 21, 2022," and "[o]n April 5, 2022, Philip Pyle informed the Company that he intends to retire from serving as the Company's Vice President of Exploration and Chief Geologist, effective April 5, 2022." Orr, Johnson, and Pyle were ousted as a result of the collapse of their scheme to conceal the known, material overstatement of resources and reserves.

175. Third, having admitted that the 2020 Technical Report contains "errors" and "should not be relied upon"—and with the looming prospect of a financial restatement—Gatos was unable to file its annual and quarterly reports with the SEC. On March 18, 2022, Gatos "announced that it intends to delay the filing of its Annual Report on Form 10-K for the year ended December 31, 2021 beyond the prescribed deadline" of March 31, 2022, stating that the "delay is due to the ongoing analysis by the Company of any potential impacts the reduction [in reserves] may have on its audited annual financial statements." On April 1, 2022, Gatos added that "the Company requires additional time to prepare and review its new LOM plan, mineral reserve

estimates and financial statements and assess the effectiveness of its internal controls over financial reporting to ensure adequate recognition and disclosure of the information required to be included in the Annual Report on Form 10-K." Indeed, because Gatos has now admitted a material overstatement in the 2020 Technical Report, without a current and reliable statement of mineral reserves, SEC regulations prohibit Gatos from filing a Form 10-K.

176. On April 22, 2022, Gatos reported that it had "received a notice from the New York Stock Exchange ("NYSE") stating that the Company was not in compliance with Section 802.01E of the NYSE Listed Company Manual as a result of its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2021," and may face delisting from the NYSE unless the late filing is cured within six months.

177. On May 9, 2022, Gatos issued a press release reporting first quarter 2022 operating and financial results, which stated that Gatos "is also continuing to evaluate the potential financial statement impact of the revision to its mineral resources and reserves and is progressing an assessment of internal controls over financial reporting for 2020 and 2021."

178. Gatos also missed its deadline for file a Form 10-Q for the first quarter of 2022, and on May 17, 2022, notified the SEC that Gatos's "financial statements for the year ended December 31, 2021 and quarter ended March 31, 2022 may be affected by the ongoing analysis of the aforementioned mineral resource and mineral reserve matters." On August 5, 2022, Gatos similarly announced that it will miss the deadline to file a Form 10-Q for the second quarter of 2022, and stated that its "financial statements for the year ended December 31, 2021 and quarters ended March 31, 2022 and June 30, 2022 may be affected by the ongoing analysis of the aforementioned mineral reserve matters."

179.    Fourth, Gatos recently admitted that it has **material weaknesses in its internal controls over financial reporting** related to the reserve reporting errors.  On May 13, 2022, Gatos posted a bi-weekly status report on its website stating that it is "evaluating the material weaknesses in its internal controls over financial reporting related to the mineral reserve reporting errors," and reiterated the same point in a May 17, 2022 SEC filing.  These admitted material weaknesses relate to the Class Period, as Gatos had previously stated that it was "conducting an assessment of internal controls over financial reporting for 2020 and 2021," and establish that Defendants' Class Period statements that they had identified and disclosed any material weaknesses were false.

180.    Finally, the January 25, 2022 press release stated that Gatos was "working with independent engineering consultants to better understand the magnitude of the overestimation, including conducting a detailed reconciliation of production to previous models and reserve calculation estimates, as well as creating a new Life of Mine ("LOM") plan."  On August 10, 2022, Gatos issued a press release stating:

> The mineral resources and mineral reserves are being completely rebuilt from base data, including data compilation of surface drilling, underground drilling, underground mapping and production data, comprehensive data validation, structural and geological interpretation, resource estimation, reconciliation to actual production, and a new mine design including updates to operating and capital costs. The Company expects to produce a new CLG life-of-mine plan and technical report before the end of October 2022.

The magnitude of this corrective work—and the fact that it remains incomplete—underscore the unreliability and material errors in the 2020 Technical Report.

IV.    SECURITIES ACT ALLEGATIONS

181.    In this section of the Complaint, Plaintiffs assert strict liability and negligence claims based on Sections 11 and 15 of the Securities Act on behalf of all persons and entities who, in domestic transactions or on the NYSE, purchased or otherwise acquired Gatos common stock pursuant and/or traceable to the 2020 Registration Statement or 2021 Registration Statement, and who were damaged thereby.  Plaintiffs expressly disclaim any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately in this Complaint from Plaintiffs' Exchange Act claims.

A.    Securities Act Parties

1.    Securities Act Plaintiffs

182.    Lead Plaintiff Bard Betz is an individual residing in Cody, Wyoming.  Lead Plaintiff purchased or otherwise acquired Gatos common stock on the NYSE pursuant and/or traceable to the IPO and/or July 2021 Offering, as set forth in the Certification attached to the Motion of Bard Betz for Appointment as Lead Plaintiff and Approval of His Selection of Lead Counsel (ECF 16-5).

183.    Named Plaintiff Jude Sweidan is an individual residing in Canada.  Named Plaintiff purchased or otherwise acquired Gatos common stock on the NYSE pursuant and/or traceable to the IPO and/or July 2021 Offering, as set forth in the Certification attached hereto as Exhibit A.

184.    As a result of material misstatements and omissions made by the Securities Act Defendants (defined below), Plaintiffs purchased or otherwise acquired Gatos common stock at artificially inflated prices.  When the relevant truth concerning the Securities Act Defendants'

misstatements and omissions of material fact was revealed to the market in January 2022, the price of Gatos common stock fell, causing Plaintiffs and the Class to suffer losses.

### 2.    Securities Act Defendants

185.    Each of the following Defendants is statutorily liable under Sections 11 and/or 15 of the Securities Act for the material misstatements and omissions contained in and incorporated (and thereby made anew) in the 2020 and/or 2021 Registration Statements.

186.    Defendant Gatos is incorporated under the laws of Delaware with its principal executive offices located in Greenwood Village, Colorado. Gatos's common stock trades on the NYSE and the Toronto Stock Exchange ("TSX") under the symbol "GATO." Gatos was the issuer for the IPO and July 2021 Offering.

187.    Defendant Stephen Orr was the Company's Chief Executive Officer ("CEO") at all relevant times. Defendant Orr signed the Registration Statements and, at all relevant times, was a member of Gatos's Board.

188.    Defendant Roger Johnson was the Company's Chief Financial Officer ("CFO") at all relevant times. Defendant Johnson signed the Registration Statements.

189.    Defendant Janice Stairs ("Stairs") has served as a director of the Company since October 2019 and as the Chairman of the Board of Directors since October 2020. Defendant Stairs signed or authorized the signing of the Company's Registration Statements filed with the SEC.

190.    Defendant Ali Erfan ("Erfan") has served as a director of the Company since May 2019 and signed or authorized the signing of the Company's Registration Statements filed with the SEC.

191.    Defendant Igor Gonzales ("Gonzales") has served as a director of the Company since June 2020 and signed or authorized the signing of the Registration Statements filed with the SEC.

192.    Defendant Karl Hanneman ("Hanneman") has served as a director of the Company since October 2019 and signed or authorized the signing of the Registration Statements filed with the SEC.

193.    Defendant David Peat ("Peat") has served as a director of the Company since September 2011 and signed or authorized the signing of the Registration Statements filed with the SEC.

194.    Defendant Charles Hansard ("Hansard") has served as a director of the Company since October 2020 and signed or authorized the signing of the 2021 Registration Statement filed with the SEC.

195.    Defendant Daniel Muñiz Quintanilla ("Quintanilla") has served as a director of the Company since April 2021 and signed or authorized the signing of the 2021 Registration Statement filed with the SEC.

196.    Defendants Gatos, Orr, Johnson, Stairs, Erfan, Gonzales, Hanneman, Peat, Hansard, and Quintanilla are collectively referred to herein as the "Securities Act Defendants." Defendants Orr, Johnson, Stairs, Erfan, Gonzales, Hanneman, Peat, Hansard, and Quintanilla are collectively referred to herein as the "Individual Defendants."[14]

---

[14] This Complaint does not name Thomas S. Kaplan (the former Chairman of Gatos's Board of Directors) or Jeb Burns (a former Gatos director) as defendants because both individuals resigned from Gatos's Board before the 2020 Registration Statement became effective.  This Complaint also does not name Igor Levental (a former Gatos director), who is deceased, as a defendant.

**B.    The 2020 Registration Statement and IPO**

197.    On October 1, 2020, Gatos filed a registration statement on Form S-1, including a preliminary prospectus and the 2020 Technical Report, with the SEC (the 2020 Registration Statement, defined above).

198.    After Gatos filed several amendments and revised preliminary prospectuses, at 4:00 PM on October 27, 2020, the 2020 Registration Statement was declared effective by the SEC. On October 29, 2020, pursuant to Rule 424(b)(4), Gatos filed the final prospectus, dated October 27, 2020 (the "Final 2020 Prospectus").

199.    The 2020 Registration Statement incorporates the 2020 Technical Report, the Final 2020 Prospectus, the Company's audited financial statements for 2017, 2018, and 2019, the LGJV's audited financial statements for 2018 and 2019, and unaudited Company and LGJV financial statements for the six months ending June 30, 2020.

200.    Gatos common stock began trading on the NYSE and TSX on October 28, 2020.

201.    In the IPO, Gatos offered a total of 24,644,500 shares of common stock (including 3,214,500 shares sold pursuant to the exercise in full of the underwriters' over-allotment option) at $7.00 per share.  Gatos received total net proceeds of $156.1 million from the IPO.

**C.    The 2020 Registration Statement Contained Material
Misstatements and Omissions**

202.    As detailed below, the 2020 Registration Statement contained materially false and misleading statements concerning (a) CLG's resources, reserves, and LOM; (b) the definitions and methodology used to determine the overstated resources and reserves; (c) risk factors related to the resources and reserves that were misleading because the purported "risks" were already a known certainty; (d) Gatos's financial performance and compliance with GAAP; and (e) a claim

that no impairment testing was required, which was false because CLG's reserves were materially

overstated at the time.  As detailed below, the 2020 Registration Statement also contained material

omissions in violation of Item 303.  For the avoidance of doubt, the only statements and omissions

in the 2020 Registration Statement that Plaintiffs allege to be actionable are included in

this section.

    **1.**       **Materially False and Misleading Statements
Concerning CLG's Resources, Reserves, and LOM**

203.    The 2020 Registration Statement quantified CLG's purported mineral resources

and reserves:

> The Los Gatos Technical Report estimates that the Cerro Los Gatos
> Mine contains ***10.4 million tonnes of measured and indicated
> resources*** (or 5.4 million tonnes of measured and indicated
> resources on a 51.5% basis) inclusive of mineral reserves, at average
> grades of 269 g/t silver, 2.7% lead, 5.5% zinc, 0.34 g/t gold and
> 0.11% copper, or 3.5 million tonnes of measured and indicated
> resources (or 1.8 million tonnes of measured and indicated resources
> on a 51.5% basis) exclusive of mineral reserves, at average grades
> of 154 g/t silver, 2.2% lead, 4.3% zinc and 0.29 g/t gold, and 3.7
> million tonnes of inferred resources (or 1.9 million tonnes of
> inferred resources on a 51.5% basis), at average grades of 107 g/t
> silver, 2.8% lead, 4.0% zinc and 0.28 g/t gold. . . .

> The Los Gatos Technical Report, which has an effective date of July
> 1, 2020, estimates that the deposit contains ***9.6 million diluted
> tonnes of proven and probable mineral reserves*** (or 5.0 million
> diluted tonnes of proven and probable mineral reserves on a 51.5%
> basis), ***with 6.4 million diluted tonnes of proven mineral reserves***
> (or 3.3 million diluted tonnes of proven mineral reserves on a 51.5%
> basis) and ***3.3 million diluted tonnes of probable mineral reserves***
> (or 1.7 million diluted tonnes of probable mineral reserves on a
> 51.5% basis). Average proven and probable mineral reserve grades
> are 306 g/t silver, 0.35 g/t gold, 2.76% lead and 5.65% zinc. . . .

The 2020 Registration Statement also attached (as Exhibit 96.1) and incorporated by reference the 2020 Technical Report, which detailed CLG's purported resources and reserves:[15]

**Table 1-2:  Mineral Resource Estimate**

| Classification | Tonnes | AgEq g/t | Ag g/t | Pb % | Zn % | Au g/t | Cu % |
|---|---|---|---|---|---|---|---|
| Measured | 5,774,314 | 652 | 324 | 2.9 | 5.8 | 0.39 | 0.11 |
| Indicated | 4,586,507 | 489 | 202 | 2.5 | 5.2 | 0.28 | 0.11 |
| **Measured and Indicated** | 10,360,822 | **576** | **269** | **2.7** | **5.5** | **0.34** | **0.11** |
| Inferred | 3,717,063 | 361 | 107 | 2.8 | 4.0 | 0.28 | 0.14 |

**Table 1-4:  Mineral Reserve**

| Classification | Tonnes | Ag (g/t) | Au (g/t) | Pb (%) | Zn (%) |
|---|---|---|---|---|---|
| **Proven** | **6,360,890** | **332** | **0.36** | **2.77** | **5.55** |
| **Probable** | **3,256,740** | **254** | **0.34** | **2.74** | **5.86** |
| **Proven + Probable** | **9,617,631** | **306** | **0.35** | **2.76** | **5.65** |

204.    The statements in Paragraph 203 were materially false when made because they materially overstated CLG's resources and reserves.  As detailed above, Gatos's prior production experience had quickly demonstrated that the resource model for CLG was inaccurate, with the location and grades of ore proving to be different from the model, and the 2020 Technical Report contained at least two key errors:  (1) overstatement of reserves based on a Life of Mine plan that wrongly extended CLG's ore and mineralization beyond the modeled boundaries of the deposit, and (2) use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, both of which were directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company had observed and experienced at CLG since 2018.  Gatos's January 25, 2022 press release admitted that the 2020 Technical Report contained "errors" and "should not be

---

[15] Certain columns and rows have been omitted for clarity.

relied upon," described "a potential reduction of the metal content of CLG's mineral reserve ranging from 30% to 50% of the metal content remaining after depletion" (equal to 26% to 43% of the 9.6 million tonnes originally claimed), and admitted that there are "indications that there is an overestimation in the existing resource model."  In addition, the statements in Paragraph 203 were materially misleading when made because they quantified CLG's purported reserves and resources while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, and (3) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.  The omission of these existing, material negative facts made the statements misleading in the context in which they were made.  The materially false and misleading statements in Paragraph 203 from the 2020 Technical Report were also incorporated by reference in the 2021 Registration Statement.

205.    The 2020 Registration Statement stated that the 2020 Technical Report complied with the SEC disclosure requirements and NI 43-101:

> The technical report summary for our material properties, the Los Gatos District and the Cerro Los Gatos Mine, has been prepared in accordance with the SEC Mining Modernization Rules and NI 43-101 and is included as Exhibit 96.1 to the registration statement of which this prospectus forms a part.

This statement was materially false when made because the 2020 Technical Report was not "prepared in accordance with the SEC Mining Modernization Rules and NI 43-101," which require (among other things) resources to be determined "from specific geological evidence and knowledge" and proven reserves to be based on "a high degree of confidence."  In reality, as

detailed above, the 2020 Technical Report contained multiple errors (as Gatos has admitted) and

materially overstated CLG's resources and reserves.  In addition, this statement was materially

misleading when made because it asserted the 2020 Technical Report's compliance with the SEC

Mining Modernization Rules and NI 43-101 while omitting the existing, material negative facts

that (1) the Company's actual production experience had already demonstrated that the resource

model for CLG was inaccurate, (2) the Company had already identified errors in the analysis

underlying the Life of Mine plan used for the 2020 Technical Report, and (3) the 2020 Technical

Report contained errors and materially overstated CLG's reserves and resources.  The omission of

these existing, material negative facts made the statements misleading in the context in which they

were made.

### 2. Materially False and Misleading Statements Concerning Definitions and Methodology

206.    The 2020 Registration Statement contained a "Glossary of Technical Terms" with

the following false and misleading statements:

> "Mineral Resources" means a concentration or occurrence of diamonds, natural solid inorganic material, or natural solid fossilized organic material including base and precious metals, coal, and industrial minerals in or on the earth's crust in such form and quantity and of such a grade or quality that it has reasonable prospects for economic extraction. ***The location, quantity, grade, geological characteristics and continuity of a Mineral Resource are known, estimated or interpreted from specific geological evidence and knowledge***. . . .

> "Indicated Mineral Resources" or "Indicated Resources" is that part of a Mineral Resource for which ***quantity, grade or quality, densities, shape and physical characteristics, can be estimated with a level of confidence sufficient to allow the appropriate application of technical and economic parameters***, to support mine planning and evaluation of the economic viability of the deposit. The estimate is ***based on detailed and reliable exploration and testing***

*information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough for geological and grade continuity to be reasonably assumed*. . . .

"Measured Mineral Resources" is that part of a Mineral Resource for which quantity, grade or quality, densities, shape, and physical characteristics are *so well established that they can be estimated with confidence sufficient to allow the appropriate application of technical and economic parameters*, to support production planning and evaluation of the economic viability of the deposit. The estimate is *based on detailed and reliable exploration, sampling and testing information gathered through appropriate techniques from locations such as outcrops, trenches, pits, workings and drill holes that are spaced closely enough to confirm both geological and grade continuity*. . . .

"Mineral Reserves" means the economically mineable part of a Measured or Indicated Resource demonstrated by at least a preliminary feasibility study. *This study must include adequate information on mining, processing, metallurgical, economic and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified*. A Mineral Reserve includes diluting materials and allowances for losses that may occur when the material is mined.

"Probable Mineral Reserve" means the economically mineable part of an Indicated, and in some circumstances a Measured Mineral Resource demonstrated by at least a preliminary feasibility study. *This study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified*.

"Proven Mineral Reserve" means the economically mineable part of a Measured Mineral Resource demonstrated by at least a preliminary feasibility study. *This preliminary feasibility study must include adequate information on mining, processing, metallurgical, economic, and other relevant factors that demonstrate, at the time of reporting, that economic extraction can be justified*.

These statements were materially false when made because (1) CLG's purported resources were

not "known, estimated or interpreted from specific geological evidence and knowledge";

(2) CLG's measured and indicated resources were not estimated with "confidence sufficient to allow the appropriate application of technical and economic parameters," were not "based on detailed and reliable exploration, sampling [or] testing information gathered through appropriate techniques" that was "spaced closely enough for geological and grade continuity to be reasonably assumed," much less "confirm[ed]"; and (3) CLG's purported reserves were not based on "adequate information on mining, processing, metallurgical, economic, and other relevant factors." Rather, as detailed above, Gatos's prior production experience had quickly demonstrated that the resource model for CLG was inaccurate, with the location and grades of ore proving to be different from the model, and the 2020 Technical Report contained at least two key errors: (1) overstatement of reserves based on a Life of Mine plan that wrongly extended CLG's ore and mineralization beyond the modeled boundaries of the deposit, and (2) use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, both of which were directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company had observed and experienced at CLG since 2018.  In addition, these statements were materially misleading when made because they detailed the criteria for CLG's purported reserves and resources while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, and (3) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.  The omission of these existing, material negative facts made the statements misleading in the context in which they were made.

207.    The 2020 Registration Statement contained the following statement regarding the

methodology used to estimate CLG's resources:

> The material assumptions for the mineral resource estimates at the
> Cerro Los Gatos Mine include (i) resource estimation completed by
> Tetra Tech in MicroMine mining software using drill hole data
> provided by MPR, (ii) usage of histograms and probability plots to
> determine where high-grade distribution tails became unsupported
> or deviated from lognormal and application of upper limits for grade
> capping, (iii) compositing sample intervals to two meters to match
> the mode sample length, (iv) using geological modeling and vein
> modeling, (v) using specific gravity measurements and (vi) no
> dilution being accounted for in the mineral resource estimates.

This statement was materially misleading when made because it described techniques that the 2020

Technical Report used to quantify the purported resources while omitting the existing, material

negative facts that (1) the Company's actual production experience had already demonstrated that

the resource model for CLG was inaccurate, (2) the 2020 Technical Report used an unreliable

resource model that wrongly assumed a consistent, uniform deposit, (3) the Company had already

identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical

Report, and (4) the 2020 Technical Report contained errors and materially overstated CLG's

reserves and resources.  The omission of these existing, material negative facts made the statement

misleading in the context in which it was made.

208.    The 2020 Registration Statement attached (as Exhibit 96.1) and incorporated by

reference the 2020 Technical Report, which contained the following statement:

> The mine plan has been generated by MPR staff and verified by
> Tetra Tech for the calculation of Reserves.

This statement was materially false when made because the "mine plan" had not been "verified by

Tetra Tech"; rather, the mine plan incorrectly extended CLG's ore and mineralization beyond the

modeled boundaries of the deposit, contributing to the 2020 Technical Report's material overstatement of reserves.   This was a fundamental error that any verification would have identified, as it was directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018.   In addition, this statement was materially misleading when made because it claimed that Tetra Tech had "verified" the mine plan while omitting the existing, material negative facts that (1) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (2) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, and (3) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.   The omission of these existing, material negative facts made the statement misleading in the context in which it was made.

### 3.    Materially Misleading Statements Concerning Risk Factors That Were a Known Certainty

209.    The 2020 Registration Statement contained the following risk disclosures:

> Calculations of mineral reserves at the Cerro Los Gatos Mine and of the mineral resources at the Los Gatos District are only estimates and depend on geological interpretation and statistical inferences or assumptions drawn from drilling and sampling analysis, which ***might prove to be materially inaccurate.*** There is a ***degree of uncertainty*** attributable to the calculation of mineral reserves and mineral resources.   Until mineral reserves and mineral resources are actually mined and processed, the quantity of metal and grades must

70

> be considered as estimates only and ***no assurance can be given that the indicated levels of metals will be produced***. . . .
>
> The estimation of mineral reserves and mineral resources is a ***subjective process that is partially dependent upon the judgment of the persons preparing the estimates***. The process relies on the quantity and quality of available data and is based on knowledge, mining experience, statistical analysis of drilling results and industry practices. Valid estimates made at a given time ***may significantly change when new information becomes available***.

These purported risk disclosures were materially misleading when made because, in purportedly warning investors that the calculations of CLG's reserves and resources "might prove to be materially inaccurate," carried "a degree of uncertainty," resulted from a "subjective process that is partially dependent" upon "judgment," and "may significantly change when new information becomes available," they omitted the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, and (4) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.  By portraying the potential inaccuracy and uncertainty of the resource and reserve calculations as merely hypothetical risks, rather than known certainties, the 2020 Registration Statement omitted material facts necessary to make the statements not misleading in the context in which they were made.

71

### 4.   Materially False Statements Concerning Financial Performance and Compliance with GAAP

210.   The 2020 Registration Statement contained audited financial statements for both

Gatos and the LGJV, and contained the following statement regarding depletion expenses at the

LGJV level:

> Subsequent to September 1, 2019 [when CLG commenced production], costs incurred to develop the mine are capitalized to mine development assets.  Upon the commencement of production, capitalized costs are charged to operations using the units-of-production method in the period the applicable metal reserves are processed over the estimated proven and probable reserve tons directly benefiting from the capital expenditures. ***The LGJV incurred $7,291 [thousand] and nil for the years ended December 31, 2019 and 2018, respectively, in depletion expense***.

The 2020 Registration Statement reported accumulated depreciation associated with the LGJV's

"[p]roperty, plant and equipment at cost" of $16,411,000 for the year ended December 31, 2019.

The 2020 Registration Statement reported the LGJV's net loss as $22.1 million and Gatos's equity

loss in affiliates as $12.9 million for the year ended December 31, 2019.  At the Company level,

the 2020 Registration Statement reported Gatos's net income (loss) as follows:

> For the years ended December 31, 2019 and 2018, our net loss was $37.8 million and $11.7 million, respectively, and for the six months ended June 30, 2020 and 2019, our net loss was $30.0 million and $18.0 million, respectively.

The 2020 Registration Statement further affirmed that the financial statements complied with

GAAP at both the Company and LGJV levels:

> In accordance with generally accepted accounting principles in the United States ("U.S. GAAP"), these financial statements represent the consolidated financial positions and results of operations of our Company and its subsidiaries . . . .

> In accordance with U.S. GAAP, these financial statements represent
> the combined financial position and results of the LGJV.

These statements were materially false when made because, as a result of the material overstatements of CLG's reserves and LOM contained in the 2020 Technical Report and Gatos's deficient internal controls, the financial statements violated GAAP, presenting investors with a materially false picture of Gatos's financial condition.  Specifically, for the year ended December 31, 2019, the LGJV's depletion expenses were materially understated by as much as $3.2 million to $6.5 million; depreciation expenses were materially understated by up to $4.7 million; net losses at the LGJV level were materially understated by as much as $7.9 million to $11.1 million; and Company-level equity loss in affiliates and net losses were materially understated by as much as $4.0 million to $5.7 million.  For the six months ended June 30, 2020, net losses at the LGJV level were materially understated by as much as $11 million to $15 million, and Company-level equity loss in affiliates and net losses were materially understated by as much as $5.7 million to $7.8 million.  Gatos has admitted that a restatement may be required, acknowledging that "any change in CLG's LOM could impact depreciation and amortization expense either prospectively or in prior periods" and that Gatos "may be required to restate its financial statements" for "those periods."

### 5.  Materially False Statements Concerning Impairment Testing

211.  The 2020 Registration Statement contained the following statements indicating that no impairment testing had been required for Gatos:

> ***We review and evaluate our long-lived assets for impairment when events or changes in circumstances indicate that the related carrying amounts may not be recoverable.*** Asset impairment is considered to exist if the total estimated future cash flows on an

undiscounted basis are less than the carrying amount of the asset. An impairment loss is measured and recorded based on discounted estimated future cash flows. Future cash flows are estimated based on estimated quantities of recoverable minerals, expected silver and other commodity prices (considering current and historical prices, trends and related factors), production levels, operating costs, capital requirements and reclamation costs, all based on LOM plans. ***No impairment tests have been required during the periods presented.***

These statements were materially false when made because they claimed that Gatos performed impairment tests "when events or changes in circumstances indicate that the related carrying amounts may not be recoverable," and that "[n]o impairment tests have been required during the periods presented," including through June 30, 2020. In reality, the 2020 Technical Report contained multiple errors (as Gatos has admitted) and materially overstated CLG's resources and reserves, the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, and the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, and an impairment test was required. Indeed, Gatos's January 25, 2022 press release confirmed that the Company "has commenced an impairment analysis to determine if the potential resource and reserve reduction could lead to an impairment charge in current or prior periods."

### 6.    Material Omissions in Violation of Item 303

212.    In addition to the materially false and misleading statements detailed above, the 2020 Registration Statement omitted known trends and uncertainties in violation of Item 303 of SEC Regulation S-K ("Item 303").

213.    Item 303 required Gatos to disclose known trends or uncertainties that have had, or that Gatos reasonably expects will have, a material favorable or unfavorable impact on net sales

or revenues or income from continuing operations.  The failure to disclose a material trend or

uncertainty in violation of Item 303 is an omission that is actionable under the Securities Act.  As

relevant here, Item 303 required Gatos to:

> Describe any known trends or uncertainties that have had or that the
> registrant reasonably expects will have a material favorable or
> unfavorable impact on net sales or revenues or income from
> continuing operations.  If the registrant knows of events that will
> cause a material change in the relationship between costs and
> revenues (such as known future increases in costs of labor or
> materials or price increases or inventory adjustments), the change in
> the relationship shall be disclosed.[16]

214.    The SEC's May 18, 1989 interpretive release (No. 33-6835) provides a two-step

test to determine whether disclosure under Item 303 is required:

> Where a trend, demand, commitment, event or uncertainty is known,
> management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty
> likely to come to fruition?  If management determines that it is not
> reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate
> objectively the consequences of the known trend, demand,
> commitment, event or uncertainty, on the assumption that it will
> come to fruition.  Disclosure is then required unless management
> determines that a material effect on the registrant's financial
> condition or results of operations is not reasonably likely to occur.

215.    The 2020 Registration Statement omitted at least two known, material trends and

uncertainties related to CLG's overstated resources and reserves, in violation of Item 303.

---

[16] Certain amendments to Item 303 became effective on February 10, 2021.  While the amendments
do not apply to the Registration Statements because they did not include financial statements for
the fiscal year ended December 31, 2021, the language quoted above is substantially similar in the
amended version of Item 303.

216.    <u>First</u>, before the IPO, Gatos knew of material errors and overstatements in the 2020 Technical Report.  Not only had Gatos's actual experience over several years already demonstrated that the resource model for CLG was inaccurate, but before the IPO, Gatos had identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report.  Regardless of whether Defendants had finally determined the errors and overstatements, that the 2020 Technical Report was based on an unreliable resource model and erroneous analysis constituted a known uncertainty that had, and that Gatos reasonably expected would have, a material unfavorable impact on its revenues, net sales, and income.  Thus, even if the errors, overstatements, or their exact magnitude were not known with absolute certainty, disclosure was required under the two-step test above.

217.    <u>Second</u>, by the time of the IPO, Gatos also knew that the CLG mine's production rate was unsustainable, as the reserves would run out years before the 11-year LOM described in the 2020 Technical Report.  Indeed, with an overstatement in reserves of 4.15 million tonnes, using a historical extraction rate of about 65,000 tonnes per month, the reserves would run out five years early.  By the time of the IPO, CLG had been in production for over a year, and this unsustainable production rate was a known trend that Gatos reasonably expected would have a material unfavorable impact on the Company's revenues, net sales, and income, as revenues, sales, and income would sharply diminish or disappear once the reserves were depleted.

**D.    The 2021 Registration Statement and July 2021 Offering**

218.    On June 21, 2021, Gatos confidentially filed a draft registration statement for an additional offering of common stock with the SEC.  On July 12, 2021, Gatos filed a registration statement on Form S-1 (the 2021 Registration Statement, defined above) with the SEC and

commenced the roadshow for the July 2021 Offering.  The 2021 Registration Statement was declared effective at 9:00 AM on July 15, 2021.  The same day, pursuant to Rule 424(b)(4), Gatos filed the final prospectus, dated July 15, 2021 (the "Final 2021 Prospectus"), for (a) its treasury offering of 8,930,000 common shares, and (b) a secondary offering of 2,500,000 common shares being sold by Electrum Silver US LLC and Electrum Silver US II LLC.

219.    The 2021 Registration Statement incorporates the 2020 Technical Report, the Final 2021 Prospectus, the 2020 10-K (and information incorporated therein), the 1Q2021 10-Q, and Gatos's Forms 8-K filed with the SEC on March 12, 2021, March 29, 2021 (but only the information in the first and second paragraphs under "2021 — A Year of Optimization" in Exhibit 99.1 thereto), April 1, 2021, June 1, 2021, June 2, 2021 and July 12, 2021 (containing Items 1.01, 2.03 and 9.01).

220.    In the July 2021 Offering, Gatos offered a total of 9,216,962 shares of common stock (including 286,962 shares the underwriters purchased from Gatos pursuant to the partial exercise of their over-allotment option) at $14.00 per share.  Gatos raised total net proceeds of over $118 million from the July 2021 Offering.

### E.    The 2021 Registration Statement Contained Material Misstatements and Omissions

221.    The 2021 Registration Statement contained the materially false and misleading statements and omissions detailed below.  For the avoidance of doubt, the only statements and omissions in the 2021 Registration Statement that Plaintiffs allege to be actionable are included in this section.

### 1.    Materially False and Misleading Statements

222.    The 2021 Registration Statement contained the following statements regarding

CLG's purported reserves:

> The CLG, located within the Los Gatos District, Chihuahua,
> Mexico, consists of a 2,500 tpd polymetallic mine and processing
> facility that commenced production on September 1, 2019. The Los
> Gatos Technical Report, which has an effective date of July 1, 2020,
> **estimates that the deposit contains approximately 9.6 million
> diluted tonnes of proven and probable mineral reserves** (or
> approximately 6.7 million diluted tonnes of proven and probable
> mineral reserves on a 70.0% basis), with **approximately 6.4 million
> diluted tonnes of proven mineral reserves** (or approximately 4.5
> million diluted tonnes of proven mineral reserves on a 70.0% basis)
> and **approximately 3.3 million diluted tonnes of probable mineral
> reserves** (or approximately 2.3 million diluted tonnes of probable
> mineral reserves on a 70.0% basis). Average proven and probable
> mineral reserve grades are 306 g/t silver, 0.35 g/t gold, 2.76% lead
> and 5.65% zinc.

The 2021 Registration Statement also incorporated the 2020 Technical Report and Gatos's

2020 10-K, which reiterated CLG's purported resources and reserves, as set forth at Paragraphs

203-04, 208, and 269-70 above and below.

223.    The statements in Paragraph 222 were materially false when made because they

materially overstated CLG's resources and reserves.  In reality, as detailed above, the 2020

Technical Report contained multiple errors (as Gatos has admitted) and materially overstated

CLG's resources and reserves.  Indeed, before the July 2021 Offering, the Company had already

been advised that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra

Tech with regard to the errors, and had made a deliberate decision not to disclose the errors.  In

addition, the statements in Paragraph 222 were materially misleading when made because they

quantified CLG's purported reserves and resources while omitting the existing, material negative

facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, (4) the Company had already been advised that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (5) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.  The omission of these existing, material negative facts made the statements misleading in the context in which they were made.

     224.    The 2021 Registration Statement contained the following statement:

> ***We believe that activity at the Cerro Los Gatos Mine ("CLG") subsequent to the effective date of the mineral resource estimates would not result in a material change to the information contained in the Los Gatos Technical Report***. The mineral reserve estimates and the economic analysis contained in the Los Gatos Technical Report have an effective date of July 1, 2020 and excluded 655,746 tonnes of mineral reserves that had been mined through June 30, 2020. Subsequent to July 1, 2020, 813,736 tonnes of material have been mined, which we believe ***would not result in a material change to the information contained in the Los Gatos Technical Report***.

These statements were materially false when made because Gatos's management knew at the time that the 2020 Technical Report contained an error of at least 20 percent, and there was no basis to

claim that "activity" at CLG "subsequent to the effective date of the mineral resource estimates" or the July 1, 2020 Technical Report "would not result in a material change" to the 2020 Technical Report's resource and reserve figures. These statements also violated the SEC requirements to provide updated disclosure "when there is a material change in the mineral reserves or mineral resources from the last technical report summary filed for the property," 17 C.F.R. § 229.1302(b)(2)(i), and when a previously filed report "is not current" with respect to "[a]ll material assumptions and information pertaining to the disclosure of a registrant's mineral resources and mineral reserves." 17 C.F.R. § 229.1304(f)(2). In its January 25, 2022 press release, Gatos admitted that the 2020 Technical Report contained "errors" and "should not be relied upon," described "a potential reduction of the metal content of CLG's mineral reserve ranging from 30% to 50% of the metal content remaining after depletion," and admitted that there are "indications that there is an overestimation in the existing resource model." In addition, these statements were materially misleading when made because they confirmed the resource and reserve figures in the 2020 Technical Report by stating that "activity" at CLG after July 1, 2020 (including the mining of 813,736 tonnes of material) "would not result in a material change to the information contained" in the 2020 Technical Report, while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver

deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, (4) the Company had already been advised that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (5) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.  The omission of these existing, material negative facts made the statements misleading in the context in which they were made.

225.    The 2021 Registration Statement contained the following risk disclosures:

> Important factors that could cause our actual results to differ materially from those expressed or implied by forward-looking statements include, but are not limited to, the following: . . . . ***mineral reserve and mineral resource calculations at the CLG and the Los Gatos District are only estimates and actual production results may vary significantly from the estimates***.

These purported risk disclosures were materially misleading when made because, while in purportedly warning investors that "actual production results may vary significantly from the estimates" of CLG's reserves and resources set forth in the 2020 Technical Report, they omitted the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, (4) the Company had already been advised that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra

Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (5) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.  By portraying the potential for inaccurate estimates as merely a hypothetical risk, rather than a known certainty, the 2021 Registration Statement omitted material facts necessary to make the statements not misleading in the context in which they were made.

226.    The 2021 Registration Statement also contained the same "Glossary of Technical Terms" from the 2020 Registration Statement.  The false and misleading statements in the "Glossary of Technical Terms," and the reasons why each such statement was materially false and misleading, are set forth in Paragraph 206 above.

227.    The 2021 Registration Statement also incorporated by reference Gatos's 2020 10-K and 1Q2021 10-Q, which contained material misstatements and omissions that are actionable under the Securities Act.  Those misstatements and omissions and the reasons why each was materially false and misleading are set forth in Paragraphs 269-71, 273-74, 276-77, and 280-82 and 286 below.

### 2.    Material Omissions in Violation of Item 303

228.    The 2021 Registration Statement omitted at least two known, material trends and uncertainties related to CLG's overstated resources and reserves, in violation of Item 303.

229.    First, before the July 2021 Offering, Gatos knew of material errors and overstatements in the 2020 Technical Report.  Indeed, by the time of the July 2021 Offering, Gatos had been specifically advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors.  Regardless of whether Defendants had finally determined the

exact origin or magnitude of the errors and overstatements, they constituted a known uncertainty that Gatos reasonably expected would have a material unfavorable impact on its revenues, net sales, and income. Even if the errors, overstatements, or their exact magnitude were not known with absolute certainty, disclosure was required under the two-step test above.

230.    Second, by the time of the July 2021 Offering, Gatos also knew that the CLG mine's production rate over the prior 22 months was unsustainable, as the reserves would run out years before the 11-year LOM described in the 2020 Technical Report. Indeed, with an overstatement in reserves of 4.15 million tonnes, using a historical extraction rate of about 65,000 tonnes per month, the reserves would run out five years early. By the time of the July 2021 Offering, CLG had been in production for nearly two years, and this unsustainable production rate was a known trend that Gatos reasonably expected would have a material unfavorable impact on the Company's revenues, net sales, and income, as revenues, sales, and income would sharply diminish or disappear once the reserves were depleted.

### F.    The Individual Defendants Failed to Perform Reasonable Diligence in Connection with the IPO and July 2021 Offering

231.    As the issuer, Gatos is strictly liable under the Securities Act and has no defenses to liability. The Individual Defendants, Gatos's directors and officers, are also liable because they acted negligently and cannot establish any due diligence defense to liability.

232.    The Individual Defendants could not have believed (or had reasonable ground to believe) that the Registration Statements contained no materially false or misleading statements or omissions. Defendants Orr and Johnson were officers of Gatos (as its CEO and CFO), were directly involved with CLG for nearly a decade prior to the IPO, and knew that the resource and reserve figures were overstated, as detailed above and below. In 2018, for example, the

Company's first effort to extract ore revealed that the orebody was not located where the model indicated. Prior to and after the IPO, Orr and Johnson participated in monthly in-person meetings, reviewed core samples, and received updates on construction progress, mining results, and costs.

233. The remaining Individual Defendants, members of Gatos's Board of Directors, are experienced mining investors and executives. For example, Defendant Stairs has over 30 years of experience in mining, including as General Counsel to Namibia Critical Metals Inc. from 2011 to 2019, while Defendant Erfan has served as a director of The Electrum Group since 2007, and as its Vice Chairman since 2017. Defendant Gonzales has more than 30 years of experience in the mining industry, including senior executive roles at Sierra Metals Inc., Companiade Minas Buenaventura, Barrick Gold Corporation, and Southern Peru Copper Corporation. Gatos's latest proxy statement indicates that Defendant Hanneman "has more than 35 years of mining industry management and technical experience as a manager, mining engineer, mine operator and entrepreneur." Defendant Peat has more than 35 years of experience in financial leadership at mining companies, including as CFO of Frontera Copper Corporation and Homestake Mining Company, and as Global Controller of Newmont Mining Corporation. Defendant Hansard has significant experience leading mining companies, including as the Chairman of African Platinum from 1996 to 2004, and as a director of Apex Silver Mines Limited from 2001 to 2006 and of Electrum Limited from 2013 to present. Defendant Quintanilla similarly has extensive experience as a mining executive, including as Managing Director (CEO) of Americas Mining, and as CEO of Industrial Minera Mexico S.A. de C.V., the Underground Mining Division of Grupo Mexico. Such individuals are necessarily familiar with the importance of accurate resource and reserve

figures, the controlling disclosure requirements, and the timely disclosure of any known or suspected errors or misstatements.

234.    The Individual Defendants failed to perform a reasonable investigation.    A reasonable investigation would have uncovered the existing facts that the 2020 Technical Report incorporated into the 2020 Registration Statement (a) contained errors and (b) materially overstated CLG's reserves and resources.  As detailed above, before the IPO, Gatos's managers regularly questioned why ore was not being found in the expected locations at CLG based on the Tetra Tech resource model, and Gatos had identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, strongly indicating that the 2020 Technical Report and the 2020 Registration Statement were materially false and misleading and contained material omissions.    Further, Gatos's withdrawal of the 2020 Technical Report and admission that it contains "errors" indicate that the 2020 Technical Report was false at the time of the IPO.  These errors could have been discovered with a reasonable investigation; indeed, the Company's consultant Linebarger was able to identify them quickly after being retained.    Even more information was available by the time the Individual Defendants signed the 2021 Registration Statement.  By this point, Gatos had been specifically advised of an error of 20 percent, and Orr (himself a Director) and Johnson received regular status updates.    Moreover, insiders Pyle and Huerta had made unusual, large, and highly profitable stock sales in May and June 2021, before the July 2021 Offering, and Gatos has admitted that it provided materially false information about reserves to its lenders before that Offering.    These matters should have been carefully reviewed by the Individual Defendants in the exercise of reasonable care.    A reasonable investigation would

also have revealed that the 2020 Registration Statement and 2021 Registration Statement omitted known trends and uncertainties in violation of SEC requirements.

235.    Reviewing the validity of the resource and reserve figures provided in the 2020 Technical Report—and reiterated in both Registration Statements—was particularly important because the CLG mine was Gatos's sole source of revenue and profit, and the claimed resources and reserve figures directly affected the value of Gatos as a public company.

**G.    Gatos's Share Price Collapses by the Time of Suit**

236.    Gatos common stock was offered in the IPO at $7.00 per share.  By the time this action was filed on February 22, 2022, its price had fallen to $3.18 per share.

**V.    CLAIMS FOR RELIEF UNDER THE SECURITIES ACT**

**COUNT I**
**Section 11 of the Securities Act**
**(Against the Securities Act Defendants)**

237.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

238.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the 2020 Registration Statement and/or 2021 Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the IPO or July 2021 Offering.  For purposes of asserting this and their other claims under the Securities Act, Plaintiffs do not allege that the Securities Act Defendants acted with intentional, reckless or otherwise fraudulent intent.

239. The 2020 Registration Statement and 2021 Registration Statement, at the time when each became effective, were inaccurate and misleading, contained (and/or incorporated by reference) untrue statements of material facts, omitted to state (and/or incorporated by reference documents that omitted to state) material facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

240. The Securities Act Defendants were responsible for the content and dissemination of the 2020 Registration Statement and 2021 Registration Statement.

241. As the issuer of Gatos common stock, Gatos is strictly liable for any material misstatements and omissions in the 2020 Registration Statement and 2021 Registration Statement.

242. The other Securities Act Defendants acted negligently in that none of them made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the 2020 Registration Statement and 2021 Registration Statement were true and not misleading, and that the 2020 Registration Statement and 2021 Registration Statement did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading. These Securities Act Defendants are liable for the actionable statements and omissions in the Registration Statements because each signed the 2020 Registration Statement and/or 2021 Registration Statement as a senior officer and/or director of Gatos.

243. Plaintiffs and members of the Class acquired Gatos common stock pursuant and/or traceable to the 2020 Registration Statement and 2021 Registration Statement.

244. When they acquired Gatos common stock pursuant and/or traceable to the 2020 Registration Statement and 2021 Registration Statement, Plaintiffs and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths or

omissions contained (and/or incorporated by reference) in the 2020 Registration Statement and 2021 Registration Statement.

245.    Plaintiffs and the Class suffered damages in connection with the purchase or acquisition of Gatos common stock pursuant and/or traceable to the 2020 Registration Statement and 2021 Registration Statement.  The value of Gatos common stock has declined substantially subsequent to and due to the Securities Act Defendants' violations.

<div align="center">

**COUNT II**
**Section 15 of the Securities Act**
**(Against the Individual Defendants)**

</div>

246.    Plaintiffs repeat and reallege each and every allegation above relating to the Securities Act claims as if fully set forth herein.

247.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the 2020 Registration Statement and 2021 Registration Statement are alleged to have been materially misstated statements of opinion or belief when made and at the time of the IPO or July 2021 Offering.  For purposes of asserting this and his other claims under the Securities Act, Plaintiffs do not allege that the Securities Act Defendants acted with intentional, reckless, or otherwise fraudulent intent.

248.    During their tenures as officers and/or directors of Gatos, including at the time of the IPO and July 2021 Offering and when the 2020 Registration Statement and 2021 Registration Statement became effective, the Individual Defendants acted as controlling persons of Gatos within the meaning of § 15 of the Securities Act.

249.    By virtue of their positions of control and authority and their direct participation in and/or awareness of Gatos's operations and finances, the Individual Defendants had the power to, and did, direct or cause the direction of the management, policies, and actions of Gatos and its employees, and caused Gatos to issue, offer, and sell common stock pursuant to the defective 2020 Registration Statement and 2021 Registration Statement.

250.    The Individual Defendants had the power to, and did, control the decision-making of Gatos, including the content and issuance of the statements contained (and/or incorporated by reference) in the 2020 Registration Statement and 2021 Registration Statement; they were provided with or had unlimited access to copies of the 2020 Registration Statement and 2021 Registration Statement (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they signed the 2020 Registration Statement and/or 2021 Registration Statement and were directly involved in or responsible for providing false or misleading information contained in the 2020 Registration Statement and/or 2021 Registration Statement (and/or documents incorporated by reference therein) and/or certifying and approving that information.

251.    The Individual Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the 2020 Registration Statement and 2021 Registration Statement were true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

252. Plaintiffs and others similarly situated suffered damages in connection with the purchase or acquisition of Gatos common stock pursuant and/or traceable to the 2020 Registration Statement and/or 2021 Registration Statement.

253. By reason of such conduct, the Individual Defendants are liable pursuant to § 15 of the Securities Act.

## VI.   EXCHANGE ACT ALLEGATIONS

### A.   Exchange Act Parties

#### 1.   Plaintiffs

254. Lead Plaintiff is described above.

255. During the Class Period, Lead Plaintiff purchased or otherwise acquired NYSE-listed Gatos common stock and publicly traded call options on Gatos common stock, and sold publicly traded put options on Gatos common stock, as set forth in the Certification attached to the Motion of Bard Betz for Appointment as Lead Plaintiff and Approval of His Selection of Lead Counsel (ECF 16-5), and suffered damages as a result of the violations of the federal securities laws alleged herein.

256. Named Plaintiff is described above.

257. During the Class Period, Named Plaintiff purchased or otherwise acquired NYSE-listed Gatos common stock, as set forth in the Certification attached hereto as Exhibit A, and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### 2.   Exchange Act Defendants

258. Defendant Gatos is described above.

259.    Defendant Orr, Gatos's former Chief Executive Officer and Director, is described above.  In addition to signing the 2020 and 2021 Registration Statements, Orr signed and certified each Form 10-K and 10-Q that Gatos filed during the Class Period and made false and misleading statements on conference calls with investors and analysts, as alleged specifically herein. During his tenure at Gatos, Orr had the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

260.    Defendant Roger Johnson, Gatos's former Chief Financial Officer, is described above.  In addition to signing the 2020 and 2021 Registration Statements, Johnson signed and certified each Form 10-K and 10-Q that Gatos filed during the Class Period.  During his tenure at Gatos, Johnson had the power and authority to, and in fact did, approve and control the contents of the Company's SEC filings alleged herein to be false and misleading.

261.    Defendant Philip Pyle was the Company's Vice President of Exploration from June 2011 to April 2022, and was the Company's Chief Geologist from January 2020 to April 2022.  During the Class Period, Pyle was regularly identified as the "qualified person" who "approved" the "[s]cientific and technical disclosures" in Gatos's press releases.  Pyle also made false and misleading statements on conference calls with investors and analysts, as alleged specifically herein.

262.    Defendants Orr, Johnson, and Pyle are referred to herein collectively as the "Officer Defendants."  Gatos and the Officer Defendants are referred to herein collectively, as to claims under the Exchange Act, as the "Exchange Act Defendants."

**B.    Exchange Act False and Misleading Statements**

263.    During the Class Period, as detailed below, the Exchange Act Defendants made materially false and misleading statements in SEC filings and on conference calls with investors concerning (a) CLG's resources, reserves, and LOM; (b) the definitions and methodology used to determine the overstated resources and reserves; (c) risk factors related to the resources and reserves that were misleading because the purported "risks" were already a known certainty; (d) Gatos's financial performance and compliance with GAAP; (e) a claim that no impairment testing was required, which was false because CLG's reserves were materially overstated at the time; (f) Gatos's disclosure controls and internal controls over financial reporting; and (g) the purported results of new drilling and success in upgrading CLG's resources, even as CLG's existing resources and reserves were known to be materially overstated.  As detailed below, the Exchange Act Defendants also made material omissions in violation of Item 303.  For the avoidance of doubt, the only statements and omissions that Plaintiffs allege to be actionable under the Exchange Act are included in this section.

**1.    Exchange Act Materially False and Misleading Statements Reiterating CLG's Resources, Reserves, and LOM**

264.    <u>3Q2020 10-Q and Other Quarterly Filings</u>.  Gatos's 3Q2020 10-Q, filed on December 9, 2020, stated:

> The Los Gatos Technical Report, which has an effective date of July 1, 2020, estimates that the deposit contains ***approximately 9.6 million diluted tonnes of proven and probable mineral reserves*** (or approximately 6.7 million diluted tonnes of proven and probable mineral reserves on a 70.0% basis), with ***approximately 6.4 million diluted tonnes of proven mineral reserves*** (or approximately 4.5 million diluted tonnes of proven mineral reserves on a 70.0% basis) and ***approximately 3.3 million diluted tonnes of probable mineral***

> *reserves* (or approximately 2.3 million diluted tonnes of probable mineral reserves on a 70.0% basis). ***Average proven and probable mineral reserve grades are 306 g/t silver, 0.35 g/t gold, 2.76% lead and 5.65% zinc***.

The 1Q2021 10-Q, 2Q2021 10-Q, and 3Q2021 10-Q likewise reiterated the 2020 Technical Report's false reserve figures, stating that the CLG mine contains "approximately 9.6 million diluted tonnes of proven and probable mineral reserves," including "approximately 6.4 diluted tonnes of proven mineral reserves" and "approximately 3.3 million diluted tonnes of probable mineral reserves."

265.    The statements in Paragraph 264 were materially false when made because they overstated CLG's reserves.  In reality, as detailed above, the 2020 Technical Report contained multiple errors (as Gatos has admitted) and materially overstated CLG's resources and reserves. In addition, the statements in Paragraph 264 were materially misleading when made because they quantified CLG's reserves and resources while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, (4) the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (5) the 2020 Technical Report contained

errors and materially overstated CLG's reserves and resources. The omission of these existing, material negative facts made the statements misleading in the context in which they were made. These materially false and misleading statements in the 3Q2020 10-Q and 1Q2021 10-Q were also incorporated by reference in the 2021 Registration Statement.

266.    During Gatos's 3Q2020 Earnings Call, Defendant Orr stated:

> Gatos Silver achieved record production from the mine, record silver, zinc and lead recoveries through the processing plant and it resulted in record cash flow generation. . . . ***The metal recoveries have been excellent. Silver is almost exactly at the expected recovery from feasibility study. Zinc is slightly above the feasibility study expectation and lead is actually 2% higher***.

These statements were materially misleading when made because they emphasized the purported strength of CLG's production results and corroboration of the 2020 Technical Report, while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, and (4) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources. The omission of these existing, material negative facts made the statements misleading in the context in which they were made.

267.    During the 3Q2020 Earnings Call, Defendant Orr stated:

> The key takeaways are that 2,500 tonnes per day, ***there are 11
> remaining years in the life of this mine.***

These statements were materially false when made because CLG's 11-year mine life was based on the materially overstated reserves and resources in the 2020 Technical Report. In reality, as detailed above, the 2020 Technical Report contained multiple errors (as Gatos has admitted) and materially overstated CLG's resources and reserves, and CLG's life of mine is several years shorter than 11 years. In addition, these statements were materially misleading when made because they promoted CLG's 11-year mine life based on the 2020 Technical Report while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, and (4) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources, with the result that CLG's actual mine life is 2.85 to 4.75 years shorter than the 11 years claimed. In failing to disclose these existing, material negative facts, Defendant Orr omitted material facts necessary to make the statements not misleading in the context in which they were made.

268. <u>Dec. 16, 2020 Form 8-K</u>. On December 16, 2020, Gatos filed a Form 8-K that attached a press release announcing the "Initiation of Exploration Drilling in the Los Gatos

Region," which specified that the "[s]cientific and technical disclosures in this press release were

approved by Philip Pyle," and stated:

> The Cerro Los Gatos measured and indicated ("M&I") resources are
> currently comprised of 10.4 million tonnes at 269 g/t silver, 5.5%
> zinc, 2.7% lead and 0.34 g/t gold.  Within the M&I resources, 9.6
> million tonnes are classified as proven and probable reserves and
> incorporated into the current mine plan.

These statements were materially false when made because they materially overstated CLG's

resources and reserves.  In reality, as detailed above, the 2020 Technical Report contained multiple

errors (as Gatos has admitted) and materially overstated CLG's resources and reserves.   In

addition, these statements were materially misleading when made because they quantified CLG's

reserves and resources while omitting the existing, material negative facts that (1) the Company's

actual production experience had already demonstrated that the resource model for CLG was

inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of

Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of

CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020

Technical Report's use of an unreliable resource model that wrongly assumed a consistent,

uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver

deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018,

and (4) the 2020 Technical Report contained errors and materially overstated CLG's reserves and

resources.  The omission of these existing, material negative facts made the statements misleading

in the context in which they were made.

     269.   <u>2020 10-K</u>.  Gatos's 2020 10-K, filed with the SEC on March 29, 2021, contained

the following statements:

The mineral resource estimates contained in the Los Gatos Technical Report have an effective date of September 6, 2019 and have not been updated since that time. *We believe that activity at the CLG subsequent to the effective date of the mineral resource estimates would not result in a material change to the information contained in the Los Gatos Technical Report.* The mineral reserve estimates and the economic analysis contained in the Los Gatos Technical Report have an effective date of July 1, 2020 and exclude 655,746 tonnes of mineral reserves that have been mined through June 30, 2020. Subsequent to July 1, 2020, 363,857 tonnes of material have been mined through December 31, 2020, which *we believe would not result in a material change to the information contained in the Los Gatos Technical Report.*

As to reserves, the 2020 10-K stated:

The Los Gatos Technical Report estimates that the deposit contains *approximately 9.6 million diluted tonnes of proven and probable mineral reserves* (or approximately 5.0 million diluted tonnes of proven and probable mineral reserves on a 51.5% basis), with *approximately 6.4 million diluted tonnes of proven mineral reserves* (or approximately 3.3 million diluted tonnes of proven mineral reserves on a 51.5% basis) and *approximately 3.3 million diluted tonnes of probable mineral reserves* (or approximately 1.7 million diluted tonnes of probable mineral reserves on a 51.5% basis). Average proven and probable mineral reserve grades are 306 g/t silver, 0.35 g/t gold, 2.76% lead and 5.65% zinc. The mineral reserve estimates contained in the Los Gatos Technical Report have an effective date of July 1, 2020 and exclude 655,746 tonnes of mineral reserves that have been mined through June 30, 2020. Subsequent to July 1, 2020, 363,857 tonnes of material have been mined through December 31, 2020, which *we believe would not result in a material change to the information contained in the Los Gatos Technical Report.*

As to resources, the 2020 10-K stated:

The Los Gatos Technical Report estimates that the CLG contains *10.4 million tonnes of measured and indicated resources* (or 5.4 million tonnes of measured and indicated resources on a 51.5% basis) inclusive of mineral reserves, at average grades of 269 g/t silver, 2.7% lead, 5.5% zinc, 0.34 g/t gold and 0.11% copper, or 3.5 million tonnes of measured and indicated resources (or 1.8 million tonnes of measured and indicated resources on a 51.5% basis)

exclusive of mineral reserves, at average grades of 154 g/t silver, 2.2% lead, 4.3% zinc and 0.29 g/t gold, and 3.7 million tonnes of inferred resources (or 1.9 million tonnes of inferred resources on a 51.5% basis), at average grades of 107 g/t silver, 2.8% lead, 4.0% zinc and 0.28 g/t gold. The mineral resource estimates for the CLG have an effective date of September 6, 2019 and have not been updated since that time. ***We believe that activity at the CLG subsequent to the effective date of the mineral resource estimates would not result in a material change to the information contained in the Los Gatos Technical Report.***

270.    The statements in Paragraph 269 were materially false when made because they materially overstated CLG's resources and reserves.  In reality, as detailed above, the 2020 Technical Report contained multiple errors (as Gatos has admitted) and materially overstated CLG's resources and reserves.  Indeed, the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors.  Moreover, the statements that "activity at the CLG subsequent to the effective date of the mineral resource estimates" or the July 1, 2020 Technical Report "would not result in a material change to the information contained in the Los Gatos Technical Report" were materially false when made because Gatos's management knew at the time that the 2020 Technical Report contained an error of at least 20 percent, and there was no basis to claim that "activity" since September 2019 "would not result in a material change" to the 2020 Technical Report's resource and reserve figures.  The statements in Paragraph 269 also violated the SEC requirements to provide updated disclosure "when there is a material change in the mineral reserves or mineral resources from the last technical report summary filed for the property," 17 C.F.R. § 229.1302(b)(2)(i), and when a previously filed report "is not current" with respect to "[a]ll material assumptions and information pertaining to the disclosure of a registrant's mineral resources and mineral reserves."  17 C.F.R. § 229.1304(f)(2).

In addition, the statements in Paragraph 269 were materially misleading when made because they detailed CLG's reserves and resources while omitting the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, (4) the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (5) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources. The omission of these existing, material negative facts made the statements misleading in the context in which they were made. The materially false and misleading statements in Paragraph 269 were also incorporated by reference in the 2021 Registration Statement.

### 2. Exchange Act Materially False and Misleading Statements Concerning Definitions and Methodology

271. The 2020 10-K contained the same false and misleading statements as the 2020 Registration Statement with respect to the "Glossary of Technical Terms" and methodology. These false and misleading statements, and the reasons why each statement is false and misleading, are set forth above at Paragraphs 206-07. These materially false and misleading statements in the 2020 10-K were also incorporated by reference in the 2021 Registration Statement.

272.    <u>1Q2021 Earnings Call</u>.  On May 7, 2021, Defendants held Gatos's 1Q2021

Earnings Call.  An analyst from BMO Capital Markets asked Defendant Orr, "Should we expect

an upward trend [through Q3 and Q4 2021] or is the number that you mentioned in April a good

number to be thinking about?  Defendant Orr responded:

> The number in April is a good number to think about. And then to your earlier question, ***we actually did a reconciliation to the resource model for all of the mining we did in 2020. And interestingly enough, we actually ended up mining more silver than the resource -- modestly more silver than the resource model indicated***. The difference was where we ended up mining because we didn't have access and we hadn't yet achieved development access into areas that we anticipated we would have. So we ended up going into areas that were lower grade and the resource model showed that as lower grade as well. But ***the takeaway for us was that the resource is turning out -- our calculation is turning out to be very reliable, which is terrific news.***

These statements were materially false when made because no "reconciliation" of 2020 mining to

the resource model had shown that "our calculation is turning out to be very reliable."  Rather, the

internally known facts were the exact opposite:  (1) the Company's actual production experience

had demonstrated that the resource model for CLG was inaccurate, (2) the Company had already

identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical

Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond

the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable

resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to

the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech

had observed and experienced at CLG since 2018, and (4) the Company had been advised in

January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged

Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors.

Defendant Orr's claim that the resource calculation was "very reliable" was also materially misleading when made because, in failing to disclose these existing, material negative facts, Defendant Orr omitted material facts necessary to make the statements not misleading in the context in which they were made.

        **3.**      **Exchange Act Materially Misleading Statements Concerning Risk Factors That Were a Known Certainty**

273.    The 2020 10-K contained the following risk disclosure:

> Calculations of mineral reserves at the CLG and of the mineral resources at the Los Gatos District are only estimates and depend on geological interpretation and statistical inferences or assumptions drawn from drilling and sampling analysis, which *might prove to be materially inaccurate*. There is a *degree of uncertainty* attributable to the calculation of mineral reserves and mineral resources.  Until mineral reserves and mineral resources are actually mined and processed, the quantity of metal and grades must be considered as estimates only and no assurance can be given that the indicated levels of metals will be produced. . . .

> The estimation of mineral reserves and mineral resources is a *subjective process that is partially dependent upon the judgment of the persons preparing the estimates*. The process relies on the quantity and quality of available data and is based on knowledge, mining experience, statistical analysis of drilling results and industry practices. Valid estimates made at a given time *may significantly change when new information becomes available*.

These purported risk disclosures were materially misleading when made because, in purportedly warning investors that the purportedly "[v]alid estimates" of CLG's reserves and resources "might prove to be materially inaccurate," carried "a degree of uncertainty," resulted from a "subjective process that is partially dependent" upon "judgment," and "may significantly change when new information becomes available," they omitted the existing, material negative facts that (1) the Company's actual production experience had already demonstrated that the resource model for

CLG was inaccurate, (2) the Company had already identified errors in the analysis underlying the Life of Mine plan used for the 2020 Technical Report, (3) the Life of Mine plan's incorrect extension of CLG's ore and mineralization beyond the modeled boundaries of the deposit, and the 2020 Technical Report's use of an unreliable resource model that wrongly assumed a consistent, uniform deposit, were both directly contrary to the inherent characteristics of narrow-vein silver deposits and what the Company and Tetra Tech had observed and experienced at CLG since 2018, (4) the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (5) the 2020 Technical Report contained errors and materially overstated CLG's reserves and resources.   By portraying the potential inaccuracy and uncertainty of the resource and reserve calculations as merely hypothetical risks, rather than known certainties, the 2020 10-K omitted material facts necessary to make the statements not misleading in the context in which they were made.   These materially misleading statements in the 2020 10-K were also incorporated by reference in the 2021 Registration Statement.

### 4. Exchange Act Materially False Statements Concerning Financial Performance and Compliance with GAAP

274.    Throughout the Class Period, Gatos filed financial reports with the SEC that materially understated depreciation and depletion expenses and materially misstated net income/losses as a result of the overstated reserves and LOM in the 2020 Technical Report. (*See* Section III.O.)  These false financial reports violated GAAP.  The specific impact of these understatements and overstatements, by quarter, is set forth in the charts below:

**Understated Depletion Expenses:**

| $s in millions | 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Depletion Expense | $7.3 | $5.0 | $4.1 | $5.0 | $5.0 | $4.9 | $5.7 | $5.7 | $42.7 |
| Error [30% Reduced Reserves] | $3.2 | $2.2 | $1.8 | $2.2 | $2.2 | $2.2 | $2.5 | $2.5 | $19.0 |
| Error [50% Reduced Reserves] | $6.5 | $4.4 | $3.6 | $4.5 | $4.5 | $4.3 | $5.0 | $5.1 | $37.8 |

**Understated Depreciation Expenses:**

| $s in millions | 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Total |
|---|---|---|---|---|---|---|---|---|---|
| Depreciation Expense | $8.2 | $6.7 | $5.5 | $6.8 | $6.8 | $6.0 | $7.0 | $7.0 | $54.0 |
| Error (7-year LOM) | $4.7 | $3.8 | $3.1 | $3.9 | $3.9 | $3.4 | $4.0 | $4.0 | $30.9 |

**Overstated LGJV Net Income/Loss:**

| Errors in LGJV Net Income/Loss | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $s in millions | 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Total |
| LGJV Reported Income/(Loss) | ($22.1) | ($23.9) | ($14.5) | $7.8 | $2.9 | $6.9 | $29.3 | $5.5 | ($8.1) |
| Corrected Income/(Loss) [30% Reduced Reserves and 7-year LOM] | ($30.0) | ($30.0) | ($19.4) | $1.7 | ($3.3) | $1.2 | $22.8 | ($1.0) | ($57.9) |
| Corrected Income/(Loss) [50% Reduced Reserves and 7-year LOM] | ($33.2) | ($32.2) | ($21.2) | ($0.5) | ($5.5) | ($0.9) | $20.3 | ($3.5) | $(76.8) |

**Overstated Company Equity Income/Loss in Affiliates:**

| Errors in Gatos Equity Income/Loss in Affiliates | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $s in millions | 2019 | Q1 2020 | Q2 2020 | Q3 2020 | Q4 2020 | Q1 2021 | Q2 2021 | Q3 2021 | Total |
| Gatos Income/(Loss) from Affiliate | ($12.9) | ($13.4) | ($8.1) | $3.4 | $0.5 | $2.7 | $18.3 | $1.6 | ($7.9) |
| Corrected Income/(Loss) [30% Reduced Reserves and 7-year LOM] | ($16.9) | ($16.6) | ($10.6) | $0.3 | ($2.7) | ($0.2) | $13.7 | ($3.0) | ($35.9) |
| Corrected Income/(Loss) [50% Reduced Reserves and 7-year LOM] | ($18.6) | ($17.7) | ($11.5) | ($0.8) | ($3.8) | ($1.3) | $12.0 | ($4.7) | ($46.6) |

**Overstated Company Net Income/Loss:**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Errors in Gatos Net Income/Loss** | | | | | | | | | |
| *$s in millions* | **2019** | **Q1 2020** | **Q2 2020** | **Q3 2020** | **Q4 2020** | **Q1 2021** | **Q2 2021** | **Q3 2021** | **Total** |
| Gatos Net Income/(Loss) | ($37.8) | ($17.8) | ($12.1) | ($1.2) | ($9.3) | ($1.6) | $13.5 | ($15.0) | ($81.4) |
| Corrected Income/(Loss) [30% Reduced Reserves and 7-year LOM] | ($41.9) | ($20.9) | ($14.7) | ($4.3) | ($12.4) | ($4.5) | $8.9 | ($19.6) | ($109.5) |
| Corrected Income/(Loss) [50% Reduced Reserves and 7-year LOM] | ($43.5) | ($22.1) | ($15.6) | ($5.5) | ($13.6) | ($5.6) | $7.2 | ($21.3) | ($120.1) |

275.     Gatos's 3Q2020 10-Q reported that, for the nine months ended September 30, 2020 and 2019, the LGJV incurred $33,077,000 and $3,394,000, respectively, in "[d]epreciation, depletion and amortization" expenses, and that Gatos had incurred net losses of $1,185,000 in 3Q2020, $4,874,000 in 3Q2019, $31,150,000 for the nine months ended September 30, 2020, and $22,896,000 for the nine months ended September 30, 2019.  The 3Q2020 10-Q also reported the LGJV's net income as $7.8 million and Gatos's equity income in affiliates as $3.5 million for 3Q2020.  In addition, the 3Q2020 10-Q affirmed that the financial statements complied with GAAP at both the Company and LGJV levels:

> In accordance with generally accepted accounting principles in the United States ("U.S. GAAP"), these financial results represent the consolidated results of operations of our Company and its subsidiaries . . . .
>
> In accordance with U.S. GAAP, these financial statements represent the combined financial position and results of the LGJV.

These statements were materially false when made because, as a result of the errors and material overstatements of CLG's reserves and LOM contained in the 2020 Technical Report and Gatos's deficient internal controls, depreciation and depletion expenses, net income/losses, and equity income in affiliates were materially misstated in violation of GAAP.  The specific material impact

of the errors, overstated reserves, and overstated LOM on the financial statements in the 3Q2020 10-Q is quantified in Paragraph 274 above. These materially false statements in the 3Q2020 10-Q were also incorporated by reference in the 2021 Registration Statement.

276.    Gatos's 2020 10-K reported that, for the twelve months ended December 31, 2020 and 2019, the LGJV incurred "[d]epreciation, depletion and amortization" expenses of $44,904,000 and $15,460,000, respectively. The 2020 10-K also contained the following statement regarding the LGJV's depletion expense:

> Upon the commencement of production, capitalized costs are charged to operations using the units-of-production method in the period the applicable metal reserves are processed over the estimated proven and probable reserve tons directly benefiting from the capital expenditures. ***The LGJV incurred $19,117 [thousand] and $7,291 [thousand] for the years ended December 31, 2020 and 2019, respectively, in depletion expense***. . . .

The 2020 10-K also indicated depreciation expenses of $25.8 million for the year ended December 31, 2020 (the $44.9 million in reported "[d]epreciation, depletion and amortization" expenses minus the reported $19.1 million in "depletion expense"). At the Company level, the 2020 10-K stated that Gatos had incurred net losses from continuing operations of $35,027,000 in 2020 and $30,908,000 in 2019:

> ***For the year ended December 31, 2020, we experienced a net loss from continuing operations of $35,027 thousand compared to a net loss of $30,908 thousand for the year ended December 31, 2019***.

The 2020 10-K also reported the LGJV's net loss as $27.7 million and Gatos's equity loss in affiliates as $17.6 million for the year ended December 31, 2020. In addition, the 2020 10-K affirmed that the financial statements complied with GAAP at both the Company and LGJV levels:

> The accompanying consolidated financial statements of the Company have been prepared in accordance with United States Generally Accepted Accounting Principles ("GAAP") and include the accounts of Gatos Silver and MLS. . . .
>
> In accordance with U.S. GAAP, these financial statements represent the combined financial position and results of the LGJV.

These statements were materially false when made because, as a result of the errors and material overstatements of CLG's reserves and LOM contained in the 2020 Technical Report and Gatos's deficient internal controls, depreciation and depletion expenses, net income/losses, and equity income in affiliates were materially misstated in violation of GAAP. The specific material impact of the errors, overstated reserves, and overstated LOM on the financial statements in the 2020 10-K is quantified in Paragraph 274 above. These materially false statements in the 2020 10-K were also incorporated by reference in the 2021 Registration Statement.

277. Gatos's 1Q2021 10-Q reported that, for 1Q2021 and 1Q2020, the LGJV incurred $10,949,000 and $11,717,000, respectively, in "[d]epreciation, depletion and amortization" expenses, and that Gatos had incurred a net loss of $1,620,000 and $17,821,000 in 1Q2021 and 1Q2020, respectively. The 1Q2021 10-Q also reported the LGJV's net income as $6.85 million and Gatos's equity income in affiliates as $2.7 million for 1Q2021. In addition, the 1Q2021 10-Q affirmed that the financial statements complied with GAAP at both the Company and LGJV levels:

> The financial statements [of Gatos] have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information. . . .
>
> The following table presents information relating to the LGJV's financial condition as of March 31, 2021 and December 31, 2020, and the operating results for the three months ended March 31, 2021 and 2020 in accordance with GAAP.

These statements were materially false when made because, as a result of the errors and material overstatements of CLG's reserves and LOM contained in the 2020 Technical Report and Gatos's deficient internal controls, depreciation and depletion expenses, net income/losses, and equity income in affiliates were materially misstated in violation of GAAP. The specific material impact of the errors, overstated reserves, and overstated LOM on the financial statements in the 1Q2021 10-Q is quantified in Paragraph 274 above. These materially false statements in the 1Q2021 10-Q were also incorporated by reference in the 2021 Registration Statement.

278.    Gatos's 2Q2021 10-Q reported that the LGJV incurred "[d]epreciation, depletion, and amortization" expenses of $12,705,000 in 2Q2021, $9,543,000 in 2Q2020, $23,654,000 in the six months ended June 30, 2021, and $21,260,000 in the six months ended June 30, 2020. The 2Q2021 10-Q also reported that Gatos generated net income of $13,491,000 in 2Q2021, net losses of $12,144,000 in 2Q2020, net income of $11,871,000 in the six months ended June 30, 2021, and net losses of $29,965,000 in the six months ended June 30, 2020. The 2Q2021 10-Q also reported the LGJV's net income as $29.3 million and Gatos's equity income in affiliates as $18.3 million for 2Q2021. In addition, the 2Q2021 10-Q affirmed that the financial statements complied with GAAP at both the Company and LGJV levels:

> The financial statements [of Gatos] have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information. . . .
>
> The following table presents information relating to the LGJV's financial condition as of June 30, 2021, and December 31, 2020, and the operating results for the six months ended June 30, 2021 and 2020 in accordance with GAAP.

These statements were materially false when made because, as a result of the errors and material overstatements of CLG's reserves and LOM contained in the 2020 Technical Report and Gatos's

deficient internal controls, depreciation and depletion expenses, net income/losses, and equity income in affiliates were materially misstated in violation of GAAP. The specific material impact of the errors, overstated reserves, and overstated LOM on the financial statements in the 2Q2021 10-Q is quantified in Paragraph 274 above.

279.    Gatos's 3Q2021 10-Q reported that the LGJV incurred "[d]epreciation, depletion, and amortization" expenses of $12,734,000 in 3Q2021, $11,817,000 in 3Q2020, $36,388,000 in the nine months ended September 30, 2021, and $33,077,000 in the nine months ended September 30, 2020. The 3Q2021 10-Q also reported that Gatos incurred net losses of $14,999,000 in 3Q2021, net income from continuing operations of $433,000 in 3Q2020, net losses of $3,128,000 in the nine months ended September 30, 2021, and net losses of $31,150,000 in the nine months ended September 30, 2020. The 3Q2021 10-Q also reported the LGJV's net income as $5.5 million and Gatos's equity income in affiliates as $1.6 million for 3Q2021. In addition, the 3Q2021 10-Q affirmed that the financial statements complied with GAAP at both the Company and LGJV levels:

> The financial statements [of Gatos] have been prepared in accordance with accounting principles generally accepted in the United States ("GAAP") for interim financial information. . . .
>
> The following table presents information relating to the LGJV's financial condition as of September 30, 2021, and December 31, 2020, and the operating results for the three and nine months ended September 30, 2021 and 2020, in accordance with GAAP.

These statements were materially false when made because, as a result of the errors and material overstatements of CLG's reserves and LOM contained in the 2020 Technical Report and Gatos's deficient internal controls, depreciation and depletion expenses, net income/losses, and equity income in affiliates were materially misstated in violation of GAAP. The specific material impact

of the errors, overstated reserves, and overstated LOM on the financial statements in the

3Q2021 10-Q is quantified in Paragraph 274 above.

<div style="text-align:center">

**5.    Exchange Act Materially False Statements Concerning Impairment Testing**

</div>

280.    The 2020 10-K contained the following statements indicating that no impairment

testing had been required for Gatos:

> ***We review and evaluate our long-lived assets for impairment when events or changes in circumstances indicate that the related carrying amounts may not be recoverable.*** Asset impairment is considered to exist if the total estimated future cash flows on an undiscounted basis are less than the carrying amount of the asset. An impairment loss is measured and recorded based on discounted estimated future cash flows. Future cash flows are estimated based on estimated quantities of recoverable minerals, expected silver and other commodity prices (considering current and historical prices, trends and related factors), production levels, operating costs, capital requirements and reclamation costs, all based on LOM plans. ***No impairment tests have been required during the periods presented***.

These statements were materially false when made because they claimed that Gatos performed

impairment tests "when events or changes in circumstances indicate that the related carrying

amounts may not be recoverable," and that "[n]o impairment tests have been required during the

periods presented," including for the year ended December 31, 2020.  In reality, the 2020 Technical

Report contained multiple errors (as Gatos has admitted) and materially overstated CLG's

resources and reserves, the Company's actual production experience had already demonstrated

that the resource model for CLG was inaccurate, the Company had already identified errors in the

analysis underlying the Life of Mine plan used for the 2020 Technical Report, and by January

2021, the Company had already been advised that the 2020 Technical Report contained an error

of 20 percent; as a result, an impairment test was required.  Indeed, Gatos's January 25, 2022 press

<div style="text-align:center">109</div>

release confirmed that the Company "has commenced an impairment analysis to determine if the potential resource and reserve reduction could lead to an impairment charge in current or prior periods." These materially false statements in the 2020 10-K were also incorporated by reference in the 2021 Registration Statement.

### 6. Exchange Act Materially False Statements Concerning Disclosure Controls and Internal Controls over Financial Reporting

281.    In each of Gatos's 3Q2020 10-Q, 2020 10-K, 1Q2021 10-Q, 2Q2021 10-Q, and 3Q2021 10-Q, in the section titled "Controls and Procedures," Defendants Orr and Johnson affirmed that they had conducted an evaluation of "the effectiveness of our disclosure controls and procedures" under the Exchange Act, and that Gatos's "disclosure controls and procedures were effective . . . ." In addition, Gatos's 3Q2020 10-Q, 2020 10-K, 1Q2021 10-Q, 2Q2021 10-Q, and 3Q2021 10-Q each stated that there "ha[d] not been any changes in the Company's internal control over financial reporting that occurred during" the respective periods "that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting," and each contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Orr and Johnson stating that the 3Q2020 10-Q, 2020 10-K, 1Q2021 10-Q, 2Q2021 10-Q, and 3Q2021 10-Q "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" of Gatos, and attesting to the disclosure of all significant deficiencies and material weaknesses in internal controls, and any fraud.

282.    These statements were materially false and misleading when made because (i) as detailed above, the 3Q2020 10-Q, 2020 10-K, 1Q2021 10-Q, 2Q2021 10-Q, and 3Q2021 10-Q contained false and/or misleading statements of material fact and omitted material facts necessary

to make the statements made, in light of the circumstances under which such statements were made, not misleading, and (ii) as a result of Gatos's deficient internal controls, the financial statements and other financial information included in the 3Q2020 10-Q, 2020 10-K, 1Q2021 10-Q, 2Q2021 10-Q, and 3Q2021 10-Q did not fairly present in all material respects the financial condition, results of operations and cash flows of the Company during the Class Period, but instead materially misstated the Company's and LGJV's expenses and income in violation of GAAP, as detailed above.  These materially false statements in the 2020 10-K and 1Q2021 10-Q were also incorporated by reference in the 2021 Registration Statement.

### 7. Exchange Act Materially False Statements Concerning Purported New Drilling and Success in Upgrading CLG's Resources

283.    On March 18, 2021, at Gatos's virtual Investor Day, Defendant Pyle stated that CLG's "total proven and probable reserves are about 9.6 million tons [sic]" and that, with regard to certain purported resources at CLG, "once we put a mine plan around those additional polygons, we'll be able to create more reserves, based on the drilling that we've [sic] already taken place." Further, with reference to the ten years that purportedly remained in CLG's LOM, Pyle stated: "I'm sure that we'll have additional mineralization [that] will take it out well beyond 10 years." These statements were materially false when made because Pyle materially overstated CLG's reserves.  In addition, these statements were materially misleading when made because Pyle quantified CLG's reserves and made positive statements that Gatos would be "able to create more reserves" and extend CLG's LOM "well beyond 10 years" while omitting the existing, material negative facts that (1) the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the

errors, and had made a deliberate decision not to disclose the errors, (2) as a result of the errors in the 2020 Technical Report, CLG's reserves and resources were already materially overstated, and (3) as a result of the errors in the 2020 Technical Report, CLG's actual mine life is 2.85 to 4.75 years shorter than the remaining 10 years Pyle cited.  In failing to disclose these existing, material negative facts, Defendant Pyle omitted material facts necessary to make the statements not misleading in the context in which they were made.

284.    Gatos's April 15, 2021 press release, titled "Gatos Silver Extends Mineralization at Cerro Los Gatos," which specified that the "[s]cientific and technical disclosures in this press release were approved by Philip Pyle," quoted Orr as stating:  "The early drill results from the reactivated definition drilling program are extremely encouraging and demonstrate continuity in both the SE and NW from the CLG reserve.  The discovery of a new SE zone vein also indicates that metal grades are increasing at depth."  These statements were materially misleading when made because they reported positive drilling results with respect to CLG's area of mineralization and grade, while omitting the existing, material negative facts that (1) the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (2) as a result of the errors in the 2020 Technical Report, CLG's reserves and resources were already materially overstated.  The omission of these existing, material negative facts made the statements misleading in the context in which they were made.

285.    On May 7, 2021, Gatos filed the 1Q2021 10-Q, issued a related press release filed with the SEC on Form 8-K, and held an investor earnings call.  The May 7, 2021 press release

filed on Form 8-K, which specified that the "[s]cientific and technical disclosures in this press release were approved by Philip Pyle," stated:

> The LGJV currently has three drills conducting definition drilling at CLG and is successfully converting the 3.7 million tonnes of inferred resource to measured and indicated.

These statements were materially misleading when made because, having chosen to report positive drilling results at CLG and claim that this work was "successfully converting the 3.7 million tonnes of inferred resource to measured and indicated," the Exchange Act Defendants omitted the existing, material negative facts that (1) the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors, and (2) as a result of the errors in the 2020 Technical Report, CLG's reserves and resources were already materially overstated.  The omission of these existing, material negative facts made the statements misleading in the context in which they were made.

### 8.  Exchange Act Material Omissions in Violation of Item 303

286.    In violation of Item 303, the 2020 10-K contained material omissions of at least two known trends and uncertainties related to CLG's overstated resources and reserves.  These trends and uncertainties are detailed at Paragraphs 216-17 above.  Underscoring the Exchange Act Defendants' violation of Item 303, before the 2020 10-K was filed on March 29, 2021, the Company had already been advised in January 2021 that the 2020 Technical Report contained an error of 20 percent, had challenged Tetra Tech with regard to the errors, and had made a deliberate decision not to disclose the errors.  The 2020 10-K's omission of (1) the known uncertainty as to

the errors and overstatements in the 2020 Technical Report, and (2) the known trend of CLG's

unsustainable production rate (given the known overstatement of reserves), violated Item 303.

### C.    Additional Allegations of Scienter

287.    Together with the above-alleged facts, the Exchange Act Defendants each acted

with scienter in that each knew or recklessly disregarded the true facts in making the materially

false and misleading statements identified herein.  The key allegations that support a strong

inference of scienter are summarized below.

### 1.    The Exchange Act Defendants Were Motivated to Conceal the Known Overstatements of Resources and Reserves While Pursuing New Exploration

288.    As detailed above, the Exchange Act Defendants were aware of serious

inaccuracies in the resource model before the Class Period, and by January 2021, had been

specifically advised that the 2020 Technical Report contained an error of 20 percent.  Knowing

these facts, they were incentivized to conceal the matter for two reasons, indicating their motive

and supporting a strong inference of scienter.

289.    <u>First</u>, to reveal a material reduction in CLG's resources and reserves shortly after

the IPO would have been disastrous, immediately deflating the Company's share price and

threatening its existence.  As a result, in January 2021, the Exchange Act Defendants made a

deliberate decision not to disclose the errors and overstatements.  By doing so, they could attempt

to offset the impact of the known overstatements by announcing newly discovered resources and/or

upgrading existing resources to reserves.  The Exchange Act Defendants vigorously pursued this

strategy, repeatedly announcing favorable drilling results during 2021 and promising an updated

resource report.

290.    <u>Second</u>, by concealing the known errors and overstatements to keep Gatos's share price artificially high, Gatos was able to conduct the July 2021 Offering at $14.00/share, double the IPO price (which also allowed Gatos's largest shareholder, Electrum, to sell 2.5 million shares at the same price in that Offering).  Concealing the errors and overstatements also allowed insiders Pyle and Huerta to make highly profitable insider sales near Gatos's peak share price, as detailed below.

### 2.    Senior Executives' Unusual, Highly Profitable Insider Stock Sales Near Peak Share Prices Support a Strong Inference of Scienter

291.    The fact that two senior Gatos executives, Defendant Pyle (Chief Geologist) and Huerta (Vice President, Mexico), made unusual, large stock sales near Gatos's all-time peak share price supports a strong inference of scienter.

292.    Pyle—who made the largest profits from his insider sales—and Huerta were uniquely situated to profit from inside information based on their intimate familiarity with the Los Gatos project and the CLG mine.

293.    As detailed above, Chief Geologist Pyle co-discovered the CLG deposit.  Huerta (who was based in Chihuahua and regularly visited the CLG mine) also had deep involvement; at the March 18, 2021 Investor Day, Pyle stated that Huerta "came into the project during the feasibility study and he shepherd[ed] it along all through the difficult stages of feasibility, development and mining, and all the community relations aspects of that."  Both executives were directly involved in the Company's analysis of the errors in the 2020 Technical Report; they personally received Linebarger's written report in January 2021, and both participated in the calls with Tetra Tech to discuss Linebarger's finding of an error of 20 percent; Pyle (with Kinyon)

reported on the errors to Orr and Johnson.  Further, in January 2021, Huerta emailed Pyle and Kinyon to urge the immediate disclosure of the errors in the 2020 Technical Report, and Kinyon responded by email that the Company would not do so.  Thereafter, Huerta would unload more than two-thirds of his Gatos common stock and vested options.  Moreover, as detailed above, by concealing the known errors in the 2020 Technical Report, Pyle and Huerta ensured that Gatos's share price remained artificially inflated and that the lock-up period would expire in April 2021; by contrast, disclosure would have reduced Gatos's share price and extended the lock-up period, removing their ability to sell shares at a profit.

294.    That these executives profited from selling Gatos common stock while knowing the 2020 Technical Report was materially inflated and false—and after the Exchange Act Defendants had made a deliberate decision not to disclose that fact—is strong evidence of scienter.

295.    <u>First</u>, the insider sales (itemized above) were highly unusual in timing, as all of them occurred during the short period (barely over a month) from May 11 through June 14, 2021. Neither of these executives had previously exercised any options or sold any shares during Gatos's existence as a public company, and after June 2021, neither did so again.  Moreover, all of these insider sales were discretionary; none was conducted pursuant to a Rule 10b5-1 insider trading plan or related to an executive departure or other external event.

296.    <u>Second</u>, each executive obtained substantial profits from their insider sales in the following amounts:  $1,178,549.93 (Pyle); $739,140.39 (Huerta).  These profits were objectively large and also significant relative to each executive's ordinary compensation.  For example, Pyle's profits of nearly $1.2 million were ***over three times*** his $370,000 base salary for 2020, and over half of his total 2020 compensation of $1,890,500.

297.  Third, the sales are unusual and suspicious relative to these executives' total holdings.  As detailed above, Pyle and Huerta respectively divested 29% and 67% of their Gatos common stock and vested options through sales between May 11 and June 14, 2021.

298.  These unusual, highly profitable sales support a strong inference that Defendant Pyle and other Gatos executives had an incentive to commit fraud by concealing the known overstatements of resources and reserves.

### 3. Former Employee Allegations

299.  Former Gatos employees provided information on a confidential basis supporting the strong inference that the Exchange Act Defendants acted with scienter in making the alleged material false and misleading statements and omissions.  The former employees' accounts corroborate one another and the additional facts alleged herein.

300.  FE-1 was employed by Sunshine Silver Mining & Refining (now Gatos) from January 2016 to September or October 2019.  FE-1 was a process manager at the CLG mine in Chihuahua, Mexico, and was responsible for the design, construction, commission, and start-up of the processing plant at the CLG mine.  FE-1 reported to managers including Victor Martinez, John Sadek, and Mark Tilley.  According to FE-1, based on personal knowledge:

i.  Before FE-1 departed in September or October 2019, FE-1 learned from multiple miners that in late 2018 or into 2019, the mining operations at CLG had reached certain areas underground with less ore than predicted.

ii.  Gatos had multiple employees and consultants dedicated to comparing actual to planned production, in terms of both the tonnes of ore and the grade.  Gatos periodically reconciled actual production results to the estimates from the resource model.

iii.  Gatos's senior executives regularly visited the CLG mine.  FE-1 personally saw and met with CEO Orr, CFO Johnson, Chief Geologist Pyle, and COO Kinyon on at least a monthly basis in Chihuahua for the duration of FE-1's

employment.  Pyle visited most often, multiple times per month, and stayed for one to two weeks each visit.  In addition, Luis Felipe Huerta (Vice President, Mexico) was based in Chihuahua and regularly visited the mine.

iv.     Orr, Johnson, Pyle, Kinyon, and other executives attended monthly two-day meetings in Chihuahua where FE-1 was present.  The first day of each meeting was held at a hotel in Chihuahua, where each manager presented a progress report on his area of responsibility, including construction progress, mining results, and costs.  FE-1 presented on the progress of the processing plant.  The second day involved traveling to the CLG mine and reviewing the activity on site.  FE-1 noted that the executives looked at core samples on every visit.

v.     Each monthly meeting involved PowerPoint presentations that were prepared in advance and circulated (by email or SharePoint) to Orr, Johnson, Pyle, and Kinyon, who provided written comments.  FE-1 was copied on the emails sent to Orr, Johnson, Pyle, and Kinyon.  Minutes were prepared for each meeting and signed by the executives in attendance, including FE-1.

301.    FE-2 was employed by Sunshine Silver Mining & Refining (now Gatos) from September 2017 to June 2022 as the mine manager at the CLG mine, responsible for overseeing various aspects of mine performance, including tracking results and production targets.  FE-2 reported to Luis Felipe Huerta and typically dealt with COO Kinyon on mining-related issues.  According to FE-2, based on personal knowledge:

i.     <u>Flow of information</u>:  FE-2 participated in monthly meetings with senior Gatos executives, including Orr, Johnson, and Pyle, that included status updates on construction and mining performance.  These meetings were held in person in Chihuahua, Mexico before COVID, and later held electronically via Microsoft Teams (and recorded beginning in early 2021).  The monthly meetings included PowerPoint presentations from various managers at the mine, which were circulated in advance by email, including to the executives, for commentary.

ii.     <u>Pre-IPO indications of unreliable resource model</u>:  Even before the 2020 Technical Report was issued, FE-2's managers regularly questioned why ore was not being found in the expected locations at CLG based on the Tetra Tech resource model.  The comment that FE-2 heard most often from colleagues and managers was that the Tetra Tech resource model was not

accurate. For instance, FE-2 recalled that in 2018, the first time the Company extracted ore, the orebody was not where the model indicated, causing concern about the accuracy and consistency of the model. There were also recurring differences between the short-term plan (prepared by Database Administrator Candy Martinez) and the long-range plan for the mine, due in part to the disparity between the Tetra Tech model and what was actually in the ground. The information from the resource model did not match well with the Company's actual mining experience, which complicated mine planning, reduced efficiency, and forced Gatos to mine from the top (highest elevation) down, contrary to the stated plan.

iii.   <u>Errors in the 2020 Technical Report</u>: Under the supervision of Chief Geologist Pyle and John Kinyon, Gatos's former mine planner, Kenneth Angola, was responsible for working with Tetra Tech on the 2020 Technical Report and developing the Life of Mine plan that Tetra Tech used to calculate reserves. In this regard, Angola used the Company's Deswik software to wrongly expand the area of ore and mineralization beyond the boundaries of the deposit from the Tetra Tech model, thereby attributing mineralization to the "waste blocks" that had no evidence of mineralization. This error resulted in a significant overstatement of reserves in the 2020 Technical Report. The error was especially large because the geology of the CLG mine was known to consist of long, thin vein-type deposits, meaning that the wrongly added "waste blocks" added proportionally large mineralization relative to the actual deposit.

iv.   <u>The errors are identified</u>: The errors in the Life of Mine plan provided to Tetra Tech also affected an updated mine plan Gatos was preparing. Before the October 2020 IPO, FE-2 and others at Gatos identified errors in the updated mine plan Angola was preparing, including an overstated amount of zinc, and Angola admitted that he had used the wrong formula. In December 2020, Angola abruptly resigned, leaving his computer and other belongings at the CLG mine. By the end of 2020, Kinyon, Huerta, FE-2 and others at Gatos exchanged emails discussing whether Angola's errors affected the 2020 Technical Report.

David Linebarger, an external consultant hired by Gatos, identified a 20% error in the 2020 Technical Report in January 2021. In January 2021, Gatos retained Linebarger to conduct an independent review. In his January 2021 report, Linebarger identified several errors in the updated mine plan, and separately determined that there was an error in the 2020 Technical Report, such that the actual reserves were 20 percent less than the 2020 Technical Report represented, including because Angola had used the Deswik software to wrongly expand the area of ore and mineralization beyond the boundaries of the deposit. In this regard, the report indicated that

Linebarger had verified his conclusions with a senior representative from Deswik. Linebarger also indicated that Tetra Tech had improperly used a geostatistical interpolation technique known as Ordinary Kriging instead of an alternative method.

v.   Linebarger's findings are reported to Orr, Johnson, Pyle, Kinyon, and Huerta:  In January 2021, Linebarger provided his written report to Pyle, Kinyon, Huerta, and FE-2 via email; Pyle, Kinyon, Huerta, and FE-2 then held conference calls (both with and without Linebarger) to discuss the report. Kinyon and Pyle met with Orr and CFO Johnson to update them on the errors, as FE-2 learned from Kinyon. In January 2021, Johnson was also copied on emails about the errors in the 2020 Technical Report. Johnson also emailed FE-2 in September or October 2020 to inquire about CLG's production grade (concentration of metal per tonne).

Gatos held a conference call with Tetra Tech in January or February 2021, after Linebarger had identified the 20 percent error; the participants included Kinyon, Pyle, Huerta, and FE-2 from Gatos, Linebarger, and Dante Ramirez-Rodriguez and Kira Johnson from Tetra Tech. Gatos had emailed Tetra Tech a copy of Linebarger's report in advance. The call did not go well, with the Gatos managers relaying Linebarger's findings and challenging the errors in the 2020 Technical Report. During the call, Tetra Tech verified that the error existed. Further calls between Tetra Tech, Huerta, Kinyon, and Pyle occurred thereafter, including a call the next day that was scheduled to include Pyle and Kinyon.

FE-2 stated that Orr knew of the errors in the 2020 Technical Report by the time of the Company's May 7, 2021 earnings call.

vi.   The Company decides not to disclose the errors:  In January 2021, after receiving Linebarger's report, Pyle, Kinyon, Huerta, and FE-2 held a conference call; Huerta followed up with an email to the same group urging immediate disclosure of the errors in the 2020 Technical Report, and Kinyon responded by email that the Company would not do so.

In parallel (as FE-2 understood from communications with Kinyon), Orr, Johnson, Pyle, and Kinyon decided to attempt to offset the errors in the previously disclosed resources and reserves by adding new, positive data from drilling that was not included in the 2020 Technical Report. Their goal was to allow Gatos to add additional data in hopes of avoiding a major drop in share price.

vii.   A second consultant confirms the error:  In June or July 2021, Gatos engaged Stantec to update the 2020 Technical Report. Andres, Roberto Lira (Gatos's new mine planner, who replaced Angola), Candy Martinez, and

FE-2 attended a meeting at the Stantec office in Chandler, Arizona in October 2021 where Stantec corroborated Linebarger's finding that there was a 20 percent error in the 2020 Technical Report. Stantec is the same "independent engineering consultants" referenced in Gatos's January 25, 2022 press release disclosing the errors in the 2020 Technical Report.

viii.    Andres further quantifies the error; Kinyon is terminated:  Andres and Tony Scott (current Vice President, Evaluations and Technical Services) calculated that Gatos faced a potential reduction in reserves of 30% to 50%, as Gatos finally disclosed on January 25, 2022.  In August 2021, Kinyon was terminated at Andres's urging.

### 4.    Orr and Johnson Admitted Making Material Misstatements to Gatos's Lenders

302.    Further confirming a strong inference of scienter, in signing the March 7, 2022 amendment to Gatos's Credit Agreement (detailed above), Orr and Johnson admitted that Gatos had provided its lenders with material misstatements regarding the overestimation of the mineral reserves at the CLG mine—in the amendment's words, that Gatos had provided material information that was "incorrect when made or furnished."

303.    The fact that Orr and Johnson have admitted material misstatements to Gatos's lenders corroborates their knowledge or recklessness as to the falsity of the Exchange Act Defendants' Class Period statements.  This amendment also confirms that the Exchange Act Defendants' statements about the mineral reserves were materially false no later than July 12, 2021, when the Credit Agreement was signed.

### 5.    The Exchange Act Defendants Spoke Repeatedly About the Purported Reliability of the Resources and Reserves

304.    The Exchange Act Defendants repeatedly touted their personal involvement with the CLG mine and claimed that they had direct knowledge of the accuracy of CLG's resources and reserves.  Their self-proclaimed personal involvement and knowledge support a strong inference

that the Exchange Act Defendants knew or had access to information concerning the true state of affairs as to the overstated resources and reserves, and thus had knowledge (or were reckless in not knowing) that their representations were false and misleading.

305.     For example, on March 18, 2021, Defendant Pyle stated that "this management team has actually been together largely since 2011 . . . .  So we've been together for 10 years already.  We've seen this project all the way from the exploration through the developments [sic] and mining stages . . . ."  Orr assured investors that Gatos had an in-depth understanding of CLG's geology and mineralization and had adequately analyzed these factors to develop a "very reliable" resource calculation.   For example, on the Company's March 11, 2021 earnings call, Orr emphasized "the extensive geologic understanding accumulated over the past decade at Cerro Los Gatos," and in the discussion with SmithWeekly Research, Orr claimed that "we intimately understand these epithermal systems."  At the March 18, 2021 Investor Day, Orr stated that "the resource model has been a relatively good indicator of what we can expect to see."  On May 7, 2021, Orr vigorously defended the resource model used in the 2020 Technical Report, stating that the Company had performed a "reconciliation to the resource model" using full-year 2020 production results and found that the resource "calculation is turning out to be very reliable, which is terrific news."

306.     Pyle and Orr addressed these issues in detail because Wall Street analysts were focused on Gatos's resources, reserves, and reconciliation to the resource model as production continued, repeatedly citing this as a major driver in their valuations of the Company.

6.    **Continuous Access to Information and
Contemporaneous Red Flags**

307.    Several other facts further confirm that the Officer Defendants (Orr, Johnson, and

Pyle) knew or had continuous access to information regarding the true state of affairs as to the

Company's overstated resources and reserves and GAAP violations, and underscore the Exchange

Act Defendants' knowledge or recklessness.

308.    <u>First</u>, as detailed above, Orr, Johnson, and Pyle regularly visited the CLG mine and

met with other senior Gatos personnel on a monthly basis before, during, and after the Class Period.

In these monthly meetings, Orr, Johnson, and Pyle personally toured the CLG mine, inspected core

samples, and were presented with detailed reports by managers on every aspect of the mine's

operation.  Further, Pyle visited Chihuahua multiple times per month and stayed for one to two

weeks each visit.  These interactions revealed the unreliability of the resource model for CLG

before the start of the Class Period (and before Gatos's IPO).

309.    Linebarger advised Gatos in January 2021 that the 2020 Technical Report contained

an error of 20 percent.  Pyle (with Kinyon, Huerta, and others) received Linebarger's written report

and participated in conference calls on the issue, and Kinyon and Pyle briefed Orr and Johnson on

the errors.  Pyle (with Kinyon, Huerta, and others) also participated in a January or February 2021

call with Tetra Tech where Gatos relayed Linebarger's findings and challenged the errors in the

2020 Technical Report, as well as further calls with Tetra Tech, Huerta, and Kinyon.

310.    Based on the foregoing, the Officer Defendants were aware of the material errors

in the 2020 Technical Report during the Class Period.  At minimum, these circumstances alerted

the Officer Defendants to the possibility that their public statements were false and misleading,

and the Officer Defendants recklessly failed to review or check information that they had a duty to monitor under these circumstances.

311.    Second, Gatos's GAAP violations strengthen the inference of scienter as to CFO Johnson, since Gatos's SEC filings stated that the Company's financial statements were prepared in accordance with GAAP, and Johnson personally signed SOX certifications stating that Gatos's SEC filings "fairly present[ed] in all material respects" Gatos's "financial condition, results of operations and cash flows," yet they materially misstated the Company's financial performance in violation of GAAP.

312.    Third, the fact that Orr and Johnson signed SOX certifications throughout the Class Period strengthens the inference of scienter as to them, since the SOX certifications they signed require them to (a) review the corresponding SEC filings; (b) design, establish, maintain, and evaluate the effectiveness of Gatos's internal controls and disclosure controls; (c) design disclosure controls to ensure that material information is made known to them; and (d) disclose all significant deficiencies and material weaknesses in internal controls, as well as any fraud, to Gatos's auditors and the Audit Committee of Gatos's Board of Directors.

### 7.    Core Operations

313.    Further strengthening the strong inference of scienter, the CLG mine constituted the core operation of the Company and its sole source of revenue and profit.  Indeed, the CLG mine is Gatos's only significant project and the only project that has reached the production stage and generated any revenue.  Thus, the Registration Statement cautioned that "[t]o become and remain profitable, we must succeed in generating significant revenues at the Cerro Los Gatos Mine," and that Gatos was "dependent on two principal projects for our future operations, the

Cerro Los Gatos Mine and the Los Gatos District." In addition, "the Los Gatos District (other than the Cerro Los Gatos Mine) does not currently have proven or probable mineral reserves."

314. With no other projects at the production stage, the amount of reserves and resources at the CLG mine determined both (a) the amount of revenue and profit the Company could generate each year, and (b) how long such revenue and profit would last. As a result, the amount of resources and reserves at CLG was critical to the Company and directly impacted its financial performance, strengthening the inference that the Exchange Act Defendants knew of the overstated reserves and resources and GAAP violations at the time of their false and misleading statements.

### 8. The Magnitude and Duration of the Fraud

315. The most compelling inference from the large magnitude and relatively short duration of the fraud is that the Exchange Act Defendants knew or recklessly disregarded the falsity of their statements.

316. As to magnitude, the fact that Gatos admittedly overstated its reserves by 26% to 43%, or 2.49 million to 4.15 million tonnes, supports a strong inference of scienter. Such a large overstatement about the Company's sole source of revenue and profit is plainly material and could not plausibly occur without the knowledge or recklessness of senior management. Indeed, as detailed above, the known overstated reserves were the subject of internal conference calls, email communication, and follow-on briefings for Orr and Johnson, and had a material impact of over $50 million on the Company's financial statements, including turning losses to profits in multiple quarters. The errors in the 2020 Technical Report were also expressly and promptly confirmed to the Company by two separate consultants starting in January 2021.

317.    The relatively short duration of the fraud also supports a strong inference of scienter.  After a decade of exploration, the 2020 Technical Report claimed 9.6 million tonnes of resources, which formed the basis for the Company's October 2020 IPO.  By January 2021, the Company's first consultant (Linebarger) was able to identify multiple errors in the 2020 Technical Report quickly after being engaged.  The second consultant (Stantec) confirmed the errors by October 2021.  Meanwhile, the Exchange Act Defendants' positive and confirmatory statements drove up Gatos's share price, allowing Pyle and Huerta to profit from insider sales and Gatos to raise over $118 million from the July 2021 Offering.  Gatos's share price peaked in July 2021.  Just six months later (and only 15 months after the IPO), the scheme collapsed, with Gatos admitting the errors and that its reserve figures would be reduced by 30 to 50 percent.

### 9.    The Terminations of Gatos's CEO, CFO, Chief Geologist, and COO Support Scienter

318.    The fact that four senior Gatos executives abruptly departed at critical times—as the overstated resources and reserves were becoming impossible to ignore, and shortly after the revelation of the truth—further supports scienter.

319.    On August 16, 2021, COO Kinyon abruptly departed.  Kinyon had been employed by Gatos (and its predecessor Sunshine) since April 2012 and personally oversaw the management of the CLG mine; Kinyon's LinkedIn page states:  "I took Los Gatos through feasibility, mining planning, development, construction, commissioning and into operations from 2016-2020."  Kinyon was terminated at the request of Andres, who joined Gatos in June 2021 and assumed responsibility for the CLG mine.  There is thus a strong inference that Kinyon's departure was connected to the grossly overstated resources and reserves.

320.    There is a similarly strong inference regarding CEO Orr, CFO Johnson, and Chief Geologist Pyle. All three executives purportedly announced their "retirement" on the same day— April 5, 2022, shortly after the Company's January 25, 2022 press release that revealed the overstated resources and reserves. In reality, Orr, Johnson, and Pyle were ousted as a result of the fraud's collapse. Indeed, Orr advised the Company and Board of his purported "retirement" with only two days' notice, while Pyle—who had previously made nearly $1.2 million from insider stock sales—"retired" with no notice at all. Both executives were immediately replaced: Andres replaced Orr as CEO and Director, and Tony Scott (Vice President, Evaluations and Technical Services) assumed responsibility for the Company's "exploration activities" in Pyle's place. RBC linked these management changes to the overstated resources and reserves, stating on April 8, 2022: "We expect the refresh of senior management announced in April 2022 (including the search for a new CFO and a new VP exploration) to be seen positively by investors given the problems with the resource/mine plan disclosed earlier in 2022."

321.    The fact that Gatos's three most senior executives departed shortly after the scheme's collapse—and Orr and Pyle were immediately replaced—supports an inference that it was these Officer Defendants who were blocking the truth from coming to light. Indeed, FE-2 confirmed that Orr, Johnson, Pyle and others decided not to disclose the errors in the 2020 Technical Report in an attempt to offset the errors by adding new, positive data from drilling. It is also relevant that Andres and Scott, who replaced Orr and Pyle, internally developed the estimate of a 30% to 50% reduction in reserves. Gatos alluded to this in its April 7, 2022 press release announcing Andres's promotion to CEO, where Defendant Stairs stated that "[s]ince joining Gatos

Silver [in June 2021], [Andres] has played a critical role in navigating the challenges related to our resource and reserve estimates . . . ."

### 10.    Corporate Scienter

322.    Gatos possessed scienter by virtue of the fact that the Officer Defendants, who acted with scienter as set forth above, had binding authority over the Company.  In addition, certain allegations herein establish Gatos's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to Gatos, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature.

323.    It can be inferred that senior corporate executives at Gatos possessed scienter such that their intent can be imputed to the Company.  Given the significance of the CLG mine to Gatos, the materiality of the overstated resources and reserves, their material impact on Gatos's financial statements, and the necessary involvement of numerous Gatos departments and personnel— including accounting and finance personnel who approved the overstated resources and improper accounting—additional unknown executives sufficiently senior to impute their scienter to Gatos were also aware of the materially overstated resources and reserves, and violations of GAAP.

324.    As-yet-unidentified employees also approved the false statements despite knowing of their false and misleading nature.  As alleged above, Gatos executives were specifically informed of the errors in the 2020 Technical Report in January 2021, and the CLG mine was Gatos's sole source of revenue and profit.  From this, it can be inferred that someone at Gatos approved of the false and misleading statements in Gatos's SEC filings concerning the resources and reserves and financial performance, while knowing that these statements were materially false or misleading and violated applicable accounting standards and disclosure requirements.

**D.    Loss Causation**

325.    The Exchange Act Defendants' fraudulent conduct directly and proximately caused the Class to suffer substantial losses as a result of purchasing Gatos common stock at artificially inflated prices during the Class Period, and as a result of purchasing publicly traded call options on Gatos common stock, and selling publicly traded put options on Gatos common stock, during the Class Period at prices that were distorted by the artificially inflated prices of Gatos common stock.

326.    The Exchange Act Defendants, through each category of false and misleading statements and omissions detailed above, concealed the truth about CLG's resources, reserves, and LOM, misstated the historical financial performance of Gatos and the LGJV, and concealed the truth that Gatos lacked effective internal controls over financial reporting.  When the truth was revealed on January 25, 2022, as a direct and proximate result, the Class suffered losses, which were foreseeable and caused by the facts that the Exchange Act Defendants' fraudulent conduct concealed from investors.

327.    On January 25, 2022, after the market closed, Gatos revealed that "there were errors in the technical report entitled 'Los Gatos Project, Chihuahua, Mexico' with an effective date of July 1, 2020 . . . , as well as indications that there is an overestimation in the existing resource model."  According to the Company, there would be "a potential reduction of the metal content of CLG's mineral reserve ranging from 30% to 50% of the metal content remaining after depletion," and "the mineral resource and reserve estimates in the 2020 Technical Report should not be relied upon."

328.    The Company also revealed that a material overstatement could constitute an event of default under Gatos's credit facility and could impact Gatos's depreciation and amortization expense, that "the potential resource and reserve reduction could lead to an impairment charge in current or prior periods," and that "the Company may be required to restate its financial statements" for prior periods.

329.    On this news, with unusually heavy trading volume, Gatos's share price immediately fell 69%—or $7.02—to close at $3.17 per share on January 26, 2022.  The next day, under continued heavy volume, Gatos's share price dropped another 11%, or $0.36, to close at $2.81 per share on January 27, 2022.

330.    The market was stunned by the Company's sudden, massive reduction of the reserves and resources from a mine that had been in production for over two years.  Canaccord Genuity slashed its price target from $15.50 to $4.00, assuming a 50% reduction in metal content and an additional 10% grade dilution; BMO reduced its price target from $12.50 to $4.00 based on a 40% reduction in metal content.  "Obviously *this is a materially negative event*," wrote an RBC analyst on January 26, 2022, and "it seems likely that a comprehensive re-modelling of CLG is necessary."  The analyst concluded that "[u]ntil the structures and veins are well understood, and there is confidence in being able to continue to mine them economically (or at all?), *it is difficult to be certain of even the presumed 4.2-5.8mt left*."

### E.    Presumption of Reliance and Fraud-on-the-Market Doctrine

331.    Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all

relevant times, the markets for Gatos common stock and publicly traded options were efficient for the following reasons, among others:

(a)    Gatos common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    The average weekly trading volume of Gatos common stock was significant;

(c)    Gatos's publicly traded options were listed and actively traded on national options exchanges, highly efficient markets;

(d)    As a regulated issuer, Gatos filed public reports with the SEC and the NYSE;

(e)    Gatos was eligible to file simplified SEC filings;

(f)    Gatos regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases on major newswire services, through communications with the financial press, and through other wide-ranging public disclosures; and

(g)    Numerous securities analysts followed Gatos and wrote reports that were published, distributed, and entered the public domain.

332.    Accordingly, the markets for Gatos common stock and options promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of Gatos common stock and call options.  Under these circumstances, all purchasers of Gatos common stock and publicly traded call options during the Class Period suffered similar injury through their purchases at artificially inflated prices, and a presumption of reliance applies.  Likewise, all sellers of Gatos publicly traded put options during the Class Period suffered similar injury through their transactions at prices that were distorted by the artificially inflated price of Gatos common stock, and a presumption of reliance applies.

333.    In addition, or in the alternative, Plaintiffs and the Class are entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128

(1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that the Exchange Act Defendants had a duty to disclose.

## VII.    CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT III
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against the Exchange Act Defendants)

334.    Plaintiffs incorporate ¶¶1-333 by reference as if fully set forth herein.

335.    During the Class Period, the Exchange Act Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

336.    The Exchange Act Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Gatos common stock and call options and sales of Gatos put options during the Class Period.

337.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Gatos common stock and call options and transacted in Gatos put options at artificially distorted prices.  Plaintiffs and the Class would not have purchased Gatos common stock or call options or transacted in Gatos put options at market

prices, or at all, if they had been aware that the market prices of those securities were artificially inflated and distorted by the Exchange Act Defendants' false and misleading statements and omissions.

338.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Gatos common stock and call options, and sales of Gatos put options, during the Class Period.

<div align="center">

**COUNT IV**
**For Violation of Section 20(a) of the Exchange Act**
**(Against the Exchange Act Defendants)**

</div>

339.    Plaintiffs incorporate ¶¶1-333 by reference as if fully set forth herein.

340.    During the Class Period, the Officer Defendants acted as controlling persons of Gatos within the meaning of § 20(a) of the Exchange Act.  By virtue of their positions and their power to control Gatos's public statements, the Officer Defendants had the power and ability to control the actions of Gatos and its employees.  The Officer Defendants controlled Gatos and its other officers and employees.  By reason of such conduct, the Officer Act Defendants are liable pursuant to § 20(a) of the Exchange Act.

## VIII.   CLASS ACTION ALLEGATIONS

341.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following proposed Class:

- As to claims under the Securities Act, all persons and entities who, in domestic transactions or on the NYSE, purchased or otherwise acquired Gatos common stock pursuant or traceable to the 2020 Registration Statement or 2021 Registration Statement, and were damaged thereby; and

- As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired Gatos common stock listed on the NYSE, or who, in domestic transactions, purchased or otherwise acquired publicly traded call options on Gatos common stock or sold publicly traded put

options on Gatos common stock, from December 9, 2020 through January 25, 2022, both inclusive, and were damaged thereby.

342.    Excluded from the Class are:  (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Gatos, and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Gatos's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

343.    The Class is so numerous that joinder of all members is impracticable.  Plaintiffs believe that Class members number at least in the thousands.  Throughout the Class Period, Gatos common stock had an average daily volume on the NYSE of approximately 744,935 shares.  As of August 15, 2022, Gatos had 69.1 million shares of common stock outstanding.  Gatos issued over 24.6 million shares of common stock in the IPO.  Gatos common stock traded actively in the United States during the Class Period.

344.    Plaintiffs' claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages by acquiring Gatos common stock at prices artificially inflated by the wrongful conduct complained of herein.

345.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in class and securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

346.     Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.   The questions of law and fact common to the Class include, but are not limited to, the following:

(a)     Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

(b)     Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

(c)     Whether the Registration Statements contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

(d)     Whether the Exchange Act Defendants acted with scienter as to Plaintiffs' claims for relief under Section 10(b) of the Exchange Act;

(e)     Whether the Officer Defendants were controlling persons as to Plaintiffs' claims for relief under Section 20(a) of the Exchange Act and Section 15 of the Securities Act;

(f)     Whether any of the Individual Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

(g)     Whether and to what extent the prices of Gatos common stock and publicly traded options were artificially inflated, distorted, or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

(h)     Whether, with respect to Plaintiffs' claims under the Exchange Act, reliance may be presumed under the fraud-on-the-market doctrine; and

(i)     Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

347.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

348.    There will be no difficulty in the management of this action as a class action.  Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

349.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein.  The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made.  Further, the PSLRA safe harbor expressly excludes forward-looking statements "included in a financial statement prepared in accordance with generally accepted accounting principles" or "made in connection with an initial public offering," such as the IPO.  15 U.S.C. § 77z- 2(b)(2)(A), (D).

350.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements; the generalized risk disclosures Gatos or other Defendants made were not sufficient to shield Defendants from liability, particularly because any purported risks had already transpired, as the 2020 Technical Report already contained errors and materially overstated CLG's resources and reserves.

351.    To the extent the statutory safe harbor otherwise would apply, the Defendants are liable under the Exchange Act and/or the Securities Act for any untrue or misleading forward-

looking statements complained of herein because the person who made (or an executive officer who approved) each such statement knew that the statement was untrue or misleading when made. As detailed above, before the Class Period, Defendants were aware of serious inaccuracies in the resource model, and by January 2021, Gatos had been specifically advised that the 2020 Technical Report contained an error of 20 percent, but Defendants made a deliberate decision not to disclose the truth.

## X.     JURY DEMAND

Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

## XI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

(a)     Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding Plaintiffs and the Class damages, including interest;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

(d)     Granting such other and further relief as the Court may deem just and proper.

Dated:  August 15, 2022

<div style="margin-left: 40%;">

_s/ Kathryn A. Reilly_
Michael L. O'Donnell
Kathryn A. Reilly
Daniel N. Guisbond
Wheeler Trigg O'Donnell LLP
370 Seventeenth Street, Suite 4500
Denver, CO 80202
Telephone:   303.244.1800
Facsimile:   303.244.1879
Email:  odonnell@wtotrial.com
          reilly@wtotrial.com
          guisbond@wtotrial.com

_Liaison Counsel for Lead
Plaintiff Bard Betz_

Joseph A. Fonti
Evan A. Kubota
Bleichmar Fonti & Auld LLP
7 Times Square, 27th Floor
New York, NY 10036
Telephone:    212.789.1340
Facsimile:    212.205.3960
Email: jfonti@bfalaw.com
          ekubota@bfalaw.com

_Counsel for Lead Plaintiff Bard Betz and Lead
Counsel for the Class_

Brian Schall
The Schall Law Firm
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone:    424.303.1964
Email:  brian@schallfirm.com

_Additional Counsel for Lead Plaintiff Bard
Betz and Named Plaintiff Jude Sweidan_

</div>

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 15, 2022, I electronically filed the foregoing
**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SECURITIES
LAWS** with the Clerk of Court using the CM/ECF system which will send notification of such
filing to all counsel of record.

*s/ Claudia L. Jones*