UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00453-PAB-KLM

MICHAEL BILINSKY, Individually and on Behalf of All Others
Similarly Situated,

        Plaintiff,

v.

GATOS SILVER, INC.,
STEPHEN ORR,
ROGER JOHNSON,
PHILIP PYLE,
JANICE STAIRS,
ALI ERFAN,
IGOR GONZALES,
KARL HANNEMAN,
DAVID PEAT,
CHARLES HANSARD, and
DANIEL MUÑIZ QUINTANILLA,

        Defendants.

---

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

---

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

STATEMENT OF FACTS ......................................................................................... 5

    A.    As a Mining Company, Gatos Had Specific Disclosure Duties by Law ............... 5

    B.    Gatos's IPO Raises $156 Million Based on the 2020 Technical Report ............... 6

        1.    Before the IPO, Two Years of Production at CLG Raise Material
              Concerns About the Accuracy of Tetra Tech's Resource Model .............. 7

        2.    Gatos Provides Tetra Tech with False Information to Procure the
              2020 Technical Report and Conduct the IPO ........................................... 8

    C.    In January 2021, Gatos's Own Expert Confirms That the 2020 Technical
        Report Contains Material Errors ................................................................. 9

    D.    Pyle, Orr, Johnson, and Kinyon Deliberately Conceal the Known, Material
        Errors and Issue Misstatements to Keep Gatos's Share Price Inflated and
        Secure $118 Million in the July 2021 Offering ...................................... 11

    E.    Pyle and Huerta Reap Large Profits from Unusual Insider Sales ......................... 12

    F.    Gatos's Materially Overstated Reserves and LOM Cause It to File False
        Financial Statements ................................................................................. 12

    G.    A Third Expert Confirms the Material Errors in the 2020 Technical Report ....... 12

    H.    Gatos Finally Admits the Reserves Were False, Resulting in a 69% Stock
        Drop, Senior Management's Termination, and the Inability to Make
        Required SEC Filings ............................................................................... 13

ARGUMENT ............................................................................................................ 14

I.    THE COMPLAINT ESTABLISHES A STRONG INFERENCE OF SCIENTER
    UNDER THE EXCHANGE ACT ....................................................................... 15

    A.    Pyle, Orr, and Johnson's Actual Knowledge Establishes Scienter ..................... 17

        1.    Defendants Cannot Claim "Reasonable Reliance" on Tetra Tech............ 17

        2.    Tetra Tech's Narrow, Ministerial "Consents" Are Irrelevant................... 19

    B.    Defendants Were Motivated to Materially Mislead, Supporting Scienter............ 21

        1.    Substantial Insider Stock Sales Support Scienter ................................... 21

i

2.      Defendants' Motive to Complete the July 2021 Offering and Offset Reduced Reserves with New Exploration.................................... 23

C.      Orr and Johnson Admitted Material Misstatements to Gatos's Lenders .............. 24

D.      Orr and Pyle's Statements Support Scienter........................................... 25

E.      Core Operations Supports Scienter...................................................... 25

F.      GAAP Violations Support Scienter ...................................................... 26

G.      The Magnitude and Duration of the Fraud Support Scienter............................... 26

H.      Executive Terminations Support Scienter ............................................... 27

II.   THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS UNDER THE EXCHANGE ACT AND SECURITIES ACT ................... 28

A.      False Statements of CLG's Reserves and Resources........................................... 28

1.      The Reserves and Resources Are False Statements of Fact ..................... 29

2.      The Reserves and Resources Are Actionable under *Omnicare* ................ 31

B.      Omissions of Known Trends and Uncertainties Violated Item 303 ..................... 34

C.      Gatos's False Financial Statements and False Statements about  GAAP Compliance, Internal Controls, and Impairment Testing..................................... 35

D.      Defendants' Other False and Misleading Statements Are Actionable.................. 36

III.  THE COMPLAINT ADEQUATELY ALLEGES SECTION 11 STANDING UNDER THE SECURITIES ACT ................................................................................... 37

CONCLUSION................................................................................................ 41

## TABLE OF AUTHORITIES

**CASES**

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ................................................................. 15, 25, 26

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................................................. 14

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).............................................................................................. 14

*Brereton v. Bountiful City Corp.*,
  434 F.3d 1213 (10th Cir. 2006) ............................................................................ 41

*Correa v. Liberty Oilfield Services, Inc.*,
  548 F. Supp. 3d 1069 (D. Colo. 2021)................................................... 33, 34, 36, 37

*Exkae Ltd. v. Domo, Inc.*,
  2020 WL 7352735 (D. Utah Dec. 15, 2020) .......................................................... 40

*Florida State Bd. of Admin. v. Green Tree*,
  270 F.3d 645 (8th Cir. 2001) ................................................................................ 17

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) ................................................................................ 28

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................... 27

*In re Allied Nevada Gold Corp. Sec. Litig.*,
  743 F. App'x 887 (9th Cir. 2018) .......................................................................... 33

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
  403 F. Supp. 3d 712 (D. Minn. 2019)..................................................................... 28

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) .................................................. 21, 34

*In re Deutsche Bank AG Sec. Litig.*,
  328 F.R.D. 71 (S.D.N.Y. 2018) ............................................................................ 39

*In re Eagle Computer Sec. Litig.*,
  1986 WL 12574 (N.D. Cal. Mar. 31, 1986)............................................................ 38

*In re ICG Commc'ns, Inc. Sec. Litig.*,
  2006 WL 416622 (D. Colo. Feb. 7, 2006)............................................................... 36

*In re Molycorp, Inc. Sec. Litig.*,
    157 F. Supp. 3d 987 (D. Colo. 2016)............................................................................ 17, 22, 25

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015) ................................................................................. 31

*In re Petrobras Sec. Litig.*,
    2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016)....................................................................... 29

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
    2007 WL 2585088 (S.D.N.Y. Sept. 5, 2007)........................................................................ 40

*In re Pretium Res. Inc. Sec. Litig.*,
    2020 WL 953609 (S.D.N.Y. Feb. 27, 2020)..................................................................... 19, 31

*In re Qwest Commc'ns Int'l, Inc.*,
    396 F. Supp. 2d 1178 (D. Colo. 2004).................................................................................. 22

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ...................................................................... 27

*In re SCANA Corp. Sec. Litig.*,
    2019 WL 1427443 (D.S.C. Mar. 29, 2019) ..................................................................... 29, 31

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ................................................................................................... 23

*In re SemGroup Energy Partners, L.P.*,
    729 F. Supp. 2d 1276 (N.D. Okla. 2010)......................................................................... 26, 27

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014) .................................................................................... 23

*In re Snap Inc. Sec. Litig.*,
    334 F.R.D. 209 (C.D. Cal. 2019).......................................................................................... 39

*In re St. Jude Med., Inc. Sec. Litig.*,
    836 F. Supp. 2d 878 (D. Minn. 2011).................................................................................... 35

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022)........................................................................ 31

*In re Wells Fargo & Co. Sec. Litig.*,
    2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)...................................................................... 34

*In re Williams Sec. Litig.*,
    339 F. Supp. 2d 1206 (N.D. Okla. 2003).......................................................................... 35, 37

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
    45 F.4th 1236 (10th Cir. 2022) ........................................................................ *passim*

*Joseph v. Wiles*,
    223 F.3d 1155 (10th Cir. 2000) ............................................................................ 37, 38

*Krim v. pcOrder.com, Inc.*,
    402 F.3d 489 (5th Cir. 2005) ................................................................................ 38, 40

*Martin v. Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ............................................................................ 19, 31

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)..................................................................................... 1, 4, 18, 19

*Medina v. Clovis Oncology, Inc.*,
    215 F. Supp. 3d 1094 (D. Colo. 2017)........................................................................ 24

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012) ........................................................................................ 39

*Northumberland Cty. Ret. Sys. v. Kenworthy*,
    2013 WL 5230000 (W.D. Okla. Sept. 16, 2013) ........................................................ 38

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................................................ *passim*

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019)......................................................................... 39

*Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*,
    372 F. Supp. 3d 1139 (D. Colo. 2019)......................................................................... 25

*Pirani v. Slack Techs., Inc.*,
    13 F.4th 940 (9th Cir. 2021) ........................................................................................ 41

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ................................................................................... 23

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*,
    2 F. Supp. 2d 1345 (D. Colo. 1998)......................................................... 15, 17, 24, 29

*Schwartz v. Celestial Seasonings, Inc.*,
    178 F.R.D. 545 (D. Colo. 1998) ..................................................................... 5, 38, 39

*Scott v. ZST Digital Networks, Inc.*,
    896 F. Supp. 2d 877 (C.D. Cal. 2012) ....................................................................... 38

*Sec. & Exch. Comm'n v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ................................................................... 18, 20, 29

*Sec. & Exch. Comm'n v. Sequential Brands Grp., Inc.*,
2021 WL 4482215 (S.D.N.Y. Sept. 30, 2021)............................................................ 21

*Slater v. A.G. Edwards & Sons, Inc.*,
719 F.3d 1190 (10th Cir. 2013) ................................................................................ 34

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) .................................................................................... 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).................................................................................... *passim*

*Tran v. Trustees of State Colleges in Colorado*,
355 F.3d 1263 (10th Cir. 2004) ..................................................................... 24, 26, 28

*Voulgaris v. Array Biopharma Inc.*,
2020 WL 8367829 (D. Colo. Nov. 24, 2020) ............................................................. 23

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
2008 WL 879023 (D. Colo. Mar. 28, 2008) ............................................................... 23

## STATUTES

15 U.S.C. § 77k............................................................................................................ 37

17 C.F.R. § 229.1302 ...................................................................................................... 6

17 C.F.R. § 229.1304 ...................................................................................................... 6

## OTHER AUTHORITIES

SEC Release No. 33-10570, 2018 WL 5668900 (Oct. 31, 2018)................................. 20

SEC Release No. 33-8350, 2003 WL 22996757 (Dec. 19, 2003) ................................. 6

## RULES

Fed. R. Evid. 201 ............................................................................................................ 3

**<u>INTRODUCTION</u>**

Under controlling law—the Supreme Court's decisions in *Tellabs*, *Matrixx*, and *Omnicare*, and the Tenth Circuit's most recent securities decision in *Pluralsight*—Defendants' motion must be denied.[1]  Far from "fraud by hindsight," Defendants knew the truth by January 2021:  Gatos's reserves at its only production mine were inflated by 1.8 million tonnes.  They concealed this fact for a full year.  When new management forced Gatos to reveal the truth, shareholders lost over 69% of their investment.  Gatos has since failed to issue financial statements and missed required SEC filings, and now faces delisting from the NYSE.[2]

In October 2020, Gatos went public in the largest precious metals IPO in a decade, raising $156 million based on a 2020 Technical Report claiming 9.6 million tonnes of reserves at the Cerro Los Gatos ("CLG") mine.  Typical of silver mines, CLG was known to have narrow veins of minerals with highly variable size and orientation.  Despite this geology, in the 2020 Technical Report, Gatos used software to add mineralization to "waste blocks" outside the boundaries of the mineral deposit.  In other words, Gatos added reserves to areas where none existed.  This was an objective error, like saying 10 plus 0 equals 12.  It artificially inflated the reserves by 1.8 million tonnes (approximately 19% of the total), wrongly adding $1.67 billion of metal that did not exist.

By January 2021, Defendants knew the reserves were inflated and false.  This fact was reported to them in writing in January 2021 by their own handpicked expert, then verified by two other experts in February and October of 2021.  Specifically, in January 2021—prompted by

---

[1] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011); *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015); *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236 (10th Cir. 2022).

[2] Capitalized terms not defined herein have the meanings stated in the Complaint (ECF 54). Citations are omitted and emphasis added unless otherwise stated.

concerns raised in 2020—Gatos retained an independent expert, David Linebarger, who identified the incorrect addition of mineralization to "waste blocks," such that actual reserves were 20% lower than the 2020 Technical Report stated. ¶76. Linebarger provided his written report directly to Defendant Philip Pyle (Chief Geologist), who briefed Defendants Stephen Orr (CEO) and Roger Johnson (CFO). By February 2021, Defendants confronted Tetra Tech, the author of the 2020 Technical Report, with Linebarger's report and Tetra Tech acknowledged that mineralization was improperly added to the "waste blocks." These facts are not disputed.

The securities laws and specific SEC regulations expressly required Defendants to disclose this known error and its material inflation of Gatos's reserves, resources, and financial statements. Rather than publicly admit the truth, Defendants Pyle, Orr, and Johnson deliberately buried it in the hope of avoiding a major drop in share price (¶¶80-81), while falsely assuring investors that the numbers were correct. To that end, Pyle falsely claimed in March 2021 that CLG's "total proven and probable reserves are about 9.6 million" tonnes. ¶283. Gatos's public SEC filings repeatedly affirmed the same figure and falsely claimed that there had been no "material change" in resources and reserves since July 2020. Gatos's stock price surged, and Gatos rushed to the market to raise $118 million from the Class in a July 2021 secondary stock offering, repeating the false reserves again. Meanwhile, Pyle unloaded almost $2 million in Gatos stock near peak prices after learning that the reserves were inflated as a result of adding the "waste blocks."

Unknown to investors, in October 2021, a third expert, Stantec, independently confirmed the same error Linebarger had identified in January and Tetra Tech had verified in February. Nonetheless, Gatos repeated the false figures yet again in November 2021.

Fully a year after the Linebarger report, Gatos's new management started to force the Company to reveal the truth Defendants had long known. In January 2022, Gatos admitted that

the 2020 Technical Report contained "errors" and "should not be relied upon," and that the reserves would be materially reduced, causing Gatos's share price to plummet 69%. Within weeks, the entire senior management team was replaced.

Finally, on October 3, 2022, Gatos specifically identified and quantified the impact of the inflated reserves. Gatos admitted that the 2020 Technical Report improperly attributed mineralization at "average" levels to areas that in fact had "***zero grade***" (*i.e.*, waste blocks). This inflated reserves from 7.8 to 9.6 million tonnes. (Ex. A at 6.)[3] Thus, Defendants cannot dispute that Linebarger was right all along: the 2020 Technical Report added mineralization where none existed. While Defendants finally admitted this fact on October 3, 2022, their October 14 brief made no mention of their admission.

Unable to dispute that Gatos's reported reserves were materially overstated, Defendants offer three arguments, all of which fail. First, as to the Exchange Act claims, Plaintiffs amply meet the Private Securities Litigation Reform Act's ("PSLRA's") requirement to plead facts that support a "strong inference" of scienter, which includes recklessness. Under *Tellabs*, a strong inference does not require a "smoking gun," but only means that the facts, viewed collectively, make the inference of scienter "at least as likely as any plausible opposing inference." 551 U.S. at 328. Plaintiffs more than meet this standard by alleging that Pyle, Orr, and Johnson had ***direct, personal knowledge*** of Linebarger's findings in January 2021, yet publicly repeated the overstated figures

---

[3] "Ex. __" refers to exhibits to the Declaration of Joseph A. Fonti in Opposition to Defendants' Motion to Dismiss. The contents of Exhibits A-H, which include SEC filings, documents cited in the Complaint, and documents cited in Defendants' motion, are judicially noticeable as facts "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Ex. I is a timeline of key events.

without disclosing the known error.  This was an extreme departure from the standards of ordinary care and presented an obvious danger of misleading investors.  *See Pluralsight*, 45 F.4th at 1259.

Defendants fail to offer a "*more plausible*" opposing inference, as controlling law requires. *Id.* at 1268 (emphasis in original); *Tellabs*, 551 U.S. at 328.  Instead, they attempt to hide behind Tetra Tech and claim that they "had every reason to believe" the numbers.  But Tetra Tech verified the incorrect addition of mineralization to the "waste blocks" in February 2021.  ¶78.  Nor can Defendants rely on Tetra Tech signing documents called "consents" after receiving Linebarger's report.  The "consents" were purely ministerial and did not update the 2020 analysis, much less affirm that the numbers remained correct.  Tetra Tech's "consents" did not erase Defendants' knowledge of the error or their affirmative duty to tell investors the truth.  *See Matrixx*, 563 U.S. at 49.  Ultimately, Defendants provide no coherent, much less more plausible, explanation for why they concealed the known error for a year while repeating numbers that were materially overstated.

Defendants' other responses also fail.  First, Defendants cannot avoid Defendant Pyle's substantial insider sales by pointing to others who did not sell.  After receiving Linebarger's report, Pyle (Gatos's Chief Geologist) deliberately decided not to disclose the truth, then dumped nearly one-third of his Gatos shares, raking in almost $2 million.  Further, while Defendants claim they "voluntarily disclosed" the inflated reserves in January 2022, this was at least a year late and only occurred because new management forced it.

Second, Defendants attempt to recast their false factual statements as non-actionable opinions under *Omnicare*, but *Omnicare* does not apply because the resource and reserve figures are not opinions:  they are verifiable figures that stated precise amounts of ore and metal that purportedly existed at CLG on specific dates.  *Omnicare*, 575 U.S. at 183-84.

Moreover, *Omnicare* held that opinion statements are actionable in any of three circumstances, and although only one is required, each is present here:  (1) Defendants could not sincerely believe the false numbers where Linebarger and Tetra Tech both confirmed the error; (2) regardless of subjective belief, the statements contained false "embedded statements of fact," such as false claims that Tetra Tech had verified the mine plan that overstated reserves (it did not); and (3) Defendants omitted "particular (and material) facts going to the basis" for the "opinion," including that Linebarger found the reserves were 20% lower than the 2020 Technical Report and Tetra Tech agreed on the material error.  575 U.S. at 184-85, 194.

Finally, Defendants make a narrow, technical argument that Plaintiffs lack "standing" to pursue their Securities Act claims, questioning whether Plaintiffs purchased Gatos stock "in or traceable to" the IPO and July 2021 Offering.  To begin, this argument has no bearing on Plaintiffs' fraud claims under the Exchange Act.  Under the Securities Act, "tracing is a merits issue, not appropriate for consideration" at the pleading stage.  *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 557 (D. Colo. 1998).  In any event, Plaintiff Sweidan purchased shares **before** the July 2021 Offering that are necessarily traceable to the IPO.  Plaintiffs also meet the pleading standard by alleging that they purchased Gatos common stock "pursuant and/or traceable to the 2020 Registration Statement or 2021 Registration Statement," ¶181, and, in all events, have class standing to represent purchasers in the July 2021 Offering.

## STATEMENT OF FACTS

### A.    As a Mining Company, Gatos Had Specific Disclosure Duties by Law

Defendants violated multiple disclosure duties under federal law, including specific, enhanced disclosure requirements for mining companies.

First, like all companies, under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Gatos is legally prohibited from making "untrue statements of material fact" and

5

"omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." ¶336. Moreover, Item 303 of SEC Regulation S-K imposes an affirmative duty to disclose known, material uncertainties and trends, ensuring informed investment decisions by allowing "investors to see the company through the eyes of management." SEC Release No. 33-8350, 2003 WL 22996757 (Dec. 19, 2003).

Second, Gatos is subject to stringent SEC requirements regarding disclosure of reserves and resources because these figures are highly material to investors. ¶¶28-38. "Resources" and "reserves" are not subjective, seat-of-the-pants estimates; they must be adequately supported by a detailed technical report. ¶¶29, 33-38, 84. Resources are the portion of a deposit with "reasonable prospects for economic extraction" based on "specific geological evidence and knowledge," while reserves are the "economically mineable part" of resources. ¶33.

Further, when a mining company learns that a prior technical report contains a material error, it cannot remain silent. Instead, disclosure is mandated when a prior technical report "is not current" with respect to "[a]ll material assumptions and information pertaining to the disclosure of a registrant's mineral resources and mineral reserves." 17 C.F.R. § 229.1304(f)(2); ¶84. The company must also disclose "when there is a material change in the mineral reserves or mineral resources from the last technical report summary filed." 17 C.F.R. § 229.1302(b)(2)(i); ¶84.

### B. Gatos's IPO Raises $156 Million Based on the 2020 Technical Report

CLG is Gatos's only production-stage mine. ¶313. Defendant Pyle co-discovered the deposit in 2008. ¶41. From 2011 to 2017, Gatos commissioned technical reports and a study to determine CLG's resources, reserves, and economic potential. ¶¶27, 44. In 2020, Defendants moved quickly to take Gatos public to capitalize on a sharp rise in silver prices. ¶53. To do so, they hastily procured the 2020 Technical Report from Tetra Tech, dated July 1, 2020, to update

the resource and reserve figures. *Id.* The Report contained material errors, including adding mineralization to "waste blocks," that materially overstated resources and reserves. ¶76.

### 1. Before the IPO, Two Years of Production at CLG Raise Material Concerns About the Accuracy of Tetra Tech's Resource Model

Before the October 2020 IPO, Gatos saw red flags indicating that the 2020 Technical Report materially overstated resources and reserves. ¶¶47-49. Based on a resource model developed by Tetra Tech, limited production began in November 2018, and commercial production began in September 2019, with over 357,000 tonnes mined by year-end. ¶46.

This production experience quickly demonstrated that the Tetra Tech resource model was inaccurate. ¶¶47-49. CLG's mine manager from September 2017 to June 2022, FE-2, repeatedly heard from colleagues and managers that the resource model was not accurate; for example, when the Company first extracted ore in 2018, the orebody was not where the model indicated (FE-2). ¶48. The resource model did not match well with Gatos's actual mining experience, which complicated mine planning, reduced efficiency, and forced Gatos to mine from the top (highest elevation) down, contrary to the stated plan (FE-2). *Id.* Likewise, FE-1, a process manager at CLG from 2016 to fall 2019, confirmed that in late 2018 or into 2019, multiple miners reported that certain areas underground at CLG had less ore than predicted. ¶49.

No later than early 2019, Gatos's senior executives knew about these concerns. Orr, Pyle, Johnson, and Chief Operating Officer John Kinyon regularly visited CLG, participated in monthly two-day executive meetings, and met with other senior Gatos personnel from at least 2016 to 2022 (FE-1, FE-2). ¶¶50-52, 300, 301. During COVID, Gatos's monthly executive meetings were held remotely via Microsoft Teams (and recorded from early 2021). ¶51.

**2.      Gatos Provides Tetra Tech with False Information to Procure the
2020 Technical Report and Conduct the IPO**

The 2020 Technical Report determined CLG's resources and reserves in three steps: (1) Tetra Tech calculated CLG's resources, (2) Gatos developed a "mine plan" to identify the portion of resources that can be economically extracted, and (3) finally, Tetra Tech used the Gatos mine plan to report CLG's reserves.  Each step was flawed.

Step 1—Resources:  The 2020 Technical Report recycled the same Tetra Tech resource model from 2017 already known to be unreliable and inaccurate, plus additional data, to construct a three-dimensional model of CLG's underground veins.  ¶¶53-56.[4]  This purportedly yielded 10.4 million tonnes of measured and indicated resources as of September 6, 2019 (¶57).  However, the resource model wrongly assumed CLG was a consistent, uniform deposit, while the actual deposit contains narrow veins of highly variable size and orientation—a geological characteristic that was well-known to Defendants based on their work since 2008.  ¶¶56, 163.

Step 2—Mine Plan:  The next step was to determine the reserves (*i.e.*, the "portion" of resources "that can be mined economically").  ¶58.  To do so, Gatos prepared a mine plan to address the logistics of extraction.  This mine plan was prepared by a Gatos mine planner, Kenneth Angola, under Pyle's and Kinyon's supervision (FE-2).  ¶¶60-61.  However, the mine plan materially inflated reserves, as Gatos has now admitted.  Specifically, instead of determining how much of the 10.4 million tonnes in resources "can be mined economically" (¶58), Gatos's mine plan wrongly added mineralization to "waste blocks" that had no evidence of mineralization (¶61).  Gatos provided the erroneous mine plan to Tetra Tech for the calculation of reserves.  ¶60.

---

[4] The resource calculation added data from "drilling that has been completed" since 2017 (¶54) but did not change the resource model itself.  Defendants are thus wrong to suggest that the inaccuracy observed in 2018 and 2019 "would have been addressed or superseded by Tetra Tech's updates" to the resource model for the 2020 Technical Report.  (MTD at 16, 24.)

Step 3—Reserves:  Because the mine plan materially inflated the amount of minerals, the 2020 Technical Report falsely stated that CLG contained 9.6 million tonnes of reserves as of July 1, 2020 (¶59).  Out of this amount, 1.8 million tonnes did not exist.  Further, based on the inflated reserves, the 2020 Technical Report claimed that CLG had a life of mine ("LOM") of 11 years, meaning that the purported reserves would last for 11 years of mining.  ¶¶62, 65.

The 2020 Registration Statement expressly incorporated the 2020 Technical Report and repeated its false resource and reserve figures.  ¶65.

Gatos completed the IPO on October 27, 2020:  the largest precious metals IPO in a decade. ¶64.  The IPO raised $156.1 million from 24.6 million shares of common stock at $7.00 per share. *Id.*  Analysts praised the "sizable reserve already established."  ¶66.

**C.     In January 2021, Gatos's Own Expert Confirms That the 2020 Technical Report Contains Material Errors**

Even before the IPO, Angola—who had prepared Gatos's mine plan that led to the overstated reserves—was under scrutiny.  Specifically, Gatos personnel had identified errors in another mine plan Angola was preparing for CLG, including an overstated amount of zinc, and Angola admitted he had used the wrong formula (FE-2).  ¶¶75, 301.

Shortly after the IPO, in December 2020, Angola abruptly resigned, leaving his computer and belongings at the CLG mine (FE-2).  ¶¶75, 301.  By year-end, Kinyon, Luis Felipe Huerta (Vice President, Mexico), Gatos's mine manager (FE-2), and others discussed by email whether Angola's errors affected the 2020 Technical Report.  *Id.*  By January 2021, after weeks of probing the issues, the concerns about the implications of Angola's errors were acute enough for Gatos to engage an outside expert, David Linebarger, to conduct an independent review.  ¶76.

Linebarger holds a degree in mining engineering and has been a member of the Society for Mining, Metallurgy & Exploration (SME) since 1978 (Ex. B at 84).  Linebarger is also a "qualified

person" under NI 43-101, had "worked continuously within the mining industry for more than 25 years" by 2009, and has prepared technical reports on Mexican properties for other publicly traded mining companies. (*See id.*)[5] As a result, Defendants' suggestion that Linebarger—an expert they chose to retain—lacks "credentials," "expertise or experience" (MTD at 21) is specious.

CLG's mine manager from September 2017 to June 2022 (FE-2) reported that in January 2021, Linebarger sent Pyle, Kinyon, Huerta, and FE-2 his written report. ¶77. Linebarger concluded that the 2020 Technical Report contained an error such that actual reserves were about 20% lower than the Report (*i.e.*, reserves were inflated by about 25%). ¶76. Specifically, in Gatos's mine plan provided to Tetra Tech to calculate the reserves, Angola had wrongly expanded the area of ore and mineralization beyond the boundaries of the mineral deposit into "waste blocks" that had no evidence of mineralization. ¶¶61, 76. Linebarger verified this error with a senior representative of Deswik, the company that made the software used to prepare the mine plan. *Id.* This error ignored CLG's known geology and significantly overstated reserves. ¶61. Linebarger also found that the Report overstated resources because Tetra Tech improperly used a geostatistical interpolation technique that wrongly assumed CLG was a uniform deposit—ignoring the well-known reality that the deposit contains veins of highly variable size and orientation. ¶¶56, 76.

Gatos's senior management knew of these material findings. Pyle, Kinyon, and Huerta personally received Linebarger's written report and discussed it on conference calls with and without him (FE-2). ¶¶77, 293, 301, 309. Kinyon and Pyle updated CEO Orr and CFO Johnson on the errors (as Kinyon told FE-2), and in January 2021, Johnson was copied on emails about the errors (FE-2). *Id.*; ¶301(v).

---

[5] Defendants also state that Linebarger is "currently a 'Cabinetmaker,'" citing his LinkedIn profile. (MTD at 21 n.19.) They omit that Linebarger retired in February 2022 (Ex. C), over a year *after* he correctly advised Gatos of the 2020 Technical Report's material error.

By February 2021, Gatos confronted Tetra Tech with Linebarger's findings and emailed Tetra Tech a copy of the report. Defendant Pyle, Kinyon, Huerta, and FE-2 held a conference call with Linebarger and Dante Ramirez-Rodriguez and Kira Johnson from Tetra Tech. ¶78. During the call—which did not go well—Tetra Tech verified that the errors existed (FE-2). *Id.*

**D.    Pyle, Orr, Johnson, and Kinyon Deliberately Conceal the Known, Material Errors and Issue Misstatements to Keep Gatos's Share Price Inflated and Secure $118 Million in the July 2021 Offering**

The known fact that the 2020 Technical Report contained material errors that overstated reserves and resources raised an obvious danger of misleading investors. In January 2021, Huerta wrote Pyle and Kinyon to urge immediate disclosure of the errors; Kinyon replied that Gatos would not do so (FE-2). ¶¶80, 293, 301. Instead, Gatos's most senior executives—Orr, Johnson, Pyle, and Kinyon—made a deliberate decision to conceal the known error. ¶¶80-82.

Further, despite the obvious danger of misleading investors, Defendants repeated the false resource and reserve figures while knowing of the material error in the 2020 Technical Report, stated that there had been no "material change," and touted the figures' accuracy. *See* ¶¶218-30, 264-86. For example, Pyle publicly claimed in March 2021 that CLG's "total proven and probable reserves are about 9.6 million tons [sic]." ¶283. On May 7, 2021, CEO Orr asserted that the 2020 Technical Report's resource model was "very reliable, which is terrific news." ¶95.

By July 9, 2021, these positive assurances pumped Gatos's share price to its all-time peak of $19.43—nearly triple its $7.00 offering price in the IPO nine months earlier. ¶12. Defendants capitalized on Gatos's inflated share price by conducting the July 2021 Offering, which raised over $118 million from over 9.2 million shares at $14.00/share. ¶¶108, 111. The 2021 Registration Statement falsely claimed that there was no "material change" in the resources and reserves and omitted the known, material error and its impact on the reported resources and reserves. ¶110.

11

**E.      Pyle and Huerta Reap Large Profits from Unusual Insider Sales**

As Gatos's share price hit record highs, from May 11, 2021 to June 14, 2021, Defendant Pyle and Huerta exercised options and sold nearly 200,000 shares of Gatos stock for combined proceeds of nearly $3.4 million (and $1.91 million in profits).  ¶¶11, 99-104, 294-98.  Neither executive sold a single share before or after this one-month period, and these unusual insider sales occurred at prices from $12.03 to $19.31, near Gatos's all-time peak.  ¶¶100, 102, 104.

**F.      Gatos's Materially Overstated Reserves and LOM Cause It to File False Financial Statements**

The 2020 Technical Report's overstatement of reserves and LOM caused Gatos's financial statements to be false for over two years.  Because Gatos's expenses were based on CLG's 9.6 million tonnes of reserves and 11-year LOM—both of which were overstated—from 2019 to 3Q2021, Gatos materially understated expenses and overstated net income (or reduced losses) in violation of U.S. Generally Accepted Accounting Principles ("GAAP").  ¶¶120, 124-55, 210, 274.

These GAAP violations were material:  they falsely turned the Gatos joint venture's losses to profits in four quarters, falsely accelerated its shift to profitability, and concealed up to $38.7 million in losses at Gatos.  ¶¶153-55.  The GAAP violations were enabled by material weaknesses in internal controls over financial reporting, which Gatos has now admitted.  ¶¶19, 179.  During the Class Period, Gatos falsely claimed that the financial statements of Gatos and the joint venture complied with GAAP, and under the Sarbanes-Oxley Act ("SOX"), Orr and Johnson falsely certified that they were accurate and Gatos had effective internal controls.  ¶¶69, 281-82.

**G.      A Third Expert Confirms the Material Errors in the 2020 Technical Report**

On June 1, 2021, Dale Andres joined Gatos as President and began to probe the inflated reserves.  ¶¶105-06.  On August 16, 2021, Gatos abruptly announced COO Kinyon's immediate departure, offering no reason; in reality, Kinyon was terminated at Andres's urging (FE-2).  ¶117.

12

In October 2021, Andres met with Stantec (an expert he had engaged in June or July 2021), which corroborated Linebarger's finding that the reserves were 20% lower than the 2020 Technical Report. ¶106. Even then—after three experts (Linebarger, Tetra Tech, and Stantec) confirmed the error—Defendants misled investors again by repeating the Report's false figures and issuing false financial statements in Gatos's Form 10-Q filed on November 8, 2021. ¶¶118, 279.

### H.    Gatos Finally Admits the Reserves Were False, Resulting in a 69% Stock Drop, Senior Management's Termination, and the Inability to Make Required SEC Filings

On January 25, 2022, Gatos publicly admitted that the 2020 Technical Report contained "errors" and "should not be relied upon"; Gatos faced "a potential reduction of the metal content of CLG's mineral reserve ranging from 30% to 50%" and found "indications that there is an overestimation in the existing resource model"; and Gatos "may be required to restate its financial statements" for prior periods and take an impairment charge. ¶¶157-65.

Crucially, this disclosure was not the product of any new or intervening event. Instead, it resulted from the *same* facts Defendants had known since at least January 2021. ¶162. Nor was the disclosure voluntary (*see* MTD at 3): it was driven by Andres, the fact that three experts had confirmed the error, Gatos's auditors' scrutiny, and the error's increasingly large impact on Gatos's financial statements, with the deadline to file 2021 financials looming. *See* ¶158.

After the January 25, 2022 disclosure, the following events occurred:

- Gatos's share price dropped 69% on January 26, 2022 and 11% the next day. ¶166.

- On March 7, 2022, Gatos reported an amendment to its $50 million credit facility—signed by Orr and Johnson—admitting that it had provided Gatos's lenders with "an overestimation of the mineral reserves at the [CLG] Mine" that was "*incorrect when made* or furnished" on July 12, 2021. ¶¶170-71.

- Gatos's entire senior management team was replaced at once. On April 5, 2022, Orr, Johnson, and Pyle abruptly "retired," with Orr replaced by Andres as CEO. ¶¶174, 320.

13

- Without an accurate statement of reserves, Gatos has been unable to file quarterly and annual reports. ¶¶175-78. Moreover, on August 19, 2022 (four days after Plaintiffs filed the Complaint), Gatos stated that it "expects" to identify "at least one material weakness" in internal controls related to "the mineral reserve reporting errors." (Ex. D.) On September 30, 2022, Gatos revealed that its auditor, KPMG, resigned. (Ex. E.)

Finally, on October 3, 2022, Gatos admitted that the 2020 Technical Report contained "material and compounding errors," including "an incorrect software parameter." (Ex. A at 5-6.) These errors improperly attributed "average" mineralization to areas that had "zero grade," including areas "outside the estimated vein." (*Id.* at 6.) This is the same error Linebarger identified in January 2021: Gatos had wrongly attributed mineralization to "waste blocks" outside the boundaries of the mineral deposit. Defendants' MTD makes no mention of this key admission.

## ARGUMENT

As the Supreme Court has "long recognized[,] meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought" by the Department of Justice and SEC. *Tellabs*, 551 U.S. at 313.

Here, Plaintiffs advance (1) fraud claims under the Exchange Act based on intentional or reckless material misstatements and omissions, and (2) strict liability claims under the Securities Act based on Gatos's IPO and July 2021 Offering. Defendants only challenge scienter (as to the Exchange Act only), whether they made actionable misstatements or omissions, and "standing" under Section 11 of the Securities Act.

When "faced with a Rule 12(b)(6) motion to dismiss a [securities] action, courts must, as with any motion to dismiss[,] accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 313. The motion must be denied where the pleading contains "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning that its allegations allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

14

Because the Complaint amply meets these standards and alleges a "strong inference" of scienter under the PSLRA, Defendants' motion should be denied.

**I.      THE COMPLAINT ESTABLISHES A STRONG INFERENCE OF SCIENTER UNDER THE EXCHANGE ACT**

As required by the Exchange Act and PSLRA, Plaintiffs plead facts supporting a strong inference of scienter.  Scienter includes recklessness:  "conduct that is an extreme departure from the standards of ordinary care," such that the defendant "knew" his statement "presented a danger of misleading buyers and sellers or that the danger was so obvious he must have known of it." *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1258-60 (10th Cir. 2022).

In *Tellabs*, the Supreme Court held that a "strong inference" of scienter means "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically," *id.* at 326, and the inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Id.* at 324.  Indeed, a plaintiff "is not forced to plead more than she would be required to prove at trial." *Id.* at 328.  The Supreme Court's holistic approach has long been the law in this District. *See, e.g.*, *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Supp. 2d 1345, 1359 (D. Colo. 1998) (court must examine "allegations in their entirety . . . to determine if the allegations permit a strong inference of fraudulent intent.").

An "inference is a logical conclusion drawn from the facts." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003).  In *Pluralsight*, 45 F.4th at 1268, the Tenth Circuit held that defendants must establish a "*more plausible*" opposing inference to defeat scienter.  In evaluating competing inferences, courts must "accept all factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Id*. at 1261 (cleaned up).

15

Applying these principles, in *Pluralsight*, the Tenth Circuit held that it was error to accept a defendant's self-serving claim that he lacked knowledge or was "merely negligent" as being "more plausible" than the inference of recklessness. *Id*. at 1262, 1268.  The court emphasized that "a 'smoking gun' is not required," such as a defendant admitting "he knowingly misrepresented" a fact, *id.* at 1262.  Where two inferences are "equally compelling," it is error to credit arguments that defendants only discovered the falsity of their statements after the fact.  *Id.*

Here, viewed holistically, the facts pleaded in the Complaint "strongly support the inference" that Pyle, Orr, and Johnson knew their statements were "false or misleading when [made]"; that their statements "presented an obvious risk of misleading" investors; and that they had "financial motive[s] for making" the statements.  *Id.* at 1259-60.  In summary:

- By January 2021, all three executives had ***actual knowledge*** that the 2020 Technical Report contained a material error that caused it to materially overstate reserves and resources. Linebarger and Tetra Tech (and later Stantec) ***agreed*** that the error existed.  Pyle personally received Linebarger's report (¶¶301(v), (vii));

- Pyle, Orr, and Johnson made a ***deliberate decision*** to conceal the known error and repeat the false figures.  They were motivated by personal profit (for Pyle), to raise capital in the July 2021 Offering, and to buy time to "offset" the overstatement (¶301(vi));

- Knowing of the error, Pyle made suspicious, substantial ***insider sales*** (¶¶291-98);

- Orr and Johnson ***admitted*** the reserve figure was false by July 12, 2021 (¶¶302-03);

- Pyle and Orr's statements, the Company's GAAP violations (in financial statements Orr and Johnson certified under SOX, while knowing of the material error in reserves), and the fact that CLG is Gatos's sole source of revenue all support scienter (¶¶304-14);

- The fraud falsely added ***over $1.6 billion*** of metal to Gatos's claimed reserves and lasted barely 15 months (¶¶315-17); and

- As the scheme collapsed, Orr, Johnson, Pyle, and Kinyon—the same executives who made the deliberate decision to conceal the truth—were all terminated.  ¶¶318-21.

*Cf. Pluralsight*, 45 F.4th at 1259-60 (five facts supporting scienter).  In response, Defendants provide no competing inference that is cogent or compelling, much less more plausible.

16

Their boilerplate claim that Plaintiffs allege "fraud by hindsight" (MTD at 19) ignores that Defendants were aware of the error by January 2021, yet decided to conceal that information. And their argument that they "reasonably relied" on Tetra Tech directly contradicts Plaintiffs' well-pleaded allegations that *all* of the Company's experts—including Tetra Tech—*agreed* on the error.

### A.    Pyle, Orr, and Johnson's Actual Knowledge Establishes Scienter

"One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts" indicating that "their public statements were materially inaccurate." *Florida State Bd. of Admin. v. Green Tree*, 270 F.3d 645, 665 (8th Cir. 2001); *see also Coeur D'Alene Mines*, 2 F. Supp. 2d at 1349, 1360 (scienter where company "increased the resource estimate" knowing of "significant structural and stability problems").

That is precisely the case here:  Pyle personally received Linebarger's written report in January 2021, participated in multiple conference calls, and personally heard Tetra Tech confirm the error.  ¶¶76-78, 301.  Pyle briefed Defendants Orr and Johnson on the error, and Johnson was copied on related emails.  ¶77, 301.  Thus, all three executives knew the 2020 Technical Report contained a material error such that Gatos's reserves were 20% lower than stated, making their public statements false.  *See In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d 987, 1007 (D. Colo. 2016) (scienter for statements about existence of metals in mine based on defendants' receipt of contrary testing reports, among other things).  Concealing this known fact "presented an obvious risk of misleading" investors.  *Pluralsight*, 45 F.4th at 1260.  Indeed, Huerta wrote Pyle to urge immediate disclosure of the errors, and Pyle, Orr, and Johnson decided not to do so.  ¶¶80-81.

### 1.    Defendants Cannot Claim "Reasonable Reliance" on Tetra Tech

Unable to dispute their actual knowledge of the material error, Defendants try to escape their disclosure duties by arguing that they "reasonably relied" on and "believed" Tetra Tech (MTD at 19, 22).  These improperly fact-intensive arguments fail.

First, recklessness is an **objective** standard. *See Pluralsight*, 45 F.4th at 1258-59 (recklessness determined by "standards of ordinary care"). Regardless of "their subjective beliefs, corporate executives . . . cannot make material representations to shareholders in disregard or contravention of obvious facts." *Sec. & Exch. Comm'n v. GenAudio Inc.*, 32 F.4th 902, 924 (10th Cir. 2022); *see also Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) (defendants' "subjective beliefs" were "irrelevant to whether [statements about geological testing and resources] were factually false and severely reckless"). Here, subjective belief is irrelevant given Defendants' actual knowledge of the material error.

Second, Defendants did not "weigh competing facts" and had no basis to "disbelieve" Linebarger (MTD at 21-22). **No one** disagreed with his written report, which was credible, corroborated, and correct. Gatos hired Linebarger because he is a "qualified person" with decades of mining experience, while the work by Gatos's own mine planner (Angola) and Tetra Tech had come into question. ¶¶6, 75-76, 301(iv). His report identified the 2020 Technical Report's key error, which Gatos has now admitted. And it correctly concluded that the reserves were 20% lower than claimed, again matching Gatos's recent admission.[6] The report further stated that Linebarger had verified his conclusions with a senior representative from Deswik, the company that made the software Gatos used to add the false reserves. ¶301. And when confronted with the report, Tetra Tech quickly **verified** the error. ¶¶78, 301(v). Thus, Defendants cannot claim that "Tetra Tech necessarily disagreed" with Linebarger. The Complaint alleges the exact opposite. ¶¶78, 301(v).

The Supreme Court's decision in *Matrixx* is controlling. There, experts told Matrixx that its key product caused adverse reactions; while Matrixx disputed the impact of the findings, it "had

---

[6] In a footnote (MTD at 22 n.20), Defendants question whether the errors had "any relation" to the issues disclosed on January 25, 2022. This is groundless given Gatos's October 3, 2022 admission of the **same** issue Linebarger found, which Defendants tellingly omit. (*Supra* at 3, 14.)

not conducted any studies of its own to disprove" the link, and thus had "no basis for rejecting [the] findings out of hand." 563 U.S. at 46-47. The Court held that the "inference that Matrixx acted recklessly (or intentionally, for that matter) is at least as compelling, if not more compelling, than the inference that it simply thought the reports did not indicate anything meaningful . . . ." *Id.* at 49. Indeed, there was a "cogent and compelling" inference that "Matrixx elected not to disclose the reports of adverse events not because it believed they were meaningless but because it understood their likely effect on the market." *Id.* The same is true here: even if Defendants claim that the precise ***amount*** of the overstatement was subject to further analysis, they already knew by January 2021 that a material error ***existed***, and their avowed goal in concealing it was to avoid a "major drop in share price." ¶81. That is securities fraud.

None of Defendants' cited authorities involved facts like *Matrixx*, where experts uniformly agreed that material errors existed. *Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018), did not address scienter at all and arose from a ***disagreement*** between consultants during a preliminary project. One consultant (Strathcona) resigned when a "sampling program" was only 20% complete; both the company and the second consultant (Snowden) expressed concerns about Strathcona's "flawed" methodology and "premature" views; and the company disclosed Strathcona's opinion "two weeks" after it resigned. *Id.* at 39-41. In *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609, at *5 (S.D.N.Y. Feb. 27, 2020), the expert merely confirmed that the company was following its disclosed mine plan. Here, in sharp contrast, both Linebarger and Tetra Tech (and later Stantec) agreed that the material error existed.

### 2.      Tetra Tech's Narrow, Ministerial "Consents" Are Irrelevant

In an effort to escape Linebarger's and Tetra Tech's agreement on the error, Defendants attempt to create a purported "inference" that "Tetra Tech did not believe that Mr. Linebarger's findings were of material or sufficient concern" because after February 2021, Tetra Tech

(1) provided narrow "consents" for Gatos to re-file the 2020 Technical Report, and (2) did not withdraw the 2020 Technical Report. (MTD at 21-22.) Both are irrelevant.

First, Tetra Tech's "consents" did not replace Defendants' duty to tell the truth. While Defendants claim that Tetra Tech was "the final say on public reserves reporting" (MTD at 22), the SEC explicitly required *Gatos* to disclose any "material change" in reserves or resources, and when a prior technical report "is not current" as to any "material assumptions and information." ¶84; *supra* at 6. *Gatos*—not Tetra Tech—had "ultimate responsibility" for "ensuring that those estimates, and the material assumptions underlying them, remain[ed] current[.]" SEC Release No. 33-10570, 2018 WL 5668900, at *107. And *Gatos*—not Tetra Tech—chose to repeatedly affirm that there had been no "material change" after learning that the numbers were inflated and false. Defendants cannot hide behind Tetra Tech and seek "absolution in the failures of others to disabuse them of their magical thinking regarding obvious facts." *GenAudio*, 32 F.4th at 924.

Second, the "consents" were narrow and ministerial. They merely confirmed Tetra Tech's authorship of the July 1, 2020 Technical Report with no further analysis since July 1, 2020, or any statement that it remained accurate. One such "consent" is shown below (ECF 64-3 at 6 of 12):

Exhibit 23.4

**CONSENT OF QUALIFIED PERSON**

Tetra Tech, Inc. ("Tetra Tech"), in connection with the Registration Statement on Form S-1 (and any amendments, supplements and/or exhibits thereto, the "Registration Statement") of Gatos Silver, Inc. (the "Company"), consents to:

- the public filing and/or incorporation by reference and use of the technical report titled "Los Gatos Project, Chihuahua, Mexico" (the "Technical Report"), with an effective date of July 1, 2020 and that was prepared in accordance with Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission and National Instrument 43-101 – *Standards of Disclosure for Mineral Project*, as an exhibit to and referenced in the Registration Statement;
- the use of and references to our name, including our status as an expert or "qualified person" (as defined in Subpart 1300 of Regulation S-K promulgated by the U.S. Securities and Exchange Commission), in connection with the Registration Statement and any such Technical Report; and
- any extracts from or a summary of the Technical Report in the Registration Statement and the use of any information derived, summarized, quoted or referenced from the Technical Report, or portions thereof, that was prepared by us, that we supervised the preparation of and/or that was reviewed and approved by us, that is included or incorporated by reference in the Registration Statement.

Tetra Tech is responsible for authoring, and this consent pertains to, the Technical Report.

Dated: July 12, 2021

Tetra Tech, Inc.

By: /s/ Guillermo Dante Ramírez-Rodríguez

　　　Name:　Guillermo Dante Ramírez-Rodríguez
　　　Title:　Principal Mining Engineer

20

Thus, the "consents" did ***not*** say that Tetra Tech "believed in the Technical Report's accuracy," as Defendants assert (MTD at 21).

Third, Gatos could not "rely" on the consents because the error resided in the mine plan that ***Gatos itself prepared***. *See supra* at 8-9. After providing Tetra Tech with the false and flawed mine plan, Defendants could not believe the resulting 2020 Technical Report was correct, even if Tetra Tech narrowly consented to its "public filing" and "use." Much like a "clean" audit opinion, the fact that an auditor failed to find any error does not guarantee that the underlying financial statements are accurate, especially where the company provided false information to the auditor.[7]

Fourth, the fact that Tetra Tech did not "withdraw or modify" the 2020 Technical Report after receiving Linebarger's report (MTD at 21) is irrelevant because withdrawing the 2020 Technical Report was ***Gatos's*** responsibility. Indeed, it was Gatos's new management—not Tetra Tech—that finally withdrew the Report in January 2022 and said it "should not be relied upon," ¶159. While this was over a year late, it confirms that Defendants—not Tetra Tech—are responsible for their own disclosure decisions. Tetra Tech's "consents" are irrelevant to scienter.

**B.      Defendants Were Motivated to Materially Mislead, Supporting Scienter**

Though not required, Plaintiffs also allege Defendants' motive, which "can be a relevant consideration" in evaluating scienter. *Tellabs*, 551 U.S. at 325.

**1.      Substantial Insider Stock Sales Support Scienter**

"Personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. Here, in May and June 2021, after learning of the material error and that Gatos would

---

[7] *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *7 (S.D.N.Y. May 24, 2018) (auditors' approval irrelevant where defendants "knew" financial statements were false); *Sec. & Exch. Comm'n v. Sequential Brands Grp., Inc.*, 2021 WL 4482215, at *8 (S.D.N.Y. Sept. 30, 2021) (argument that auditors "have not backed away" from audit opinion irrelevant and "not cognizable on a motion to dismiss").

not disclose it, Pyle and Huerta sold nearly 200,000 shares of Gatos stock near peak prices for almost $3.4 million. These unusual, highly profitable insider sales support a strong inference of scienter, including due to "the amount of profit from the sales, the portion of stockholdings sold, [and] the change in volume of insider sales." *Pluralsight*, 45 F.4th at 1264-65.

Substantial profit: Pyle and Huerta reaped substantial profits—$1,178,550 and $739,140, respectively. ¶¶103-04. Pyle's profits were over half of his total 2020 compensation. ¶296. The profits were particularly high because the sales occurred at prices from $12.03 to $19.31 (only $0.12 below Gatos's all-time peak). ¶¶12, 103-04. "Obviously, these trades presented the greatest opportunity for profit and the greatest opportunity to benefit" from concealing the truth. *In re Qwest Commc'ns Int'l, Inc.*, 396 F. Supp. 2d 1178, 1195–96 (D. Colo. 2004) (sales of stock "when its price was nearing its zenith" supported scienter). Defendants assert that Gatos's high share price at the time of Pyle's and Huerta's sales is "known now only in *hindsight*." (MTD at 27.) But they knew by May 2021 that Gatos's stock had soared far above its $7.00 IPO price, ¶12, allowing them to reap large profits at the Class's expense.

Significant portion sold: Pyle and Huerta sold 29% and 67%, respectively, of their holdings—well within the range supporting scienter.[8] For example, in *Pluralsight*, 45 F.4th at 1267, the Tenth Circuit (reversing the district court) held that sale percentages of 5% and 12% of holdings supported scienter. Further, the Circuit rejected the argument (which Defendants also advance here) that the defendants lacked scienter because they "retained the vast majority of their stock, so they 'miss[ed] the boat' along with every other investor." *Id.*; *see* MTD at 2, 29.[9]

---

[8] *See also Molycorp*, 157 F. Supp. 3d at 1011 (sales of 21% to 52% of total holdings); *Qwest Commc'ns*, 396 F. Supp. 2d at 1195–96 (sales of 1.9%, 11%, and 33% of total holdings).

[9] Defendants cannot dilute Pyle and Huerta's large sales by pointing to unvested options (MTD at 11). They did not own (and could not exercise) any unvested options, making them irrelevant.

22

Unusual timing:  The sales occurred over a short one-month period, and neither Pyle nor Huerta had previously sold any shares or did so again.  ¶295.  And the sales were entirely discretionary; each executive chose when and whether to sell.  ¶102.  Defendants' argument that the sales are not "unusual" because they occurred "after the expiration of a 180-day lockup period" following the IPO (MTD at 27) fails under controlling law.  *Pluralsight*, 45 F.4th at 1267.  Further, because the lockup was "subject to extension" due to "material news or a material event relating to [Gatos]" (¶103), only by concealing the "material event" of the errors could Pyle and Huerta ensure that the lock-up expired while Gatos's share price remained inflated.

Defendants try to distract from these suspicious insider sales by noting that Orr, Johnson, and Gatos's directors did not sell stock, and that Orr made a minuscule purchase of 8,000 shares (a mere 1% of his shares and vested options).  (MTD at 12, 28.)  This is irrelevant to Pyle, since "motive is considered with respect to [each defendant] alone."  *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 75 (2d Cir. 2001).  Further, the lack of sales by Orr and Johnson does not support an inference that they "lacked motive to defraud investors," *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1191 (10th Cir. 2003), much less "negate the inference of scienter."  *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, 2008 WL 879023, at \*13 (D. Colo. Mar. 28, 2008).  And the remaining defendants are not accused of fraud, making their holdings irrelevant.

### 2.    Defendants' Motive to Complete the July 2021 Offering and Offset Reduced Reserves with New Exploration

Defendants were also highly motivated to maintain Gatos's artificially inflated stock price to complete the $118 million July 2021 Offering at $14.00/share.[10]  ¶¶108, 111, 290; *Coeur*

---

[10] *See Voulgaris v. Array Biopharma Inc.*, 2020 WL 8367829, at \*25 (D. Colo. Nov. 24, 2020) (motive to "conduct a secondary public offering" and generate $108 million supported scienter); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 271 (S.D.N.Y. 2014) (motive for mining company to complete $117 million offering).

*D'Alene Mines*, 2 F. Supp. 2d at 1359 (scienter where statements were "designed to inflate the value of Coeur's stock and in turn permit Coeur to complete a $150 million convertible securities offering," among other things). Defendants ignore this motive and have thus waived their opportunity to address it. *Tran v. Trustees of State Colleges in Colorado*, 355 F.3d 1263, 1266 (10th Cir. 2004) ("Issues not raised in the opening brief are deemed abandoned or waived.").

Defendants were further motivated to conceal the truth so they could attempt to offset the impact of the known overstatements by announcing newly discovered resources and/or upgrading existing resources to reserves. ¶289. Indeed, Defendants decided to conceal Linebarger's findings in January 2021 to pursue this strategy, with the explicit goal of avoiding a "major drop in share price." ¶81. This is not a "generalized motive[] shared by all companies." (MTD at 27.) It is specific and driven by the known overstatement that Defendants intentionally tried to "obscure," strongly supporting scienter. *Pluralsight*, 45 F.4th at 1262 ("equally compelling inference" that defendant "hoped Pluralsight could maintain its billing growth and obscure his misrepresentation"); *Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1130 (D. Colo. 2017) ("It is more than logical for plaintiffs to assert that the Clovis Defendants acted in the hope that positive results would overtake negative ones.").

### C.       Orr and Johnson Admitted Material Misstatements to Gatos's Lenders

Further supporting their scienter, Orr and Johnson admitted that on July 12, 2021, Gatos provided its lenders with "an overestimation of the mineral reserves" at CLG that was "***incorrect when made*** or furnished." ¶¶170-72; 302-03. Defendants only respond in a footnote (MTD at 30 n.22) arguing that this does not support "an inference that errors were known to the Company at the time" of the misstatements. But this makes no sense; the reserves were known to be false in July 2021 due to the same error Linebarger identified—and Orr and Johnson knew about—in January 2021.

24

### D.   Orr and Pyle's Statements Support Scienter

Defendants' statements touting their personal involvement in CLG's mining operations and the accuracy of the resources and reserves—an issue analysts cited as a major driver in their valuations—further support scienter. ¶¶304-06. For example, Orr claimed "extensive geologic understanding" and that the resource "calculation is turning out to be very reliable, which is terrific news," (¶305), when he already knew the 2020 Technical Report contained material errors.[11] *See Peace Officers' Annuity and Benefit Fund of Ga. v. DaVita Inc.*, 372 F. Supp. 3d 1139, 1154 (D. Colo. 2019) (statements that executives were personally involved in monitoring key financial metrics supported scienter).

### E.   Core Operations Supports Scienter

Gatos's revenue depends entirely on CLG, its sole operational mine. ¶¶122, 235. Orr, Pyle, and Johnson were senior executives for a decade and personally oversaw and monitored developments at CLG, including personally visiting at least once a month for presentations and to inspect core samples. ¶¶50-52, 300, 301. Further, as Gatos's Chief Geologist, Pyle personally received Linebarger's report and reported to CEO Orr; Pyle's knowledge is an "important link in the inferential chain" that Orr also knew of the error and that the statements were false. *Adams*, 340 F.3d at 1106. "[I]t would be absurd to suggest that Defendants . . . were without knowledge" of the material errors in CLG's reserves and resources. *Molycorp*, 157 F. Supp. 3d at 1011 (core operations supported executives' knowledge about products at mine); *Pluralsight*, 45 F.4th at 1259–60 (misstated fact "at the core" of business model).

---

[11] Defendants' observation that this statement "is about Tetra Tech's *resource* model" (MTD at 25) is beside the point, since Orr also knew the resource model was unreliable. *Supra* at 7.

## F.      GAAP Violations Support Scienter

"In the context of other particularized and relevant facts, accounting errors are relevant to determining whether allegations are sufficient to support a strong inference of scienter." *Adams*, 340 F.3d at 1105-06.  Here, together with Plaintiffs' other detailed scienter allegations, GAAP violations support a strong inference of scienter.  Based on Gatos's own accounting policies, the Complaint alleges precisely how the overstatement of CLG's reserves and LOM caused Gatos's financial statements to misstate expenses and income in violation of GAAP.  *See* ¶¶126, 137. Defendants' claim that they had "no reason to believe that Gatos's accounting was incorrect" (MTD at 26) fails, given that the GAAP violations necessarily followed from Gatos's accounting policies and the known error inflating Gatos's reserves and LOM.  Further supporting their scienter, CEO Orr and CFO Johnson personally signed statutorily mandated certifications attesting to the accuracy of Gatos's financial statements and the disclosure of any fraud (¶¶311-12), while knowing of the error that caused the GAAP violations.  *See In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1298 (N.D. Okla. 2010) (executives' filing of false SOX certifications that "contradicted facts that were then available to them" is "indicia of scienter").

## G.      The Magnitude and Duration of the Fraud Support Scienter

The large magnitude and relatively short duration of the fraud further support a strong inference of scienter.  Defendants ignore this issue and thus waived it.  *Tran*, 355 F.3d at 1266.

Magnitude:  The error added 1.8 million tonnes of reserves, worth over $1.6 billion, and materially impacted Gatos's financial statements.  *See* ¶¶160, 316.  "It is reasonable to infer that such a substantial" misstatement at Gatos's sole operating mine would have been known by Defendants at the time of their statements.  *Adams*, 340 F.3d at 1106 (loss of more than 25% of reported net income supported scienter).

26

Duration: The fraud lasted barely 15 months from the IPO. ¶317. Defendants conducted the IPO in October 2020 and learned of the material error by January 2021. Gatos's share price peaked in July 2021, and collapsed in January 2022, just six months later. *See SemGroup*, 729 F. Supp. 2d at 1299 ("short lapse of time between the IPO and Secondary Offerings, which touted SGLP's 'minimal exposure' to spiking oil prices, and the public disclosure [five months after the SPO] of SemGroup's liquidity crisis" supported "strong inference of scienter").

## H.    Executive Terminations Support Scienter

The terminations of Defendants Orr, Johnson, and Pyle and COO Kinyon (¶¶318-21) are "highly unusual or suspicious" and support an inference of scienter because "independent facts indicate" that these departures were "tied to the fraud alleged." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011). Defendants offer only generic denials.

First, Kinyon suddenly departed on August 16, 2021 and was terminated at the urging of Andres, who had taken over management of CLG and the reserve issues. ¶¶117, 301, 319, 321. Second, on April 5, 2022, Defendants Orr, Johnson, and Pyle all announced their purported "retirements" at once. ¶320. Strongly supporting scienter, this was barely two months after the fraud collapsed on January 25, 2022, and analysts expressly linked this senior management "refresh" to the "problems with the resource/mine plan disclosed earlier in 2022." ¶320.[12] Andres became CEO, and Tony Scott, who had also probed the error, took over Pyle's role. *Id.*

Defendants argue that Orr, Johnson, and Pyle were "retirement age," and that Orr had announced his intention to retire by late 2022. But that does not explain their sudden, simultaneous departure. Moreover, while Gatos originally stated that it "intend[ed] for Mr. Orr to continue to

---

[12] *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *15 (S.D.N.Y. Apr. 22, 2016) (retirement of CEO two months after revelation of fraud).

27

serve on our Board of Directors after his retirement as [CEO]" (ECF 64-2 at 3 of 14), Orr abruptly

resigned from both Board and CEO roles with just two days' notice (¶320)—hardly a planned

"retirement."  Pyle's sudden departure contradicts his March 2021 statement that "I tell people that

I can never retire because I've got exploration programs for years in advance within this district."

¶88.  These suspicious circumstances support an inference of scienter.[13]

## II.    THE COMPLAINT ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS UNDER THE EXCHANGE ACT AND SECURITIES ACT

Defendants do not contest the falsity of their misstatements and omissions regarding CLG's

reserves and resources, but instead argue they are non-actionable opinions under *Omnicare*.  This

argument fails, as do Defendants' cursory challenges to the remaining statements.

### A.    False Statements of CLG's Reserves and Resources

To begin, Defendants' statements are not "opinions"; they are "determinate, verifiable"

false statements of fact.  *Omnicare*, 575 U.S. at 183-84.  Even if considered to be opinions, these

statements are actionable for three independent reasons:  (i) Defendants did not "actually hold[]

the stated belief," *id.* at 184; (ii) the statements contain "embedded statements of fact" that are

false, *id.* at 185; and (iii) the statements omit "particular (and material) facts going to the basis for

the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the

knowledge it did or did not have—whose omission makes the opinion statement at issue

misleading to a reasonable person reading the statement fairly and in context."  *Id.* at 194.[14]

---

[13] *See Frank v. Dana Corp.*, 646 F.3d 954, 960-62 (6th Cir. 2011) (defendant's "retirement from Dana supports a strong inference of scienter because it occurred within months of the time that Dana first discovered its accounting errors"); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 734 (D. Minn. 2019) (CEO of 26 years "announc[ed] his early retirement several weeks after CenturyLink announced the results of its investigation" into accounting fraud).

[14] Defendants do not argue that any challenged statements are forward-looking or non-actionable under the PSLRA safe harbor or the bespeaks caution doctrine.  As such, those arguments are waived, *Tran*, 355 F.3d at 1266, and are inapplicable in all events because none of the statements

## 1.    The Reserves and Resources Are False Statements of Fact

In *Omnicare*, the Supreme Court held that a "determinate, verifiable statement" is a "statement of fact," not opinion.  575 U.S. at 183-84.  Indeed, statements that are "objectively verifiable" and "express[] certainty . . . cannot be described as opinions."  *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at \*9 (D.S.C. Mar. 29, 2019).  Defendants' statements regarding CLG's reserves and resources meet these standards.[15]

First, while Defendants call the figures "estimates," "a fact-based estimate is different from a subjective opinion."  *In re Petrobras Sec. Litig.*, 2016 WL 1533553, at \*4 (S.D.N.Y. Feb. 19, 2016).  Unlike subjective opinions (like one's taste in music), the reserves and resources were presented as quantitative, precise, and fact-based, not speculative or uncertain ranges.  They claimed precise numerical amounts (*e.g.*, "9,617,631" tonnes of proven and probable reserves) as of specific dates (September 6, 2019 for resources; July 1, 2020 for reserves).  *See, e.g.*, ¶203. These precise amounts were "determinate" and "verifiable."  *Omnicare*, 575 U.S. at 183-84; *cf. Coeur D'Alene Mines*, 2 F. Supp. 2d at 1354 (statements "regarding the exact amount of anticipated production at a particular mine" were "concrete and capable of objective verification").

Second, a known, objective falsehood is not a matter of opinion.  Here, based on independent expert analysis, Defendants knew the numbers were objectively false by January 2021, and Tetra Tech verified the error by February 2021.  Plaintiffs' claims thus have nothing to

---

are forward-looking, Defendants had actual knowledge that the reserves and resources were false, and no cautionary language can protect against deliberate misstatements of present fact. *See GenAudio*, 32 F.4th at 928–29 ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made.").

[15] Further, in several instances, Gatos's executives publicly affirmed the numbers without even attempting to qualify them as opinions (*e.g.*, "I believe"); for example, Pyle declared that the "total proven and probable reserves are about 9.6 million tons [sic]" (¶283), and Orr stated that "there are 11 remaining years in the life of this mine" (¶267).  These are statements of fact, not opinions.

do with "Monday morning quarterback[ing] an issuer's opinions."  *Omnicare*, 575 U.S. at 186. The inflated reserves and resources were driven by objective errors, not any "geological interpretation," "statistical inferences," "judgment," or "degree of uncertainty."  (MTD at 32.) Gatos's false addition of "waste blocks" to reserves was like saying 10 plus 0 equals 12, an objective error not subject to any debate.  Further, Tetra Tech's use of an unreliable resource model ignored Gatos's actual production experience and CLG's known geology.  ¶17.  And the errors' magnitude far exceeds any "degree of uncertainty":  the 19% reduction in reserves that Gatos has admitted is worth $1.67 billion (at January 25, 2022 prices), aligning with the 20% misstatement in reserves that Linebarger identified in January 2021.  ¶76.[16]

Third, Gatos withdrew the 2020 Technical Report and admitted that it contains "errors" and "should not be relied upon," ¶159.  An "error" means a document was false when issued, such as (in the financial statement context) due to "mistakes" or the "oversight or misuse of facts that existed at the time."  ¶164.  If the numbers were truly "uncertain and reflected only opinions," as Defendants argue (MTD at 32), Gatos would not have (a) withdrawn the 2020 Technical Report and admitted "errors" (¶159), (b) admitted that it provided contemporaneously false information to its lenders to obtain $50 million in July 2021 (¶170), and (c) admitted a material overstatement based on the same error Linebarger identified in January 2021 (Ex. A at 5-6; ¶76).  Moreover, Gatos may be required to restate its prior financial statements.  ¶121.  These actions confirm that the 2020 Technical Report's figures were objectively false at the time.

---

[16] Defendants also point to a generic risk disclosure that CLG's resources and reserves "might prove to be materially inaccurate" as indicating that the numbers were opinions.  (MTD at 32-33.) However, that statement itself was misleading (¶209) because the material inaccuracy was not a "risk," but already existed and was known, as set forth above.

Defendants' cases are irrelevant.  CLG had been in full-scale production for over a year before the IPO, and by February 2021, both of Gatos's experts (Linebarger and Tetra Tech) told senior management that the 2020 Technical Report contained material errors.  ¶¶46, 76-78.  In contrast, Defendants' cases involved early-stage projects with debatable views about their prospects.  For example, in *Martin*, 732 F. App'x at 42, the "mine [was] still under development," and the company had merely started to mine a "sample" to "confirm the estimate before undertaking full-scale mining."  *Id.* at 39 & 42.[17]

### 2.  The Reserves and Resources Are Actionable under *Omnicare*

Even viewed as opinions, Defendants' misstatements regarding CLG's reserves and resources are actionable under each independent prong of *Omnicare*.

### a.  Defendants Did Not Sincerely Believe the Statements

The Complaint establishes that Defendants did not "actually hold[] the stated belief" in the reserve and resource figures, making the statements actionable.  *Omnicare*, 575 U.S. at 184.  Their direct knowledge (verified by three experts) that the 2020 Technical Report contained material errors and false reserve figures, detailed above, defeats a claim that they sincerely believed those numbers were correct and forecloses any claim of reliance on third parties.[18]

---

[17] Likewise, in *Pretium*, 2020 WL 953609 at *1-2, 4, the statements merely expressed confidence in a preliminary mine plan from an "exploratory phase" years before commercial production.  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *30-31 (S.D.N.Y. Sept. 2, 2022), held statements that project delays were "not atypical" to be opinions because there was no "objective metric" to evaluate falsity.  This has no bearing on Gatos's objectively false, quantitative statements of resources and reserves.

[18] *See, e.g.*, *SCANA Corp.*, 2019 WL 1427443 at *3, 9 ("Defendants could not have sincerely believed" opinions about timeline for construction project where they received reports from outside consultant stating that "there was no credible path for SCANA to complete the Project" on the expected timeline); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 380–81 (S.D.N.Y. 2015) (allegations "sufficient to infer that the Company disbelieved" opinion statements about internal controls where "management was well aware of the extensive corruption in the Company's procurement activities" at the time).

### b.      The Statements Embedded False Facts

Defendants have waived *Omnicare*'s second prong, and in all events the reserve and resource statements are actionable because they "embedded" false statements of fact. *Omnicare*, 575 U.S. at 185.  In this regard, the Supreme Court provided the hypothetical of a CEO who stated: "I believe our TVs have the highest resolution available because we use a patented technology to which our competitors do not have access." *Id.*  If the "underlying fact" of using "a patented technology" was false, liability "would follow." *Id.*

Here, the 2020 Technical Report embedded a false factual claim that Tetra Tech "verified" the mine plan "for the calculation of Reserves" when it had not; even a basic verification would have revealed the erroneous addition of reserves outside the boundaries of the deposit. ¶208.  By February 2021, Tetra Tech verified that the 2020 Technical Report contained a material error. ¶78.

The statements also embedded false factual statements that CLG's reserves and resources complied with stringent SEC requirements and definitions, when they did not:

- The 2020 Technical Report was "prepared in accordance with the SEC Mining Modernization Rules" (¶205);

- Resources were based on "specific geological evidence and knowledge" and "detailed and reliable exploration, sampling and testing information gathered through appropriate techniques" (¶206);

- Reserves were based on the resulting resources and "adequate information on mining, processing, metallurgical, economic, and other relevant factors" (*id.*).

These embedded factual statements falsely assured investors that CLG's reserves and resources had a basis in reality.  In truth, the addition of reserves based on Gatos's misuse of software violated the SEC Mining Modernization Rules and had no basis in "specific geological evidence and knowledge," while the resource model was inaccurate and assumed a consistent, uniform deposit, both contrary to the characteristics of narrow-vein silver deposits and Gatos's production experience.  ¶¶205-06.  Further, Gatos's use of the false 2020 Technical Report after

January 2021 violated the SEC Mining Modernization Rules' express requirement to disclose "a material change" in resources and reserves, and to disclose when a previously filed report "is not current" with respect to "[a]ll material assumptions and information."  ¶84.

Since multiple embedded "supporting facts are untrue," the purported opinion statements are actionable.  *Correa v. Liberty Oilfield Services, Inc.*, 548 F. Supp. 3d 1069, 1082-83 (D. Colo. 2021) (Jackson, J.) (statement that "[w]e believe industry contraction and the resulting reduction in total U.S. marketable fracturing capacity will benefit us as industry demand increases" actionable where plaintiff "dispute[d] the veracity of the underlying trends of industry contraction and capacity reduction on which the prediction relies") (cleaned up).

### c.       The Statements Misleadingly Omitted Material Facts

The reserve and resource statements are separately actionable because they omitted "particular (and material) facts going to the basis for [Defendants'] opinion—facts about the . . . knowledge [Defendants] did or did not have—whose omission makes the opinion statement[s] at issue misleading."  *Omnicare*, 575 U.S. at 194.

Defendants' public statements omitted the material facts that Linebarger identified a material error that meant reserves were 20% lower; Tetra Tech promptly verified the error; and a third expert, Stantec, later agreed the error existed.  *Supra* at 10, 13.  These internally known and omitted facts went directly to the "basis" for the figures and Defendants' "knowledge" that they were materially false.  *Omnicare*, 575 U.S. at 188.  Indeed, while knowing of the material error, Defendants repeated the false figures five times and twice claimed that there had been no "material change" (¶¶222, 224, 264, 269).  Such statements are actionable because they did not "fairly align[]" with the information in [Gatos's] possession at the time."  *Omnicare*, 575 U.S. at 189.[19]

---

[19] *See also In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 888 (9th Cir. 2018) ("defendants possessed knowledge," including that company was pursuing "an extensive drilling

Defendants' bald assertion—citing nothing—that "Plaintiffs acknowledge" the "statements were fully consistent with independent experts hired to comply with the Company's disclosure obligations" (MTD at 34 n.24) is simply false. ***All three experts*** (Linebarger, Tetra Tech, and Stantec) ***agreed*** the errors existed, and Gatos has admitted that Linebarger's January 2021 finding was correct. ¶¶76-78, 106, 301; Ex. A at 5-6. There is no allegation that ***anyone*** ever disputed Linebarger's findings. Defendants' naked speculation that Tetra Tech "necessarily" disagreed (MTD at 22) must be rejected in light of the specific factual allegation that Tetra Tech agreed the material error existed. Moreover, the PSLRA does not "demand that [Plaintiffs] negate every alternative explanation to adequately plead falsity." *Pluralsight*, 45 F.4th at 1251.[20]

## B.    Omissions of Known Trends and Uncertainties Violated Item 303

Defendants violated Item 303's affirmative requirements to disclose known "trends" and "uncertainties" that may materially impact financial performance. Omissions that violate Item 303 are actionable under the securities laws. *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1197 (10th Cir. 2013). In violation of Item 303, Gatos omitted the known (1) "uncertainty" of the errors and overstatement in the 2020 Technical Report, and (2) "trend" that CLG's production rate was unsustainable because the reserves would run out years early. ¶¶212-17. *See Correa*, 548 F. Supp. 3d at 1081-82 (Item 303 omission claim sustained).

---

program to investigate" problem at gold mine, "that left them with no basis for their optimistic statements" about production); *Chicago Bridge & Iron Co.*, 2018 WL 2382600 at *8 (statements about "good progress" and status of nuclear project misleading by "[f]ailure to disclose [a] three-month long Stop Work Order"); *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *14 (S.D.N.Y. Sept. 30, 2021) (statements misleading because they had "no basis" and omitted "specific material facts" about regulatory communications "that conflicted with" the statements).

[20] These facts—where multiple experts all confirm a material error—are far different from the *Omnicare* hypothetical Defendants reference (MTD at 37) where "an opinion about legal compliance" did "not disclose that a single junior attorney expressed doubts about a practice's legality, when six of his more senior colleagues gave a stamp of approval." 575 U.S. at 190.

Defendants only dispute whether they "should have credited the Linebarger work to such a degree that its disclosure was required under Item 303." (MTD at 37.) This argument has no basis, particularly because Tetra Tech also verified the error. And it is irrelevant because Item 303 does not turn on whether management subjectively "credit[s]" known, material negative information. Rather, Item 303 requires management to "objectively" evaluate "uncertaint[ies]" that are "known," even if their magnitude and whether they will "come to fruition" have not been finally determined. ¶214. Because Gatos failed to do so, Item 303 required disclosure.

C.    **Gatos's False Financial Statements and False Statements about GAAP Compliance, Internal Controls, and Impairment Testing**

Based on Gatos's own accounting policies, the Complaint alleges how the material overstatement of reserves and LOM rendered over two years of Gatos's financial statements false in violation of GAAP. ¶¶126, 137; *supra* at 12. Gatos also falsely claimed that no impairment testing was required. These violations were enabled by now-admitted material weaknesses in internal controls (¶¶19, 179; Ex. D), which Orr and Johnson falsely certified as effective. ¶¶69, 281-82. Gatos has further admitted that it may need to restate its prior-period financials and take an impairment charge—that is, write off part of CLG's value. ¶165.

With no substantive response, Defendants largely ignore these misstatements (MTD at 35) and merely observe that Gatos has not restated its financial statements to date. While a restatement is by no means required for liability,[21] Defendants' argument is premature because whether Gatos will restate remains to be determined. *See* ¶165. Gatos has missed all of its annual and quarterly

---

[21] *See In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1222 n.4 (N.D. Okla. 2003) (that "financial results were not restated does not mean that [they] were accurate"); *In re St. Jude Med., Inc. Sec. Litig.*, 836 F. Supp. 2d 878, 889 (D. Minn. 2011) (lack of "formal restatement does not preclude a claim for securities fraud").

SEC filings since November 2021, and its auditor KPMG resigned days before Gatos admitted

large reserve reductions on October 3, 2022.  (Ex. E.)

Citing nothing, Defendants finally argue that "any theoretical error in the financial

statements" or misstatements about impairments or internal controls "did not cause any loss."

(MTD at 35-36.)  This argument fails because Gatos's share price immediately plunged 69% after

the January 25, 2022 press release, which revealed (among other things) the errors' potential

financial statement impact and the prospect of a restatement and impairment charge.  ¶¶166; 325-

29.  This is more than sufficient to plead loss causation under the Exchange Act.[22]

### D.       Defendants' Other False and Misleading Statements Are Actionable

Definitions and Methodology:  Plaintiffs explicitly allege that these statements were false

and misleading because CLG's reserves and resources were not "very reliable" or based on

"adequate information," "specific geological evidence," or "reliable techniques."  ¶¶206-207, 271-

72; *supra* at 32.  Defendants cannot re-interpret Orr's "very reliable" statement by claiming that it

simply meant "past mining" matched "prior projection" (MTD at 25).  While knowing the 2020

Technical Report contained a material error, Orr explicitly referred to the "resource model" and

"resource," vouching for its reliability.  ¶272.  The Court "need not evaluate Defendants'

hypotheticals" about how the statement could be re-interpreted.  *Pluralsight*, 45 F.4th at 1250.

Risk Factors:  Gatos misleadingly described a "risk" that the reserves and resources "might

prove to be materially inaccurate" (¶¶209, 273), which in fact was a certainty because Defendants

knew of the material error and resulting overstatement by January 2021.  Defendants do not dispute

---

[22] *See In re ICG Commc'ns, Inc. Sec. Litig.*, 2006 WL 416622, at \*10 (D. Colo. Feb. 7, 2006)
("law does not require" allegations "that ICG disclosed every fine detail" of revenue manipulation
"to establish that those manipulations caused the plaintiffs' losses").  Under the Securities Act,
Plaintiffs "need not allege . . . loss causation."  *Correa*, 548 F. Supp. 3d at 1079.

that such "risk factors" are actionable where, as here, they "present a risk as merely a contingency after the risk has materialized." *Williams*, 339 F. Supp. 2d at 1233.

Half-Truths about New Drilling and Upgrading CLG's Resources: Defendants' claim that "Plaintiffs do not allege anything false or misleading was said" (MTD at 36) is not true. For example, Gatos claimed that new exploration would add "more reserves" (¶283), but omitted the known fact that CLG's reserves were already materially overstated. Such statements are actionable as "at least misleading even if not literally false." *Pluralsight*, 45 F.4th at 1251.

## III. THE COMPLAINT ADEQUATELY ALLEGES SECTION 11 STANDING UNDER THE SECURITIES ACT

Defendants are wrong to argue that Plaintiffs lack "standing" to bring claims under Section 11 of the Securities Act.[23] Where, as here, the registration statement for a securities offering contains material misstatements or omissions, Section 11 grants an express cause of action to "any person acquiring such security," 15 U.S.C. § 77k(a). "Congress adopted § 11 to ensure that issuers 'tell[ ] the whole truth' to investors. For that reason, literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Omnicare*, 575 U.S. at 192; *Correa*, 548 F. Supp. 3d at 1078 ("Because Section 11 is a strict liability provision, a plaintiff's burden for a prima facie showing is low.").

The so-called "tracing" requirement means that a plaintiff who purchased shares after the offering must show that the shares were issued under a false registration statement (as opposed to another registration statement or being unregistered). The Tenth Circuit has "endorse[d]" the "'tracing' theory" of Section 11 "standing." *Joseph v. Wiles*, 223 F.3d 1155, 1160 (10th Cir. 2000).

---

[23] This argument has no bearing on Plaintiffs' Exchange Act claims, where Defendants do not dispute standing.

Section 11 "standing" is not a heavy burden at the pleading stage.  "The pleading requirement . . . is satisfied by general allegations that plaintiff purchased pursuant to or traceable to" a challenged registration statement.  *Northumberland Cty. Ret. Sys. v. Kenworthy*, 2013 WL 5230000, at \*6 (W.D. Okla. Sept. 16, 2013).  Plaintiffs satisfy this requirement by alleging that they purchased Gatos common stock "pursuant and/or traceable to the 2020 Registration Statement or 2021 Registration Statement" (¶181).  Defendants' responses fail.

First, Plaintiffs' Section 11 claim relates to ***both*** of Gatos's securities offerings:  the October 2020 IPO and the secondary offering in July 2021.  ¶¶201, 220.  Defendants' claim that neither Plaintiff bought "shares traceable to either" offering (MTD at 4) is false.  Plaintiff Sweidan bought shares on July 13, 2021 (ECF 54-1 at 3), ***before*** the secondary offering on July 15, 2021 (¶110).  Because Gatos had "made only one" offering as of July 13, 2021, the shares are directly traceable to the IPO, and Plaintiff Sweidan has Section 11 standing.  *Wiles*, 223 F.3d at 1160.  Defendants' own authority agrees.  *See Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 498 (5th Cir. 2005) ("Section 11 is available for . . . any aftermarket purchasers" when "there had only been one offering at the time of purchase.").[24]

Second, after the July 2021 Offering, both Plaintiffs purchased additional shares, traceable to that Offering or the IPO, from August 2021 to January 2022.  Thus, both Plaintiffs have "standing to bring § 11 claims, provided that they can trace their stock to one of the two offerings." *Celestial Seasonings*, 178 F.R.D. at 557.  And because ***both*** Registration Statements violated Section 11, "tracing" is a red herring:  Plaintiffs have Section 11 "standing" for each share they purchased, whether it was issued in the IPO or in the July 2021 Offering.  *See In re Eagle Computer*

---

[24] Defendants' citation to *Scott v. ZST Digital Networks, Inc.*, 896 F. Supp. 2d 877, 884 (C.D. Cal. 2012), is irrelevant because the plaintiff only purchased shares "thirteen months after" the second offering.  *ZST* does not address purchases when only ***one*** offering had occurred, as here.

*Sec. Litig.*, 1986 WL 12574, at \*9 (N.D. Cal. Mar. 31, 1986) (where both registration statements were "similarly defective," "all the shares are Section 11 shares issued pursuant to a defective registration statement and no tracing is required").  In fact, the "issue of tracing is a merits issue, not appropriate for consideration here."  *Celestial Seasonings*, 178 F.R.D. at 557.  Defendants cite no authority from this District that involved two challenged offerings and required "tracing" at the pleading stage.  At most, this is an issue of measuring Section 11 ***damages*** (because the offering prices were different), not ***standing***, and should be addressed at the merits stage.[25]

In all events, Plaintiffs' purchases of Gatos common stock both before and after the July 2021 Offering confer class standing to bring Securities Act claims on behalf of all purchasers in the July 2021 Offering.  While the Tenth Circuit has not addressed class standing as to multiple securities offerings, in *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 163 (2d Cir. 2012), the Second Circuit held that where multiple offerings are "issued over the course of a year" and each "contained an identical misrepresentation," Section 11 claims by a purchaser "from one offering would raise a 'set of concerns' nearly identical to that of a purchaser from another offering" and give rise to class standing.  Here, the IPO and July 2021 Offering involved the same security (Gatos common stock) and virtually identical misstatements (*compare* ¶¶202-17 *with* ¶¶221-30), and occurred just nine months apart.  Plaintiffs have class standing.[26]

---

[25] To the extent Defendants nonetheless claim that tracing is necessary, Plaintiffs can do so using statistical tracing or other techniques utilized in securities class actions.  *See In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 224 (C.D. Cal. 2019).  Again, this is a merits issue, not a pleading matter.

[26] *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 180–81 (D. Conn. 2019) (class standing for Securities Act claims where "claims brought under the Exchange Act, for which [plaintiff] indisputably has standing, are based on the same set of misrepresentations and omissions"); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71, 77–78 (S.D.N.Y. 2018) (plaintiffs that purchased in 2007 offering had class standing for 2008 offering).

39

Third, Defendants argue that the "existence of [other] shares not sold pursuant to" the Registration Statements at issue "is fatal to Plaintiffs' Section 11 claims." (MTD at 40.) Not so. Defendants claim that there were 34,538,576 unregistered shares after the IPO and 32,184,215 after the July 2021 Offering. Setting aside Defendants' dubious math,[27] any unregistered shares could *only* affect "tracing" if and when they actually entered "the secondary market" (MTD at 40). Defendants offer no evidence that *any* unregistered shares did so.[28] Indeed, *all* the shares Defendants identify were "restricted shares," meaning that they could "be sold in the public market *only* if registered or if they qualify for the exemption from registration under Rules 144 or 701 under the U.S. Securities Act."[29] This requires filing a Rule 144 notice and removing the restrictive legend from the shares' certificate.[30] No such notices were filed.

Finally, insider sales by Pyle and Huerta are irrelevant to standing because Gatos filed a registration statement covering all such shares (including those subject to outstanding options)[31] that incorporated the same misstatements as the Registration Statement for the IPO.[32] As a result, any insider sales necessarily involved shares registered as "part of the same registration package"

---

[27] For example, "32,184,215" does not appear in the document Defendants cite (ECF 64-11), nor does it result from Defendants' purported calculation (MTD at 40 n.26).

[28] *See, e.g.*, *In re Prestige Brands Holdings, Inc. Sec. Litig.*, 2007 WL 2585088, at *5 (S.D.N.Y. Sept. 5, 2007) ("No evidence has so far been presented that non-IPO shares entered the market in any significant number during the class period."). Unlike here, in Defendants' authorities, *Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *5 (D. Utah Dec. 15, 2020), and *Krim*, 402 F.3d at 492, it was undisputed (or the court expressly found) that unregistered shares had entered the market.

[29] (Ex. F (Oct. 29, 2020 Prospectus) at 162; Ex. G (July 15, 2021 Prospectus) at 30.)

[30] *See* U.S. SEC, "Rule 144: Selling Restricted and Control Securities," https://www.sec.gov/reportspubs/investor-publications/investorpubsrule144htm.html (last visited Nov. 22, 2022).

[31] (Ex. F (Oct. 29, 2020 Prospectus) at 163; Ex. G (July 15, 2021 Prospectus) at 31.)

[32] The October 30, 2020 S-8 "incorporated . . . by reference" Gatos's "prospectus, dated October 29, 2020, filed with the SEC" in connection with the Registration Statement. (Ex. H at 3.)

40

in the IPO, and thus have no impact on tracing or Section 11 standing. *Pirani v. Slack Techs., Inc.*,

13 F.4th 940, 947 n.5 (9th Cir. 2021).[33]

## **CONCLUSION**

Defendants' motion should be denied in its entirety. Alternatively, if the Court is inclined

to grant any portion of Defendants' motion, any dismissal should be without prejudice to allow

Plaintiffs an opportunity to amend.[34]

Dated: November 23, 2022

| | |
|---|---|
| *s/ Kathryn A. Reilly* | *s/ Joseph A. Fonti* |
| Michael L. O'Donnell | Joseph A. Fonti |
| Kathryn A. Reilly | Evan A. Kubota |
| Daniel N. Guisbond | Bleichmar Fonti & Auld LLP |
| Wheeler Trigg O'Donnell LLP | 7 Times Square, 27th Floor |
| 370 Seventeenth Street, Suite 4500 | New York, NY 10036 |
| Denver, CO 80202 | Telephone: 212.789.1340 |
| Telephone: 303.244.1800 | Facsimile: 212.205.3960 |
| Facsimile: 303.244.1879 | Email: jfonti@bfalaw.com |
| Email: odonnell@wtotrial.com | ekubota@bfalaw.com |
| reilly@wtotrial.com | |
| guisbond@wtotrial.com | *Counsel for Lead Plaintiff Bard Betz and* |
| | *Lead Counsel for the Class* |
| *Liaison Counsel for* | |
| *Lead Plaintiff Bard Betz* | |

Brian Schall
The Schall Law Firm
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Telephone: 424.303.1964
Email: brian@schallfirm.com

*Additional Counsel for Lead Plaintiff Bard
Betz and Named Plaintiff Jude Sweidan*

---

[33] Plaintiffs' "control person" claims should also be sustained. Defendants do not dispute control (MTD at 41) and the Complaint adequately alleges primary violations of the securities laws.

[34] Dismissal without prejudice is appropriate where granting leave to amend would not be futile. *See Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006). Critically, Gatos has not yet filed 2021 financials or reported the results of its restatement analysis and impairment testing. Plaintiffs expect that these facts will lend additional support to their claims. For this reason and others, allowing Plaintiffs an opportunity to amend would not be futile here.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 23, 2022, I electronically filed the foregoing **Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.


*/s/ Joseph A. Fonti*