UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:22-cv-00453-PAB-KLM

MICHAEL BILINSKY, Individually and On Behalf of All Others
Similarly Situated,

       Plaintiff,

v.

GATOS SILVER, INC.,
STEPHEN ORR,
ROGER JOHNSON,
PHILIP PYLE,
JANICE STAIRS,
ALI ERFAN,
IGOR GONZALES,
KARL HANNEMAN,
DAVID PEAT,
CHARLES HANSARD, and
DANIEL MUÑIZ QUINTANILLA,

       Defendants.

---

**DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
THE AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

ARGUMENT........................................................................................................................2

    I.    THE COURT SHOULD DISMISS PLAINTIFFS' SECTION 10(b) CLAIM
        BECAUSE THE COMPLAINT DOES NOT SATISFY THE PSLRA'S
        HEIGHTENED STANDARD TO PLEAD SCIENTER. ...............................................2

        1.    Plaintiffs' allegations regarding Tetra Tech are implausible and unsupported,
            and should therefore be rejected ...............................................................................3

        2.    Plaintiffs' allegations that Defendants knew of Mr. Linebarger's opinion do not
            plead scienter .............................................................................................................9

        3.    Defendants' other scienter allegations are insufficient under Section 10(b) .........13

    II.    PLAINTIFFS DO NOT ALLEGE FALSE OR MISLEADING STATEMENTS
        UNDER *OMNICARE*.....................................................................................................22

        1.    The resource and reserve estimates were statements of opinion subject to
            *Omnicare*..................................................................................................................22

        2.    The resource and reserve estimates were true and not misleading opinion
            statements under *Omnicare*......................................................................................25

        3.    Additional statements made by Defendants are not actionable .............................27

    III.    PLAINTIFFS HAVE NOT ALLEGED STANDING UNDER SECTION 11 ..............28

        1.    Plaintiffs must allege with "factual specificity" that they purchased shares
            pursuant to a particular registration statement ........................................................28

        2.    Millions of Gatos shares not sold pursuant to the IPO or Secondary Offering
            were outstanding when Plaintiffs purchased their relevant shares ........................29

        3.    Plaintiffs' allegations are insufficient and do not rule out that they purchased
            shares sold by Messrs. Pyle or Huerta .................................................................32

    IV.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ........................34

CONCLUSION.................................................................................................................35

# TABLE OF AUTHORITIES

CASES                                                                                          PAGE(S)

*Acito v. IMCERA Group*,
47 F.3d 47 (2d Cir. 1995) ....................................................................................................... 16

*Adams v. Kinder-Morgan, Inc.*,
340 F.3d 1083 (10th Cir. 2003) ............................................................................................. 10

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ............................................................................................. 19

*In re ARIAD Pharms. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016) ................................................................................................. 28

*Banker v. Gold Res. Corp. (In re Gold Res. Corp. Sec. Litig.)*,
776 F.3d 1103 (10th Cir. 2015) ..................................................................................... *passim*

*Bauchman v. West High Sch.*,
132 F.3d 542 (10th Cir. 1997) ............................................................................................... 35

*Bryson v. City of Edmond*,
905 F.2d 1386 (10th Cir. 1990) ............................................................................................... 2

*Burroughs v. Northrop Grumman Corp.*,
2000 U.S. Dist. LEXIS 23668 (C.D. Cal. Oct. 16, 2000) ..................................................... 16

*Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*,
181 F.3d 1180 (10th Cir. 1999) ............................................................................................. 35

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ............................................................................................... 28

*City of Phila. v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) ............................................................................................. 18

*Davidco Invs., LLC v. Anchor Glass Container Corp.*,
2006 WL 547989 (M.D. Fla. Mar. 6, 2006) ......................................................................... 32

*In re Deutsche Bank AG Sec. Litig.*,
328 F.R.D. 71 (S.D.N.Y. 2018) ............................................................................................. 29

*In re Eagle Computer Sec. Litig.*,
1986 WL 12574 (N.D. Cal. Mar. 31, 1986) .......................................................................... 29

*Exkae Ltd. v. Domo, Inc.*,
2020 WL 7352735 (D. Utah Dec. 15, 2020) ......................................................................... 31

*Frank v. Dana Corp.*
646 F.3d 954 (6th Cir. 2011) ................................................................................................. 21

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................................... 21

*Gross v. Summa Four*,
93 F.3d 987 (1st Cir. 1996) ................................................................................................... 20

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ................................................................................................. 10

*Hunt v. Bloom Energy Corp.*,
2021 WL 4461171 (N.D. Cal. Sept. 29, 2021) ..................................................................... 22

*Krim v. pcOrder.com, Inc.*,
402 F.3d 489 (5th Cir. 2005) .......................................................................................... 31, 32

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022) ................................................................................... 14, 15, 19

*Johnson v. CBD Energy Ltd.*,
2016 WL 3654657 (S.D. Tex. July 6, 2016) ............................................................... 31

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) .................................................................................. 16

*Martin v. Quartermain*,
732 F. App'x 37 (2d Cir. 2018) .......................................................................... *passim*

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ...................................................................................................... 8

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*,
2022 WL 377415 (N.D. Okla. Jan. 7, 2022) .............................................................. 10

*In re Molson Coors Bev. Co. Sec. Litig.*,
2020 WL 13499995 (D. Colo. Dec. 2, 2020) ..................................................... *passim*

*In re Molycorp, Inc. Sec. Litig.*,
157 F. Supp. 3d 987 (D. Colo. 2016) .......................................................................... 8

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
693 F.3d 145 (2d Cir. 2012) ........................................................................................ 29

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) ................................................................................................ 22, 27

*Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
432 F. Supp. 3d 131 (D. Conn. 2019) ......................................................................... 29

*In re Paracelsus Corp. Sec. Litig.*,
61 F. Supp. 2d 591 (S.D. Tex. 1998) .......................................................................... 20

*In re Petrobras Sec. Litig.*,
2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) ............................................................. 23

*Pirani v. Slack Techs., Inc.*,
13 F.4th 940 (9th Cir. 2021) ........................................................................................ 34

*In re Prestige Brands Holdings, Inc. Sec. Litig.*,
2007 WL 2585088 (S.D.N.Y. Sept. 5, 2007) .............................................................. 31

*In re Pretium Res. Inc. Sec. Litig.*,
2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) ............................................................... 24

*Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*,
2 F. Supp. 2d 1345 (D. Colo. 1998) ............................................................................ 23

*In re Salix Pharms., Ltd.*
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................................................. 21

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
75 F.3d 801 (2d Cir. 1996) .......................................................................................... 15

*In re SCANA Corp. Sec. Litig.*,
2019 WL 1427443 (D.S.C. Mar. 29, 2019) ................................................................ 23

*Schwartz v. Celestial Seasonings, Inc.*,
178 F.R.D. 545 (D. Colo. 1998) ............................................................................................. 29

*Scott v. ZST Digital Networks Inc.*,
896 F. Supp 2d 877 (C.D. Cal 2012) ...................................................................................... 29

*Sec. & Exch. Comm'n v. GenAudio Inc.*,
32 F.4th 902 (10th Cir. 2022) ................................................................................................... 9

*In re Semgroup Energy Partners, L.P.* ,
729 F. Supp. 2d 1276 (N.D. Okla. 2010) ............................................................................... 19

*Sgalambo v. McKenzie*,
739 F. Supp. 2d 453 (S.D.N.Y. 2010) .................................................................................... 14

*Slack Techs., LLC v. Pirani*,
2022 WL 17586972 (U.S. Dec. 13, 2022) ............................................................................. 34

*Smallen v. Western Union Co.*,
950 F.3d 1297 (10th Cir. 2020) .............................................................................................. 16

*Smith v. Pizza Hut, Inc.*,
694 F. Supp. 2d 1227 (D. Colo. 2010) ................................................................................... 11

*In re Snap Inc. Sec. Litig.*,
334 F.R.D. 209 (C.D. Cal. 2019) ........................................................................................... 32

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) ........................................................................ 24

*In re Williams Sec. Litig. – WCG Subclass,*
558 F.3d 1130 (10th Cir. 2009) .............................................................................................. 26

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ....................................................................... 31

*In re Zagg, Inc. Sec. Litig.*,
797 F.3d 1194 (10th Cir. 2015) .............................................................................................. 17

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) .................................................................................................. 10

### STATUTES & RULES

15 U.S.C. § 78u-4 (b)(4) ........................................................................................................ 26
17 C.F.R. § 229.601(b)(23) ....................................................................................................... 4
17 C.F.R. § 229.1300 ........................................................................................................... 7, 11
17 C.F.R. § 229.1302(a)(1) ........................................................................................................ 7
17 C.F.R. § 229.1304(b)(2) ........................................................................................................ 6
17 C.F.R. § 229.1304(f)(2) ......................................................................................................... 6
17 C.F.R. § 230.144(b)(1)(i) .................................................................................................... 32
17 C.F.R. § 230.144(h) ............................................................................................................. 31
17 C.F.R. § 230.436(a) ............................................................................................................... 4
17 C.F.R. § 239.11 ................................................................................................................... 33
17 C.F.R. § 239.16(b) .............................................................................................................. 33

All Defendants submit this Reply in further support of Defendants' Motion to Dismiss the Amended Class Action Complaint ("Brief") (Dkt. No. 63) and in response to Plaintiffs' Opposition to Defendants' Brief ("Opp.") (Dkt. No. 67).

**INTRODUCTION**

Key unrebutted points in Defendants' Brief and certain undisputed facts reflected in the Complaint demonstrate the reasons the Complaint should be dismissed. There is no dispute, for example, that Gatos informed Tetra Tech of Mr. Linebarger's opinion and Tetra Tech afterward consented to Gatos' continued reliance on the Technical Report. The Complaint pleads no allegation that Tetra Tech did not believe its report when published or when it consented to Gatos' continued disclosure of the report's contents. Accordingly, the only reasonable inference, based on the Complaint itself and documents incorporated therein, is that Defendants did not act with scienter, but instead reasonably relied on Tetra Tech's independent expert opinion.

Plaintiffs' Opposition does not address the obvious implication of Tetra Tech's consents to Gatos' continued reference to the Technical Report in public filings after Tetra Tech knew of Mr. Linebarger's opinion. Plaintiffs instead ask the Court to draw implausible inferences in a bid to distract from those fatal facts. Specifically, Plaintiffs ask the Court to construe Tetra Tech's "consents" as merely "ministerial," and to infer, without a single supporting factual allegation, that Tetra Tech—a reputable engineering consulting firm—rubber stamped its Technical Report knowing it was false. Plaintiffs further ask the Court to make the illogical inference that Defendants schemed to conceal an error, only to then *voluntarily* disclose that error, and even though the Company's CEO and CFO did not seek to profit from the supposed scheme by selling Gatos stock during the relevant period. The Court should reject these unreasonable inferences.

Even more fundamentally, Plaintiffs fail to show that Defendants' allegedly false statements were statements of fact, rather than opinions under *Omnicare*. The resource and reserve estimates are opinions not only because they are inherently uncertain but also because Defendants expressly *said* so in various disclaimers, which described resources and reserves as "estimates" based on a "subjective process." To plead falsity based on these opinion statements, Plaintiffs must plead facts to demonstrate that Defendants did not actually believe in the estimates or that Defendants were otherwise required to disclose Mr. Linebarger's opinion. They do not do so. Plaintiffs merely assert conclusory, unsupported allegations that Defendants disbelieved the Technical Report or the bona fides of Tetra Tech's consents. Again, though, the Complaint concedes that Tetra Tech continuously signed off on the Technical Report with full knowledge of Mr. Linebarger's work.

Finally, Plaintiffs' Opposition misconstrues case law on standing, which squarely holds that on a motion to dismiss, and to bring a claim under Section 11, a plaintiff must allege with "factual specificity" that he or she purchased shares under a *particular* registration statement that is alleged to contain false or misleading statements. The Complaint fails to do this because Plaintiffs cannot account for the millions of shares eligible for sale to the public when Plaintiffs purchased their shares, but which were not sold pursuant to *either* the IPO or Secondary Offering registration statements. Plaintiffs' allegations are thus inadequate to plead standing.

## ARGUMENT

### I.     THE COURT SHOULD DISMISS PLAINTIFFS' SECTION 10(b) CLAIM BECAUSE THE COMPLAINT DOES NOT SATISFY THE PSLRA'S HEIGHTENED STANDARD TO PLEAD SCIENTER.

On a motion to dismiss, the Court must not accept unreasonable inferences or conclusory allegations. *See, e.g.*, *Bryson v. City of Edmond*, 905 F.2d 1386, 1391 (10th Cir. 1990). Plaintiffs' Section 10(b) claim fundamentally depends on such unacceptable pleading tactics,

2

asking the Court to adopt Plaintiffs' self-serving conclusions and to draw inferences that plainly

contravene the Complaint and documents incorporated by reference.  Specifically, Plaintiffs ask

the Court to adopt their conclusions, without supporting factual allegations and contrary to the

Complaint itself, that (1) Tetra Tech concluded there were material inaccuracies in the Technical

Report, and (2) all Defendants actually knew about, or even should have credited, the sole and

unsubstantiated opinion of Mr. Linebarger over Tetra Tech.  These unsupported conclusions are

foundational to Plaintiffs' scienter argument, but are inadequate under well-established law

governing the heightened standard for pleading scienter to state a Section 10(b) claim.[1]

> 1.    Plaintiffs' allegations regarding Tetra Tech are implausible and unsupported, and should therefore be rejected

It is undisputed that Tetra Tech was Gatos' designated Qualified Person and expert on the

Cerro Los Gatos deposit.  The Complaint and documents referenced therein make clear that

Tetra Tech reviewed the error Mr. Linebarger allegedly identified in the Technical Report and

nonetheless concluded that the Technical Report did not contain any material errors.  As

explained in Defendants' Brief, *after* Mr. Linebarger identified supposed errors and Tetra Tech

reviewed them, Tetra Tech repeatedly provided "consents" in March, July, and November 2021

authorizing Gatos to refer to the Technical Report in public filings—notably in the precise public

filings that the Complaint alleges contained the misleading statements about the resource and

reserve figures.  Brief at 9–10, 19–20; ¶¶ 65, 89, 110, 118, 221.  Plaintiffs' Opposition fails to

meaningfully address these undisputed facts, and the law holding that reasonable reliance on the

opinions of retained experts, such as Tetra Tech, negates an inference of scienter.

---

[1] Capitalized or abbreviated terms not otherwise defined here shall have the meaning they are ascribed in Defendants' Brief or the Complaint.  All paragraph numbers ("¶") refer to Complaint paragraphs.

Instead, Plaintiffs merely attempt to downplay the significance of Tetra Tech's consents, characterizing them as "narrow and ministerial" documents confirming Tetra Tech's authorship but not the accuracy of the Technical Report. Opp. at 4, 19–20. This argument requires the Court to draw the entirely implausible conclusion—unsupported by any factual allegations—that a reputable engineering firm not accused of any wrongdoing, acting as Defendants' designated independent QP, repeatedly allowed Gatos to use the Technical Report in public filings while *knowing* that it was materially inaccurate. Plaintiffs' argument further requires the Court to conclude that SEC regulations requiring QPs to submit consents, *see, e.g.*, 17 C.F.R. §§ 229.601(b)(23), 230.436(a), bear no relation to investor protection and instead serve a "ministerial" purpose that would permit designated experts to consent to inaccurate statements with impunity. Such a conclusion would be inconsistent with the role and responsibility that Tetra Tech was statutorily *required* to play as the Company's independent QP.[2] Indeed, Plaintiffs' argument runs counter to the plain language of the consents, which specifically state that Tetra Tech consented to the use of information that "was prepared by [Tetra Tech], that [Tetra Tech] supervised the preparation of and/or that was reviewed and approved by [Tetra Tech]"—i.e., Tetra Tech held out that the Technical Report was accurate. Opp. at 20.

In the absence of factual allegations to the contrary (of which there are none in the Complaint), the only inference the Court can reasonably draw is that Tetra Tech concluded the Technical Report was materially accurate each time it signed a new consent supporting Gatos'

---

[2] Plaintiffs' backhand dismissal of Tetra Tech is also at odds with Plaintiffs' own allegations. Plaintiffs admit that the reserve estimates are not "seat-of-the-pants estimates." ¶ 29; Opp. at 6. SEC regulations require that a *Qualified Person* review and sign off on reserve estimates precisely because the estimation of reserves is a complex task that requires technical expertise. ¶¶ 29, 33, 35–36, 261.

use of the Technical Report in a public filing.  Brief at 19–22.  Therefore, the only inference that can be drawn from the consents is that Tetra Tech, the expert hired to give an opinion in this regard, remained comfortable that its report was materially accurate, even after Gatos informed Tetra Tech of Mr. Linebarger's opinion in January or February 2021.  ¶¶ 78, 301(v).

Faced with these inescapable and reasonable inferences, much of Plaintiffs' Opposition pretends Tetra Tech does not exist.  For example, the Opposition asserts that "Defendants provide no coherent, much less plausible, explanation for why they concealed the known error for a year while repeating numbers that were materially overstated," Opp. at 4, and that "*no one* disagreed with [Mr. Linebarger's] written report."  Opp. at 18.  But Tetra Tech and its consents *do* exist.  Their existence points to the more plausible inference that Tetra Tech *did* disagree with Mr. Linebarger, and Defendants *did* reasonably rely on their QP's opinion.

Plaintiffs' Opposition occasionally shifts out of its counter-factual world in which Tetra Tech does not exist to make an alternative series of equally baseless arguments that Defendants' acceptance of Tetra Tech's analysis of the issues, including Mr. Linebarger's views, should not be considered.  First, Plaintiffs liken the consents to a clean audit opinion, which they argue does not guarantee that underlying financial statements are free of errors, "especially where the company provided false information to the auditor."  Opp. at 21.  This analogy is inapt.  Here, the Complaint concedes that Tetra Tech *was* informed of Mr. Linebarger's findings.  ¶ 78.  The more apt analogy is thus to an auditor, not accused of any wrongdoing, who is informed of a another's opinion claiming potential accounting errors and who *after investigation* determines that the challenged accounting was materially accurate.  Reliance on that auditor negates an inference of scienter.  Where a defendant relies on an independent expert, particularly as to "complex, technical, and not obvious" matters, and where there is no allegation that the

5

independent expert participated in a fraud, reliance on the expert "weigh[s] against" an inference

of scienter.[3]  Second, Plaintiffs argue that the consents "did not replace Defendants' duty to tell

the truth" under 17 C.F.R. §§ 229.1304(b)(2), (f)(2), by updating the Technical Report or

disclosing "material changes."  Opp. at 6, 20.  This argument requires the Court to assume,

without factual support, that Defendants did not believe their own expert after it considered the

very information that Plaintiffs say should have changed the expert's opinion but did not.  Given

Tetra Tech's review and rejection of Mr. Linebarger's opinion, *there were no* material changes to

disclose at that time.[4]

Finally, Plaintiffs argue that Gatos could not reasonably rely on the consents because

Gatos employees prepared parts of the mine plan that informed Tetra Tech's reserve estimation.

Opp. at 21.  This argument fails because, as the Complaint acknowledges, the mine plan was

"*verified by Tetra Tech* for the calculation of Reserves."  ¶ 208 (emphasis added); Brief at 7.

Thus, notwithstanding any work by Gatos' employees, it was *Tetra Tech* that was the author and

authority as to the Technical Report, and Tetra Tech continued to approve it.  Moreover,

---

[3] In *In re Molson Coors Bev. Co. Sec. Litig.*, 2020 WL 13499995 (D. Colo. Dec. 2, 2020),
the court held that the defendants' reliance on an independent auditor (PwC) to publish financial
results that were later discovered to have been misstated did "not categorically insulate
Defendants from liability," but "weighed against an inference of scienter."  *Id.* at *4–5.  The
court found significant that the plaintiffs did not allege that PwC participated in the alleged
fraud, or that the defendants concealed the fraud from PwC.  *Id.*  The court considered "PwC's
involvement the strongest indicator against scienter" given the errors were "complex, technical,
and not obvious."  *Id.* at *4, 12–13.

[4] Plaintiffs in a footnote also argue that Defendants are wrong that Tetra Tech changed
the Technical Report in 2020 in response to an alleged "inaccuracy" identified by Gatos
employees in 2018.  Opp. at 8 n.4.  First, as noted in Defendants' Brief, there is no plausible
allegation of inaccuracies in the resource model in 2018.  Brief at 23–24.  Second, Defendants'
argument was not that Tetra Tech *changed* the resource model to address purported inaccuracies.
Defendants' argument was that *had* there been inaccuracies identified in 2018, the only
reasonable inference would be that Tetra Tech necessarily reviewed and would have addressed
any such inaccuracies when it issued the Technical Report two years later.

Plaintiffs' argument evinces a fundamental misunderstanding of a QP's role, which is to *prepare* (not merely audit) the resource and reserve estimates.  17 C.F.R. §§ 229.1300, 229.1302(a)(1). As Plaintiffs acknowledge, the law vests QPs with this responsibility precisely to ensure that appropriately skilled professionals opine on the reserve and resource presented to investors.[5]

Plaintiffs also cannot plausibly argue that Defendants should have *disputed* Tetra Tech's judgment in light of Mr. Linebarger's opinion.  This argument requires the Court to infer scienter from Defendants' trust in the experts *they hired.*  Case law rejects this inference, including specifically in the context of reserve estimates.  For example, in *Martin*, a gold-mining company (Pretium) retained "independent experts" (Snowden) to "estimate the quantity of gold" in its mine. *See Martin v. Quartermain*, 732 F. App'x 37, 39 (2d Cir. 2018) (unpublished).  Pretium publicly disclosed Snowden's estimate and then engaged a second expert (Strathcona) to conduct a sampling program to confirm Snowden's estimate.  *Id*.  During the course of the sampling program, Pretium made various public statements about "favorable results from the sampling program and expressed continued faith in Snowden's estimates." *Id*.  Strathcona ultimately resigned and, in so doing, expressed doubt in Snowden's estimates, referring to Snowden's estimate as "erroneous and misleading." *Id*. at 40.  In light of this, the plaintiffs asserted Section 10(b) claims, alleging that Pretium failed to disclose Strathcona's doubts regarding the estimate, and that "Pretium defrauded investors by expressing continued faith in Snowden's estimates, notwithstanding—and without disclosing—Strathcona's view that the sampling program was not bearing out those projections." *Id*.  However, the district court dismissed the claims and the Second Circuit affirmed, holding that Pretium was entitled to rely on Snowden's expert view and

---

[5] "[S]ecurities laws require mining companies to follow stringent requirements for publicly disclosing resources and reserves.  To do so, mining companies must provide detailed technical reports authored by so called 'qualified persons.'" ¶¶ 29, 33, 35–36, 261.

that "all the relevant allegations in the complaint suggest that, *despite Strathcona's contrary opinion*, Pretium believed that Snowden's estimates would prove accurate," including "given Snowden's status as an independent expert." *Id*. at 40–41 (emphasis added). In the context of analyzing *Omnicare*'s first factor (i.e., whether the defendants believed in their opinions), the court rejected the plaintiffs' arguments and explained that Pretium was "entitled to investigate and confirm . . . Strathcona's opinion" and ultimately defer to Snowden. *Id*. at 42. In short, the defendants were entitled to rely on their independent expert despite the contrary view of another party.

Plaintiffs have not meaningfully distinguished *Martin*. They argue that *Martin* "did not address scienter at all and arose from a *disagreement* between consultants." Opp. at 19. But that is the case here. Tetra Tech (like Snowden) was an independent expert hired by Defendants to develop and author the Technical Report. When another party (Mr. Linebarger) purported to identify an error in the Technical Report, Gatos informed Tetra Tech, which then disagreed with the other party. Under *Martin*, Defendants' actions reflected reasonable and good faith corporate decision making. Moreover, *Martin* did address scienter. *Martin* held under *Omnicare*'s first prong that the defendant appropriately and sincerely relied on an expert opinion despite contrary opinions. Plaintiffs cannot allege that Defendants' reliance on Tetra Tech was unreasonable or that Defendants acted with a culpable mindset in not accepting alternate but rejected views.[6]

---

[6] For the same reason, Plaintiffs' citation to *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011), is unavailing. Opp. at 18–19. There, the defendant had not "conducted any studies of its own to disprove" adverse studies, and therefore (unlike here) had "no basis for rejecting [the] findings out of hand." *Id.* at 46–47. Further, the plaintiffs in that case pled facts indicating that the defendant "acted with deliberate recklessness (or even intent)," including that the defendant sent a letter to a scientist demanding that he remove all references to Matrixx's name from a presentation discussing studies that linked ingredients in Matrixx products to the loss of smell. *Id.* at 33, 49. Here, Tetra Tech reviewed Mr. Linebarger's opinion and determined it did not identify a material error. Similarly, *In re Molycorp, Inc. Sec. Litig.*, 157 F. Supp. 3d

Finally, Plaintiffs argue that Defendants were "reckless[]" as to their statements about the

Technical Report because of their "actual knowledge" of the material error, regardless of their

"subjective belief."  Opp. at 18.  But Defendants have not argued any difference between

objective and subjective belief here.  Assuming *arguendo* that Defendants were aware of Mr.

Linebarger's alleged opinion, *see infra* Section I.2, Defendants had reasonable basis to reject his

opinion after Tetra Tech did so.  There are simply no particularized facts establishing a strong

inference that Defendants' reliance on Tetra Tech was *unreasonable*, much less an "extreme

departure" from ordinary care.[7]

> 2. <u>Plaintiffs' allegations that Defendants knew of Mr. Linebarger's opinion do not plead scienter</u>

Plaintiffs argue that the Complaint pleads scienter simply because it concludes that

Defendants "knew" or had "direct, personal knowledge" of Mr. Linebarger's opinion.  Opp. at 3,

16–17, 37.  This argument has no merit.  As noted in Defendants' Brief, Plaintiffs do not meet

their burden to plead *particularized* facts demonstrating who knew what about Mr. Linebarger's

opinion.  Brief at 23 n.21.  For example, as to Messrs. Orr and Johnson, the Complaint's scienter

argument depends entirely on the hearsay allegation that a confidential witness (FE-2)

supposedly "learned" secondhand "from Kinyon" that "Kinyon and Pyle met with Orr and CFO

---

987 (D. Colo. 2016), *see* Opp. at 17, is distinguishable.  There, the defendants were alleged to
have been aware of internal "daily analysis" showing that there were "no"—i.e., literally *zero*—
heavy rare earth elements in their mine while they publicly assured investors that these elements
existed.  *Id.* at 1004.  Here, in contrast, Gatos has been successfully mining silver and other
metals, and Tetra Tech signed off on the reserves.

[7] *Sec. & Exch. Comm'n v. GenAudio Inc.*, *see* Opp. at 20, is similarly distinguishable.
There, unlike here, there was "nothing in the record suggesting that [the defendant] had a factual
basis for believing" statements he made about a potential business opportunity because "obvious
facts paint[ed] a bleaker picture" of his business.  32 F.4th 902, 924–25 (10th Cir. 2022).

Johnson to update them on the errors." ¶ 301(v); Opp. at 10.[8]  However, the Complaint is devoid

of any particularized facts about the supposed "update" on which these claims are based.  The

Opposition also does not shed any light as to *what* Messrs. Orr and Johnson were allegedly told

or *when* they were allegedly "update[d]," much less facts from which the Court can infer that

Messrs. Orr and Johnson "knew" that the Technical Report contained *material* errors or that any

public statements made thereafter were false or misleading.  Plaintiffs also do not allege that

Messrs. Orr or Johnson were advised of Mr. Linebarger's credentials or provided any

information to suggest that his opinion was reliable.

Even if such facts were sufficiently pled, merely *knowing* about Mr. Linebarger's opinion

is not remotely dispositive of scienter.  The question is how Defendants *responded* to his

opinion—particularly whether they deemed his opinion sufficiently reliable to require that they

immediately accept his opinion and stop relying on Tetra Tech's expert opinion.[9]  The only

---

[8] "[C]onfidential witness statements may only be relied upon where the confidential witnesses are described with '*sufficient particularity* to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (emphasis added); *see also Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1103 (10th Cir. 2003) ("We emphasize, however, that the PSLRA did heighten the standard for pleading securities fraud, and where a plaintiff does not identify the sources of the facts stated in the complaint, the facts alleged in an information and belief complaint will usually have to be particularly detailed, numerous, plausible, or objectively verifiable by the defendant before they will support a reasonable belief that the defendant's statements were false or misleading."). The Complaint does not plead particularized facts from which the Court can conclude that FE-2 would be in a position to know what information was supposedly conveyed to the Company's most senior executives.  These allegations amount to "secondhand or hearsay information and there are no particularized allegations which would make that information sufficiently reliable, plausible, or coherent." *Meitav Dash Provident Funds & Pension Ltd. v. Spirit Aerosystems Holdings, Inc.*, 2022 WL 377415, at *19 (N.D. Okla. Jan. 7, 2022) (unpublished) (citing *Zucco Partners*, 552 F.3d at 997 n.4).

[9] *See, e.g.*, *Banker v. Gold Res. Corp. (In re Gold Res. Corp. Sec. Litig.)*, 776 F.3d 1103, 1113 (10th Cir. 2015) ("It is certainly plausible that a prudent executive would want to investigate and confirm a claimed discrepancy before disclosing it publicly."); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 755 (7th Cir. 2007) ("The most one can say is that, sometime during May 2004, Baxter learned enough to lead a reasonable person to conduct an investigation.

reasonable inferential answer to that question, based on the Complaint, is that Gatos acted

*responsibly* and disclosed Mr. Linebarger's opinion to Tetra Tech, which determined that the

Technical Report did not contain a material error.

Plaintiffs' Opposition also attempts to inflate Mr. Linebarger's role and expertise,

perhaps to suggest that he should have been credited over Tetra Tech, and argues for the first

time that Mr. Linebarger was hired "*because* he is a 'qualified person' with decades of mining

experience."  Opp. at 18 (emphasis added); *id*. at 9–10.  These arguments are meritless.  The

Opposition's characterizations of Mr. Linebarger's experience, credentials, and status as a QP

under SEC rules rest on facts found nowhere in the Complaint, and thus cannot be considered.[10]

Even if these facts could be considered, they provide no basis to infer that Mr. Linebarger was

more credible than Tetra Tech with respect to the Technical Report.  An individual can be a QP

only if he or she has "relevant experience in the type of mineralization and type of deposit under

consideration" and only with respect to "*the specific type of activity* that person is undertaking on

behalf of the registrant."  17 CFR § 229.1300 (emphasis added).  Yet, Plaintiffs' new claimed

facts do not suggest that Mr. Linebarger had expertise with respect to the subject matter of the

*Technical Report*, or change the fundamental fact that *Tetra Tech*, and not Mr. Linebarger, was

the undisputed QP for the Technical Report.

Plaintiffs also second-guess Defendants, suggesting that they should have concluded the

Technical Report contained a material error because Stantec, a third expert, "corroborated

---

That is exactly what Baxter did during the next two months, demonstrating a pursuit of truth
rather than reckless indifference to the truth. Knowing enough to launch an investigation . . . is a
very great distance from convincing proof of intent to deceive.").

[10] Plaintiffs' Opposition attaches an exhibit containing a declaration from Mr. Linebarger
in an unrelated case stating that he was a QP in that case.  Opp. at 9–10 & Ex. B at 84.  Plaintiffs
cannot "rectify their pleading deficiencies by asserting new facts in an opposition to a motion to
dismiss."  *Smith v. Pizza Hut, Inc.*, 694 F. Supp. 2d 1227, 1230 (D. Colo. 2010).

11

Linebarger's finding." Opp. at 2, 13, 16, 19, 33–34. First, the Complaint is devoid of any detail as to the nature of Stantec's "corroboration." ¶¶ 13, 106, 162, 301(vii), 317. Plaintiffs do not allege any facts describing what Stantec was told or confirmed about Mr. Linebarger's findings, the nature of any analysis Stantec performed, the degree of certainty to which Stantec made its alleged finding, or whether Stantec's finding was communicated to Messrs. Orr, Johnson, or Pyle. *Id.* Second, the Complaint alleges that Stantec's purported "corroboration" occurred in October 2021, *10 months after* Mr. Linebarger arrived at his opinion in January 2021 and shortly before the Company disclosed an error in the reserve model in January 2022. ¶ 106. If anything, Stantec's alleged "corroboration" in October 2021 supports the inference that it was long after Mr. Linebarger's opinion, and because of *other independent consultants* (not Mr. Linebarger) that Gatos came to believe the reserve estimate should be revised. Brief at 22 n.20. Notably, after October 2021, Tetra Tech in November 2021 *again* expressed its view and consented to Gatos referring to the Technical Report in public filings. Brief at 10.

Finally, Plaintiffs attach as an exhibit, Opp. at Ex. A., a press release Gatos issued on October 3, 2022 ("October 3 Press Release"), and argue that it shows that "Defendants cannot dispute that Linebarger was right all along." Opp. at 3, 14, 18 n.6. But the October 3 Press Release, which is not pled in the Complaint, does not support this inference. It makes no mention of Mr. Linebarger or a 20% error.[11] To the contrary, it identifies reductions in contained metals ranging from 32% to 37% and in part attributes these reductions to "*two material and*

_____

[11] Plaintiffs also claim that the 20% error Linebarger allegedly identified "match[ed] Gatos'[] recent admission." Opp. at 18. This is wrong. Plaintiffs appear to base their assertion on a table in the October 3 Press Release showing a 19% change in the mineral reserve remaining after depletion between the Technical Report and 2022. Opp., Ex. A at 6. However, the depletion figure that the Company accounted for to reach this conclusion was depletion *from July 1, 2020 to June 30, 2022. Id.* Mr. Linebarger's January 2021 opinion, of course, could not have accounted for depletion through June 2022.

*compounding errors*," including a "distorted" block model, that in "combination" resulted in the overstatement of metal grades.  Opp., Ex. A at 2, 5–6 (emphasis added).  It additionally states that *other* errors affected the reserve estimates, "including overlapping reserve stope solids, incorrect external dilution calculations and the inclusion of a small amount of Inferred grades within stope solids."  *Id.* at 6.  The Complaint makes no reference to a "distorted" *block model* or any of these other errors, ¶¶ 61, 76, nor does it suggest that Mr. Linebarger made any of these findings.  And nothing in the October 3 Press Release suggests that the error Mr. Linebarger allegedly identified, ¶ 76, independently had a material effect on the reserve estimate.

Indeed, the October 3 Press Release shows that Mr. Linebarger was clearly incorrect with respect to at least some parts of his opinion.  For example, Plaintiffs claim Mr. Linebarger advised the Company that its use of Ordinary Kriging to construct its resource model was improper, and that an alternative method should have been used.  ¶ 56.  However, the October 3 Press Release makes clear that the Company never made this finding—according to the release, Gatos used Ordinary Kriging to construct its new resource model.  Opp., Ex. A at 4.

3.      Defendants' other scienter allegations are insufficient under Section 10(b)

Plaintiffs' additional scienter allegations similarly fail to support a strong inference of scienter that is "at least as likely as any plausible opposing inference," as required by the PSLRA.  Opp. at 3, 15–16.  Based on the undisputed facts the Complaint alleges, there is only one (certainly "more plausible," *see id.*) inference that can be reasonably drawn, which is that Defendants reasonably and appropriately relied on Tetra Tech's expert opinion when making statements about Gatos' reserve and resource estimates, and believed those statements to be truthful.  Plaintiffs' allegations of motive or scienter are purely academic under these facts.  That Defendants *could* have had a general motive to conceal errors, as well as Plaintiffs' other general and conclusory allegations of scienter, have no bearing here since the only plausible inference

that can be drawn from the Complaint is that that there was no fraud or scienter.  In any event,
none of Plaintiffs' other motive or scienter allegations support a strong inference of scienter.

*Alleged Motives.*  Plaintiffs argue generically that Defendants had motive to defraud
investors, to (i) profit from stock sales, (ii) complete the Secondary Offering, and (iii) offset the
impact of overstated reserves with new exploration and by upgrading existing resources.

As to the alleged insider sales, Plaintiffs concede that Messrs. Orr and Johnson sold *no*
stock during the Class Period but argue that the Court should focus on Mr. Pyle's trading
because motive must be considered "with respect to [each defendant] alone."  Opp. at 23.  This
concedes the point as to Messrs. Orr and Johnson.  Plaintiffs cannot show personal motivation to
engage in fraud as to two of the three senior management Defendants—indeed, Gatos' CEO and
CFO—who also signed the registration statements at issue from which the alleged reserve and
resource misstatements derive.  ¶¶ 187–88.  This is significant because Plaintiffs misstate the
law, which makes clear that the absence of sales by Messrs. Orr and Johnson is highly relevant.
In assessing whether trading activity is suspicious, courts consider "the amount of profit from the
sales, the portion of stockholdings sold, *the change in volume of insider sales, and the number of
insiders selling*," *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1264 (10th Cir. 2022)
(emphasis added).  Messrs. Orr and Johnson's absence of trading (and Mr. Orr's purchase of
*additional* shares) weighs against any inference of scienter as to them, and the undisputed fact
that a vast majority of Defendants did not trade undermines Plaintiffs' generalized motive
allegations as to all Defendants.[12]  *See id*.  Plaintiffs cannot ignore—and the Court must weigh

---

[12] *See In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *7 ("[A]ny
inference of scienter the Court might otherwise draw from defendants' stock sales is rebutted by
evidence that the defendants retained or increased their holdings during the class period");
*Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 481 n.170 (S.D.N.Y. 2010) (holding that insider
sales could not establish motive where two defendant company officers were not alleged to have

14

against scienter—the fact that these Defendants did not seek to profit from the supposed scheme by selling Gatos stock during the Class Period.

As to Messrs. Pyle and Huerta, Plaintiffs' trading allegations do not suggest scienter. Mr. Huerta is not named as a defendant; his stock sales thus cannot plead the Exchange Act Defendants' motives here. *See In re Molson Coors Beverage Co. Sec. Litig.*, 2020 WL 13499995, at *7 ("[T]he Court finds PH Coors' sales irrelevant, as he is not named as a § 10(b) defendant."). In any event, Plaintiffs cannot show that the timing of Messrs. Pyle's or Huerta's trades was unusual because the trading occurred in the short interval between two long-term lock-up periods. Gatos officers were subject to a trading lock-up for 180 days post-IPO (from October 28, 2020 through April 26, 2021), and a 90-day lock-up shortly thereafter in connection with the Secondary Offering (from July 15, 2021 through October 13, 2021).[13] This short window in which officers were entitled to trade fully explains the timing of Messrs. Pyle and Huerta's trades.[14] In addition, both Messrs. Pyle and Huerta retained significant holdings, particularly when considering their total unvested holdings.[15] Considering the allegations of

---

sold stock, and one defendant company officer purchased stock, during the class period); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive.").

[13] *See* Reply Ex. 1, Gatos Silver, Inc., Prospectus (Form 424B4), 162–63 (Oct. 29, 2020); Opp., Ex. G at 30–31.

[14] Contrary to Plaintiffs' suggestion, Opp. at 23, *Pluralsight* did not hold that trading after a lock-up period is irrelevant to whether insider sales are unusual. While the defendants there pointed out that insider sales followed a 180-day post-IPO lock-up period, the court did not reject this argument and instead found plaintiffs' allegations as a whole, which included that the defendants knew from a "single objectively verifiable data point" that they lacked capacity to achieve publicly communicated growth projections, plainly supported an inference of scienter. *See* 45 F.4th 1236 at 1264, 1267.

[15] Plaintiffs provide no legal basis for their suggestion that unvested options are not relevant to the issue of scienter. Opp. at 22 n.9. Messrs. Pyle and Huerta had already been granted their unvested options and would have expected to receive them in the ordinary course

motive "holistically," *Smallen v. Western Union Co.*, 950 F.3d 1297, 1311 (10th Cir. 2020),

nothing suspicious is pled.

Next, Plaintiffs argue that Defendants were motivated to conceal alleged errors to

complete the Secondary Offering and offset the impact of an overstatement with new exploration

and resource upgrades.  Opp. at 23–24.[16]  As demonstrated in Defendants' Brief, allegations that

Gatos sought to raise money and increase reserves are merely "general motives" to profit which

are themselves insufficient to show scienter, and which do not rebut the core facts at issue—that

Tetra Tech reviewed Mr. Linebarger's opinion and concluded there was no material error.  *See In*

*re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346 (10th Cir. 2012); Brief at 27.

*Additional Alleged Misstatements.*  Plaintiffs argue that various alleged misstatements

support an inference of scienter, such as a March 2022 statement in which Gatos told creditors

that the reserve estimate the Company shared in July 2021 was "incorrect when made" (repeating

the January 25 Press Release).  Opp. at 24.  Statements in *January and March 2022* do not show

that Defendants knew or believed the reserve estimate was incorrect when Defendants made

statements to creditors in *July 2021*—they only show that Gatos later concluded the estimate was

wrong in hindsight.  As explained above, given Tetra Tech's support for the resource and reserve

estimates at the time, Gatos had a reasonable basis for its July 2021 statement when it was made.

---

through their employment.  *See, e.g.*, *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995)
(accounting for a defendant's vested *and unvested* holdings in calculating percentage of holdings
sold); *Burroughs v. Northrop Grumman Corp.*, 2000 U.S. Dist. LEXIS 23668, at *46 (C.D. Cal.
Oct. 16, 2000) (unpublished) ("Plaintiffs[] have correctly added percentages reflecting vested as
well as unvested options in their allegations regarding the amount and percentages of insider
stock sales").

[16] Plaintiffs argue that Defendants have "waived" their opportunity to address their
argument about motive.  Opp. at 24.  However, as explained in Defendant's Brief, these
allegations are nothing more than "general motives for management to further the interests of the
corporation," which do not suggest scienter as a matter of law.  Brief at 27.

Plaintiffs also argue that Messrs. Orr and Pyle knew that their statements regarding the resource and reserve estimates were false when made. Opp. at 25. However, as demonstrated in Defendants' Brief, Plaintiffs take these statements out of context. Brief at 25. Plaintiffs' Opposition fails to meaningfully respond to these arguments.[17] Moreover, to the extent these statements reference the reserve and resource estimates, Plaintiffs again overlook that Messrs. Orr and Pyle reasonably relied on Tetra Tech's expertise. Public statements reiterating or relying on the expert opinion of Gatos' retained QP do not suggest scienter.

*Alleged Accounting Errors.* Plaintiffs also raise alleged GAAP or accounting errors, Opp. at 26. However, as Defendants' Brief explains, these allegations do not support scienter and are merely derivative of Plaintiffs' other allegations. Brief at 26. Since Defendants reasonably relied on Tetra Tech's expert opinion, any alleged errors in the resource or reserve estimates—or in financial statements incorporating those estimates—cannot suggest scienter.[18] As further demonstrated in Defendants' Brief, Plaintiffs' GAAP violation allegations are entirely speculative, and Plaintiffs' concocted accounting has never been validated by anyone. Brief at 35–36. Plaintiffs do not even attempt to justify their numbers in their Opposition.

*Core Operations and Magnitude of Fraud.* Plaintiffs argue that scienter should be inferred because the CLG was part of Gatos' "core operations," and because the alleged error in

---

[17] Plaintiffs' Opposition also misconstrues Mr. Orr's statement regarding "extensive geologic understanding." Opp. at 25. Mr. Orr was referring to "the extensive geologic understanding" *at the CLG*, and not his own understanding of the mine. ¶ 305.

[18] Similarly, Messrs. Orr and Johnson's SOX certifications do not suggest scienter, Opp. at 26, because their certifications relied on the opinions of an independent expert. *See In re Molson Coors Bev. Co. Sec. Litig.*, 2020 WL 13499995, at *10 ("Absent particularized facts suggesting that Defendants knew of the certifications' falsity, the certifications' mere existence is 'unpersuasive' to prove scienter." (citing *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1205 (10th Cir. 2015))); *see also In re Gold res. Corp. Sec. Litig.*, 776 F.3d at 1116 ("The 'bare allegation' that defendants lied when they certified GRC's financial statements pursuant to SOX adds 'nothing substantial to the scienter calculus.'" (citation omitted)).

the Technical Report was purportedly large in magnitude and short in duration.  Opp. at 25–27.[19]

None of these allegations are relevant to scienter here.  As an initial matter, "the Tenth Circuit

has decline[d] to accept a core operations inference in order to plead scienter, absent

*particularized facts showing what executives actually knew*."  *In re Molson Coors Bev. Co. Sec.*

*Litig.*, 2020 WL 13499995, at *8 (emphasis added) (citation omitted); *see also In re Gold Res.*

*Corp. Sec. Litig.*, 776 F.3d at 1103, 1116 ("The assertion that because the company was small,

produced only one product, and had only one buyer, and that therefore defendants 'must have

known'" financial statements were false "is simply insufficient under the heightened pleading

requirements to establish a strong inference of scienter.").  Moreover, as previously explained,

the only plausible inference from the Complaint is that *Tetra Tech* continuously signed off on the

accuracy of the Technical Report even after it reviewed Mr. Linebarger's opinion.  Regardless of

whether the CLG's is part of Gatos' "core operations," no factual allegations suggest that

Defendants did anything other than reasonably rely on Tetra Tech in estimating the resource and

reserve. [20]  There is no allegation that any individual Defendant had the technical expertise to

---

[19] Plaintiffs argue with respect to the "magnitude" of the fraud that Defendants somehow "waived" their response to this argument.  Opp. at 26.  Again, Defendants argued in their Brief that scienter is not alleged, and it is not clear what argument Defendants "waived."  Plaintiffs are also simply wrong, as Defendants *did* address this point.  Brief at 23 n.20.

[20] Additionally, as Defendants have explained, Brief at 24, Plaintiffs do not allege that Messrs. Orr, Pyle, or Johnson received any particular information during visits to, or in updates regarding, the CLG that should have informed them of any material error relating to the CLG resources or reserves.  *See City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1264 (10th Cir. 2001) (holding allegations that defendants held senior positions with the company and had access to inside information were "not sufficient to imply knowledge of the specific fact of materiality" and plead scienter).  Plaintiffs' Opposition again goes outside any facts pleaded in the Complaint.  The Opposition claims that Messrs. Orr, Pyle, and Johnson "personally oversaw" developments at the CLG.  Opp. at 25.  The Complaint vaguely alleges only that they "regularly visited" the CLG and attended monthly meetings that "included status updates on construction and mining performance."  ¶¶ 50–52, 300(iii)-(v), 301(i).  The Complaint conspicuously does not make any specific allegations about what was supposedly conveyed at these meetings, much less that specific information about a known, confirmed, and material error was discussed.

18

independently evaluate Mr. Linebarger's findings or otherwise assess technical aspects of the

Technical Report.  There is also no allegation that Gatos missed *any* production targets during

the Class Period.  *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1113 (noting scienter

allegations did not "come on top of other particularized facts indicating that a key operation of

the company was losing money" (citation omitted)); Brief at 25.[21]

Second, no allegations suggest that the magnitude of the alleged Technical Report errors

was known in January 2021.  Plaintiffs have not alleged any facts showing that Defendants had

confirmed the issues that Gatos eventually disclosed on any date before January 25, 2022.  As

noted in Defendants' Brief, "the PSLRA does not permit allegations of 'fraud by hindsight.'"

*Smallen*, F.d 1297 at 1309; Brief at 1, 19, 27; *see also Anderson v. Spirit Aerosystems Holdings,
Inc.*, 827 F.3d 1229, 1251 (10th Cir. 2016) ("The plaintiffs argue that because the forward loss

was so large, the executives must have known long before October 2012 that Spirit would incur a

loss. But this argument relies on hindsight review based on the size of Spirit's eventual loss and

does not include particularized allegations that the four executives knew before October 2012

that Spirit would lose money on the three projects.").

Third, Plaintiffs cite *In re Semgroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276 (N.D.

Okla. 2010) to argue that the "short" period between July 2021 (the Secondary Offering) and the

January 25, 2022 Press Release suggests scienter.  Opp. at 27.  Plaintiffs do not elaborate on this

argument or explain how that duration sheds light on Defendants' review or consideration of Mr.

---

[21] The case law Plaintiffs cite on this issue, *see* Opp. at 25, is inapposite.  For example, in
*Pluralsight*, the "core operation" was the number of quota-bearing sales representatives
employed by the defendant—"a single objectively verifiable data point"—and the court there
distinguished that from core operations in other cases involving "complex projections about
progress on particular projects of massive scale" where defendants "were at most negligent by
failing to put together 'a great volume of puzzle pieces.'"  *Pluralsight*, 45 F.4th at 1263–64.

Linebarger's opinion in January 2021. Nothing about this duration or timeline affects the facts pled in the Complaint and documents incorporated by reference demonstrating that Tetra Tech signed off on the Technical Report subsequent to and with knowledge of Mr. Linebarger's alleged findings. These facts again make clear that the Court should infer that Defendants reasonably relied on Tetra Tech's signoff.[22]

*Executive Departures*. Finally, Plaintiffs argue that the departures of Messrs. Orr, Johnson, Pyle, and Kinyon suggest scienter. Opp. at 27. Plaintiffs again seek to save their Complaint with allegations that they do not (and cannot) plead in the Complaint. While the Opposition claims that Messrs. Orr, Johnson, and Pyle were "all terminated," Opp. at 16, the Complaint actually alleges *not* that they were terminated, but that they all "departed" or "retired," ¶¶ 318–21. As to Mr. Kinyon, Plaintiffs allege Mr. Andres sought his termination, but do not allege any particular reason for this. ¶ 319. Mr. Andres did not join Gatos until June 2021. ¶ 13. Mr. Kinyon's departure soon thereafter more suggests, if anything, Mr. Kinyon's inability to work effectively with Mr. Andres, not scienter, as Plaintiffs speculate.

Plaintiffs next argue that Messrs. Orr, Johnson, and Pyle's departures were "sudden" and "simultaneous." Opp. at 27. That misses Defendants' argument. Brief at 29–30. These executives were at retirement age *and* their departures followed significant negative news for the Company. *Id.* Executive departures, even if simultaneous, are entirely understandable given such circumstances, and do not shed *any* light on what the executives actually knew at the time of earlier alleged misstatements. *Id.* Further, the cases Plaintiffs cite are inapposite and do not

---

[22] Courts have also found that even shorter durations than here between allegedly false statements and later disclosures of inconsistent information did not support scienter. *See, e.g.*, *In re Paracelsus Corp. Sec. Litig.*, 61 F. Supp. 2d 591, 600 (S.D. Tex. 1998) (finding less than two months insufficiently close in time to give rise to a strong inference of scienter); *Gross v. Summa Four*, 93 F.3d 987, 995 (1st Cir. 1996) (finding five weeks insufficiently close).

20

conclude that scienter is pled under such circumstances.  For example, in *Glaser v. The9, Ltd.*,

the court found that the plaintiffs' allegations did *not* "come close" to connecting the resignations

to the alleged fraud.  *See* 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011).  The court instead noted

that allegations suggest scienter only where "*independent facts indicate that [a] resignation was*

*somehow tied to the fraud alleged*, that the resignation somehow alerted defendants to the fraud,

or that defendants' scienter was otherwise evident."  *Id.* (emphasis added).  Plaintiffs here do not

allege any independent facts connecting any resignation to a fraud.[23]  Plaintiffs' additional

arguments—that, while the IPO Registration Statement shows Mr. Orr planned to retire, it stated

that he intended to join the Gatos Board of Directors upon retirement but ultimately did not, and

that Mr. Pyle once joked that he could "never retire" from Gatos, Opp. at 27–28—only invite the

Court to improperly speculate based on snippets of facts.

Plaintiffs also ask the Court to ignore the Complaint's own allegations making clear that

Defendants *voluntarily* disclosed errors in January 2022.  Plaintiffs' Opposition does not address

the authority holding that such voluntary disclosure negates an inference of scienter.  Brief at 30–

31.  The Opposition instead claims that "new management forced Gatos to reveal the truth,"

Opp. at 1–2, 4, 21, but the Complaint makes no factual allegations supporting this claim.[24]  Nor

could it, as the Complaint plainly alleges that as of January 25, 2022, Mr. Orr was the CEO, Mr.

---

[23] The other cases Plaintiffs cite, Opp. at 12, are entirely distinguishable because unlike here, those cases clearly involved indicia of "suspicion" and relation between a resignation and allegedly fraudulent statements.  *See, e.g.*, *In re Salix Pharms., Ltd.* 2016 WL 1629341, at \*15 (S.D.N.Y. Apr. 22, 2016) (unpublished) (resignation amidst SEC investigation and where board exercised claw backs in CEO's departing agreement); *Frank v. Dana Corp.* 646 F.3d 954, 960 (6th Cir. 2011) (making no finding regarding a resignation's bearing on scienter, but stating facts showing resignation occurred amidst a formal SEC investigation).

[24] The Opposition also claims that Gatos' then-President Dale Andres engaged Stantec to update the Technical Report, Opp. at 13, but the Complaint alleges only that *Gatos* (not Mr. Andres) engaged Stantec, ¶¶ 106, 301(vii).

21

Johnson was the CFO, and Mr. Pyle was the Chief Geologist, and *they* were the "management"

that disclosed errors on that date.  Brief at 30–31; ¶ 320.

## II.     PLAINTIFFS DO NOT ALLEGE FALSE OR MISLEADING STATEMENTS UNDER *OMNICARE*

### 1.     The resource and reserve estimates were statements of opinion subject to *Omnicare*

"An opinion is a belief, [or] a view . . . [that] in ordinary usage . . . does not imply . . .

definiteness . . . or certainty."  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension

Fund*, 575 U.S. 175, 183 (2015); Brief at 31–34.  Under this standard, the statements of resources

and reserves, which Defendants expressly described numerous times as uncertain estimates only,

were opinions under *Omnicare*.  Nevertheless, Plaintiffs argue that because Defendants have

stated that the Technical Report contains "errors," that means that the resource and reserve

estimates are not opinions.  Opp. 29–30.  But that conclusion does not follow.  That Gatos later

determined that in addition to the inherent uncertainty of estimates (which makes them opinions)

there were *also* errors that made the estimates even less certain does not mean that these

statements were not opinions.  An opinion later shown to be inaccurate does not accordingly

become a statement of "fact" under *Omnicare*.  *See, e.g.*, *Hunt v. Bloom Energy Corp.*, 2021 WL

4461171, at *8 (N.D. Cal. Sept. 29, 2021) (unpublished) ("[O]pinion statements can still be

wrong such that a company may seek to correct them.  This does not, however, transform the

opinion statement into an objective statement of fact.  The Supreme Court in *Omnicare*

implicitly recognized this.").

Plaintiffs also fail to meaningfully distinguish *Martin*.  There, the court held that metal

production estimates were nonactionable opinions under *Omnicare*, and the court observed that

"[e]stimates, in particular, constitute a well-established species of opinion."  *Martin*, 732 F.

App'x at 40 n.1.  The court emphasized the importance of evaluating such estimates within the

22

context of relevant disclaimers, like the ones Defendants made here. *Id.* at 40 n.1, 41–42. In

holding that reserve estimates were opinions—and that they were not misleading—the court

found significant that the defendants' disclaimers stated that the mineral reserves "are and will

only be estimates" and that estimation "is a subjective process that relies on the judgment of the

persons preparing the estimates," which are "imprecise and depend, to a certain extent, upon

analysis of drilling results and statistical inferences and may ultimately prove to be inaccurate."

*Id.* at 40 n.1. The disclaimers that *Martin* points to are materially identical to disclaimers that

Defendants made here, Brief at 7–9, 32–33, yet Plaintiffs in a perfunctory manner dismiss their

relevance, Opp. at 30 n.16. Plaintiffs cannot, in light of *Martin*, plausibly argue that Defendants'

estimates were anything other than statements of opinion.[25]

Plaintiffs also attempt to distinguish *Martin* by arguing that the estimates in that case

were made while the mine was still under "development." Opp. at 31. But that is a distinction

without a meaningful difference, and it had nothing to do with the court's characterization of

why the estimates were considered to be statements of opinion. *See* 732 F. App'x at 40. Both in

*Martin* and here, the inherent uncertainty of estimates as well as the relevant *disclosures* are what

---

[25] None of Plaintiffs' cases in opposition alter this conclusion. *In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443 (D.S.C. Mar. 29, 2019) held that the defendants' statements were "objectively verifiable statements of fact" under *Omnicare* where they concerned a project schedule that a retained project manager concluded was "impossible to achieve." *Id.* at *3, 9. Here, as noted, Gatos' resource and reserve estimates were inherently subjective, and Defendants *disclosed* that they were uncertain estimates only. Plaintiffs' reliance on *In re Petrobras Sec. Litig.*, 2016 WL 1533553 (S.D.N.Y. Feb. 19, 2016) (unpublished), is similarly misguided. There, the court held that *financial statements* were statements of fact because Section 11 and "long-standing precedent" impose "liability expressly on auditors for portions of registration statements that they certify." *Id.* at *4. That has no relevance to statements regarding productivity or reserve estimates, which courts consider to be opinions. Brief at 31–34. Finally, *Queen Uno Ltd. P'ship v. Coeur D'Alene Mines Corp.*, 2 F. Supp. 2d 1345 (D. Colo. 1998) is inapposite. It predated *Omnicare*, and considered whether certain statements were nonactionable puffery, not whether they were nonactionable opinions under *Omnicare*.

indicate that the estimates are only opinions.  Moreover, the CLG was *also* under development in this respect when Defendants communicated its estimated resource and reserve.  The Technical Report expressly had an effective date of July 1, 2020, and after that time Gatos "did [further] drilling to better confirm the actual location of mineralization."  ¶ 87.[26]

Plaintiffs' additional arguments that the resource and reserve estimates were not opinions also fail.  Contrary to Plaintiffs' argument, Defendants are not required to preface their opinions with "I believe" or "I think," Opp. at 29 n.15, to make them opinions under *Omnicare*.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *31 ("[A]lthough the examples the Supreme Court gave of opinion statements in *Omnicare* were expressly stated as opinion (e.g., 'I think the coffee is hot' or 'I believe our marketing practices are lawful'), the Court decidedly did not hold that a statement must be qualified by a 'I think' or 'I believe' or 'it is my opinion that' to qualify as one of opinion.").  Plaintiffs also argue that the resource and reserve estimates were opinions because they were made with a level of specificity and presented as "quantitative, precise, and fact-based, not speculative or uncertain ranges."  Opp. at 29.  But Plaintiffs point to

---

[26] Plaintiffs also attempt to distinguish *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, --- F. Supp. 3d ----, (S.D.N.Y. Sept. 2, 2022) (unpublished) and *In re Pretium Res. Inc. Sec. Litig.*, 2020 WL 953609 (S.D.N.Y. Feb. 27, 2020) (unpublished), cited by Defendants, but fail to meaningfully do so.  Plaintiffs argue that *Turquoise* has "no bearing" on this case because statements regarding mining project delays have no "objective metric."  Opp. at 31 n.17.  But as explained, that is also the case here because resource and reserve estimates are inherently subjective.  Indeed, in *Turquoise*, the court agreed that project delay statements were opinions under *Omnicare* "for the same reason [productivity] estimates are well-established species of opinion."  2022 WL 4085677, at *31 (citing *Martin*, 732 F. App'x at 40 n.1).  Plaintiffs next argue that *Pretium* is "irrelevant" because the statements there expressed confidence in a mine plan predating commercial production.  Opp. at 31 & n.17.  However, a mine's early development stage has no relevance to the issue of whether reserve statements are opinions under *Omnicare* and is in any event indistinguishable from this case.  *Pretium* is clear that "statements [that] give commentary or updates on, or tacitly express confidence in, aspects of Pretium's *mine plan . . . are expressions of opinion*," and defendants there were entitled to rely on the views of their "outside consultant."  2020 WL 953609, at *1–2, *4–5 (emphasis added).

24

no case holding that a number cannot be an opinion merely because it is specific.  Plaintiffs

ignore the more relevant consideration, which is that Defendants clearly made numerous

disclosures that the estimates were uncertain (and thus opinions).

      2.      <u>The resource and reserve estimates were true and not misleading opinion statements under *Omnicare*</u>

Plaintiffs next argue that even if the estimates were opinions, they were false and/or

misleading under the three alternative bases for liability under *Omnicare*.  None of these bases

are supported by plausibly alleged facts.  First, Plaintiffs argue that Defendants did not "sincerely

believe" the estimates to be true.  Opp. at 31.  However, as discussed above, there are no

probative allegations that Defendants acted with scienter or did not believe in the estimates,

particularly given Tetra Tech's continued consents to use of the Technical Report.

Second, Plaintiffs argue that Defendants' statements regarding the reserve and resource

estimates contained "embedded" false facts that are actionable under *Omnicare*.[27]  According to

Plaintiffs, this includes statements that (a) Tetra Tech verified the mine plan for the calculation

of reserves, (b) the Technical Report was prepared in accordance with SEC rules, (c) the

resource model was based on geological evidence and knowledge, and detailed and reliable

exploration, sampling, and testing, and (d) the reserves were based on the resource model and

adequate information on mining, processing and other factors.  Opp. at 32.  For one, these

statements were true, and Plaintiffs have not alleged any facts suggesting otherwise.  The

Technical Report states that Tetra Tech verified the mine plan and that it was generally prepared

---

[27] Plaintiffs, oddly, state that Defendants "waived *Omnicare*'s second prong."  Opp. at 32.  Defendants moved to dismiss the entire Complaint on the basis of *Omnicare* and argued there are not *any* actionable false statements.  *See* Brief at 31–34.  To the extent Plaintiffs now argue in their Opposition that there are actionable statements because the opinions Defendants shared contained embedded facts, Defendants respond accordingly in this Reply.

in accordance with SEC requirements.  The allegation that there was an error in the Technical

Report's reserve model does not make these statements false.  In any case, these supposedly false

statements are not what allegedly caused Plaintiffs' losses—rather, any losses are alleged to be

the result of the resource and reserve errors disclosed in the January 25, 2022 press release,

which allegedly caused a stock price drop.  *See* Opp. at 13, 36; ¶¶ 166, 329.  Plaintiffs cannot

manufacture "embedded facts" as the basis for their claims when those alleged misstatements are

not alleged to have caused losses.  *See In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d

1130, 1137 (10th Cir. 2009) (noting that securities laws "protect [investors] against those

economic losses that misrepresentations actually cause."); 15 U.S.C. § 78u-4(b)(4) ("[T]he

plaintiff shall have the burden of proving that the act or omission of the defendant alleged to

violate this title . . .  caused the loss for which the plaintiff seeks to recover damages.").

Third, Plaintiffs argue that the resource and reserve estimates are actionable under

*Omnicare*'s third prong because Defendants omitted material facts that make their statements of

opinion misleading, specifically that Mr. Linebarger's opinion would have casted doubt on Tetra

Tech's. Plaintiffs argue that "*[a]ll three experts* (Linebarger, Tetra Tech, and Stantec) *agreed* the

errors existed" and "[t]here is no allegation that anyone ever disputed Linebarger's findings."

Opp. at 34 & n.20.  Again, this is plainly not true.  As discussed, in January 2021, Tetra Tech

disagreed with Mr. Linebarger.  Plaintiffs further do not allege when and how Mr. Linebarger,

Tetra Tech, and Stantec agreed on anything at any particular time.  To the extent Stantec did

meaningfully "corroborate" Mr. Linebarger's opinion in October 2021, *see* Section I.2, this sheds

no light on what Defendants understood or had reason to rely on in January 2021.

Because Tetra Tech did not find that Mr. Linebarger's opinion identified a material error

in the Technical Report, disclosure of Mr. Linebarger's lone and unsubstantiated opinion was not

required by law. This is the import of *Omnicare*, which observed that disclosure of a dissenting

opinion, for example that of a "junior attorney" contrasting with those of more senior attorneys,

is not required. *Omnicare*, 575 U.S. at 190. This is also what *Martin* squarely held: defendants

are entitled to rely on their independent expert's views, without disclosing disagreeing views of a

second party. *Martin*, 732 F. App'x at 41. For similar reasons, Plaintiffs' argument that

Defendants should have disclosed Mr. Linebarger's opinion pursuant to Item 303 is baseless,

Opp. at 34–35, because neither Tetra Tech nor Gatos concluded that Mr. Linebarger identified a

"credible" material error. *Martin*, 732 F. App'x at 42 n.3 (noting that "Item 303 applies only to

'*known* trends or uncertainties'" and "credible" doubts). Properly viewed in their full context as

*Omnicare* requires—including Gatos' many public disclosures that the resource and reserve

estimates were inherently uncertain, based on complex and subjective judgments about a variety

of inputs—there was simply nothing misleading about the estimates Defendants reported.

          3.      Additional statements made by Defendants are not actionable

Plaintiffs argue that, aside from the statements regarding the resource and reserve

estimates, Defendants made additional false statements that are actionable under *Omnicare*.

Plaintiffs argue, for example, that statements regarding GAAP compliance, internal controls,

impairment testing, definitions and methodologies, risk factors, and new drilling were false.

Opp. at 35–37. However, as explained in Defendants' Brief, Plaintiffs either base their

allegations that these statements were false on the view that Defendants omitted to disclose a

reserve error or fail to connect these purportedly false statements to any loss. Brief at 34–37.

Plaintiffs' Opposition confirms these points. The Opposition specifies that Defendants'

statements concerning definitions and methodology, risk factors, new drilling, and upgrading the

CLG's resources are allegedly false only because Defendants did not disclose an alleged reserve

error in connection with the statements. Opp. at 36–37. Moreover, Plaintiffs claim that

27

Defendants' loss causation argument "fails because Gatos's share price immediately plunged 69% after the January 25, 2022 press release," Opp. at 36, but this reasoning supports Defendants' argument, not Plaintiffs'. Gatos' stock allegedly dropped on January 25, 2022 after the Company announced errors in the Technical Report reserve estimate and potential overestimation in the resource. Opp. at 13, 36; ¶¶ 166, 329. The Company did *not* announce on January 25 that its financials were inaccurate or violated GAAP, or any of the other alleged misstatements to which Plaintiffs now point.

## III.    PLAINTIFFS HAVE NOT ALLEGED STANDING UNDER SECTION 11

1.    <u>Plaintiffs must allege with "factual specificity" that they purchased shares pursuant to a particular registration statement</u>

Every Circuit court to address Section 11 standing has held that where a company has issued shares pursuant to multiple registration statements, a plaintiff must allege *at the pleading stage* under which registration statements he or she purchased shares to demonstrate standing. For example, in *Century Aluminum*, *see* Brief at 38–39, held that "[w]hen a company has issued shares in multiple offerings under more than one registration statement, . . . a greater level of factual specificity will be needed before a court can reasonably infer that shares purchased in the aftermarket are traceable to a particular offering." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013); *see also id.* at 1108 ("Standing alone, the conclusory allegation that plaintiffs 'purchased Century Aluminum common stock directly traceable to the Company's Secondary Offering' does not allow us to draw a reasonable inference about anything because it is devoid of factual content."); *In re ARIAD Pharms. Sec. Litig.*, 842 F.3d 744, 755-56 (1st Cir. 2016). Accordingly, Plaintiffs' general allegations that they purchased shares "pursuant *and/or* traceable to the IPO *and/or* July 2021 Offering" are insufficient on their face. ¶¶ 182–83 (emphasis added). In their Opposition, Plaintiffs do not even acknowledge *Century Aluminum* or

28

this body of case law.[28]  Instead, Plaintiffs cite inapposite case law regarding class certification—

not in the pleading context—that is distinguishable and has no bearing on pleading standards.[29]

>        2.        Millions of Gatos shares not sold pursuant to the IPO or Secondary Offering
>                  were outstanding when Plaintiffs purchased their relevant shares

Plaintiffs attempt to circumvent the Complaint's plainly deficient allegations by arguing

that Plaintiff Sweidan necessarily purchased shares pursuant to the IPO Registration Statement

on July 13, 2021, before the Secondary Offering.  Opp. at 38.  This argument misses key points

in Defendants' Brief.  When Plaintiff Sweidan made that purchase, there were 34,538,576 shares

eligible for sale that were issued but *not* sold pursuant to the IPO.  Brief at 39–40.[30]  These

---

[28] Plaintiffs in their Opposition, Opp. at 38 n.24, attempt to distinguish *Scott v. ZST Digital Networks Inc.*, 896 F. Supp 2d 877, 888 (C.D. Cal 2012), which held (like *Century Aluminum*) that Section 11 standing was lacking where plaintiffs could not trace their shares to a particular registration statement.  It is notable that Plaintiffs do *not* dispute the central holding of *Scott* that a plaintiff must plead with particularity under which registration statements the purchases were made.  Instead, Plaintiffs attempt to argue that *Scott* is distinguishable because that case involved two offerings before the plaintiff had purchased shares.  But that is the case here.  As explained *infra*, not only were there two offerings, there were millions of shares not sold pursuant to either offering that were outstanding when Plaintiffs made relevant purchases.

[29] For example, Plaintiffs cite *Schwartz v. Celestial Seasonings, Inc.*, 178 F.R.D. 545, 557 (D. Colo. 1998) to argue the issue of tracing is "'not appropriate for consideration' at the pleading stage."  Opp. at 5.  But *Schwartz* addressed tracing at the *class certification* stage.  178 F.R.D. at 557.  The issue of class standing—where a plaintiff *already* has standing and ability to bring cognizable individual claims, and the issue is whether the plaintiff can bring claims on behalf of a class—has no bearing on the issue of standing at the motion to dismiss stage, which concerns whether individual claims are properly pled.  More importantly, *Schwartz* is inapposite because all three named plaintiffs in that case purchased their shares *before* a secondary offering, and there was no allegation that the plaintiffs otherwise purchased from a pool of stock polluted with shares not registered pursuant to the relevant registration statement.  Plaintiffs' additional cited cases, Opp. at 39, all concern irrelevant issues relating to class certification.  *See In re Eagle Computer Sec. Litig.*, 1986 WL 12574 (N.D. Cal. Mar. 31, 1986) (unpublished); *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145 (2d Cir. 2012); *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131 (D. Conn. 2019); *In re Deutsche Bank AG Sec. Litig.*, 328 F.R.D. 71 (S.D.N.Y. 2018).

[30] Similarly, after the Secondary Offering, there were tens of millions of shares (32,184,215) not registered in the IPO or Secondary Offering.  Brief at 39–40.  The Secondary Offering prospectus stated that total shares of common stock outstanding after the offering would

shares accounted for roughly half of Gatos' outstanding shares, and they were eligible for trading at either 90 or 180 days (depending on whether a shareholder signed a lock-up agreement) after the IPO, or no later than April 26, 2021.[31]  This is fatal to Plaintiffs' ability to plead standing because Plaintiffs' relevant trading occurred *after* April 26, 2021.  As explained in Defendant's Brief, Plaintiff Sweidan (as well as Plaintiff Betz) purchased shares before April 26, 2021, but they sold all of those shares at a profit, and therefore such purchases cannot sustain a Section 11 claim.  Brief at 40 n. 27–28.  Rather, the *only* relevant purchases are from after April 26, 2021.

Plaintiffs' responses to Defendants' arguments are wholly inadequate.  First, Plaintiffs without explanation dismiss Defendants' basic arithmetic for calculating outstanding shares as "dubious," but do not articulate what supposed mathematical errors Defendants made.  Opp. at 40.[32]  Second, Plaintiffs argue that while these millions of shares were eligible for trading, there is no evidence that they were actually circulating in the public markets.  Opp. at 40.  However,

---

equal 68,339,052 plus shares the underwriters purchased from the Company by exercising their option to purchase additional shares.  Brief Ex. 11.  The underwriters partially exercised their option and purchased 286,962 shares from the Company, *see* Brief Ex. 12, making the total outstanding shares following the Secondary Offering 68,626,014.  Brief Exs. 11, 12.  The total shares sold by Gatos pursuant to the Secondary Offering was 11,797,299 (11,430,000 shares sold in the firm commitment offering and 367,299 sold to underwriters exercising their option and purchasing shares from the Company and selling stockholders).  Brief Exs. 11, 12.  Thus, after the Secondary Offering, the total shares outstanding that were not sold pursuant to the IPO or Secondary Offering equaled 68,626,014 minus 24,644,500 (shares sold pursuant to IPO) minus 11,797,299 (shares sold pursuant to Secondary Offering), or 32,184,215.

[31] *See* Reply Ex. 1, Gatos Silver, Inc., Prospectus (Form 424B4), 162–63 (Oct. 29, 2020).

[32] Defendants' arithmetic is plain from documents cited in Defendants' Brief. Brief at 39–40 nn.25–26.  For example, Gatos' IPO prospectus states that 24,644,500 shares were sold pursuant to the IPO (21,430,000 sold in the firm commitment offering and 3,214,500 sold to underwriters exercising their over-allotment option).  It also states that Gatos would have a total of 59,183,076 shares outstanding after IPO if underwriters exercised their over-allotment option in full, which they did.  *See* Brief Exs. 9, 10.  Thus, 34,538,576 shares of Gatos common stock (59,183,076 minus 24,644,500) were outstanding post-IPO and not registered in the IPO.

that these shares were *eligible* for trading is sufficient to defeat Plaintiffs' Section 11 standing.

Case law is clear that the burden is on Plaintiffs to adequately plead that they purchased shares

pursuant to a registration statement.[33]  Plaintiffs have not met this burden by asserting boilerplate

and conclusory allegations that they purchased shares "pursuant *and/or* traceable to the IPO

*and/or* July 2021 Offering" given the existence of shares not sold pursuant to either registration.

Plaintiffs next argue that these millions of shares could not have been trading in the

market because no Form 144s have been publicly filed, and absent such forms these shares *could*

not enter the market.  Opp. at 40.  This argument is wrong because it rests on the incorrect

assumption that Form 144s had to be filed for any of these shares to be tradeable.  A Form 144

must only be filed by *affiliates*, and only when affiliate sales exceed certain volume thresholds.

17 C.F.R. § 230.144(h).  Non-affiliates sales, and affiliate sales that do not exceed the threshold

volume, do not require the filing of a Form 144, meaning these shares can be freely traded

---

[33] *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 500 (5th Cir. 2005) (finding plaintiffs "cannot meet the statutory standing requirement of Section 11 merely by showing that they jumped into a potentially polluted 'pool' of stock."); *Exkae Ltd. v. Domo, Inc.*, 2020 WL 7352735, at *5 (D. Utah Dec. 15, 2020) (unpublished) (denying Section 11 standing where unregistered shares "became *eligible* for sale into the market" and plaintiffs therefore "purchased their Domo shares from a mixed or 'polluted' pool of stock . . ." (emphasis added)); *Johnson v. CBD Energy Ltd.*, 2016 WL 3654657, at *5 n.2 (S.D. Tex. July 6, 2016) (unpublished) (denying Section 11 standing where there were "1,692,345 [shares not subject to lock-ups] that Plaintiffs *could* have purchased" (emphasis added)); *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *25 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019) (unpublished) (after granting dismissal when plaintiff failed to "specifically allege[] that the TriNet shares Plaintiff purchased after the IPO were the only shares in the market," allowing plaintiff to proceed *only after* amending complaint to allege that, because lock-ups were in place, "the only shares available to be purchased when Plaintiff bought shares were shares issued in, and thus traceable to, the IPO").  To combat this case law, Plaintiffs cite *In re Prestige Brands Holdings, Inc. Sec. Litig.*, 2007 WL 2585088 (S.D.N.Y. Sept. 5, 2007) (unpublished), which held at the *class certification* stage that the *predominance* requirement for class certification could be met notwithstanding the fact that shares not registered pursuant to the IPO became eligible for sale three months before the end of the class period.  *Id.* at *5.  *Prestige* is inapposite, both due to its posture and because here, shares not registered pursuant to any relevant registration statement became eligible for sale *before* Plaintiffs made any of their relevant purchases.

without public notice if they meet the other requirements of Rule 144.  *See, e.g.*, 17 C.F.R.

§ 230.144(b)(1)(i).  Plaintiffs' Opposition provides no basis for the conclusion that the millions

of outstanding Gatos shares were held only by affiliates, or that affiliates did not make sales

lower than the threshold volume requiring a Form 144.[34]

> 3.    Plaintiffs' allegations are insufficient and do not rule out that they purchased shares sold by Messrs. Pyle or Huerta

Plaintiffs' allegations fail for the related reason that at the time Plaintiffs made their

relevant purchases, Messrs. Pyle and Huerta had sold shares to the public.  Messrs. Pyle and

Huerta sold shares in May and June 2021.  ¶ 104.  Plaintiffs' relevant trading occurred after that

point in time.  Since Messrs. Pyle and Huerta's shares were not registered in the IPO, and since

Plaintiffs could have purchased *those* shares, Plaintiffs cannot plead standing.

In response, Plaintiffs' Opposition for the first time refers to Gatos' Form S-8 filed on

October 30, 2020, and argues that the shares Messrs. Pyle and Huerta sold in May and June 2021

---

[34] Plaintiffs' final attempt to rest their standing argument on a "statistical tracing" theory, *see* Opp. at 39 n.25, is not supported by case law, and, in any event, is not applicable under the facts here, given that approximately half of Gatos' outstanding shares were not registered in the IPO.  The only two decisions to have addressed the "statistical tracing" theory at the motion to dismiss stage have rejected it.  *See Krim*, 402 F.3d at 496 (rejecting "statistical tracing" theory where 99.85% of shares were issued pursuant to the disputed IPO because such a theory would "impermissibly expand the statute's standing requirement"); *id.* at 497 ("Taking a United States resident at random, there is a 99.83% chance that she will be from somewhere other than Wyoming.  Does this high statistical likelihood alone . . . mean that she can avail herself of diversity jurisdiction in a suit against a Wyoming resident?  Surely not."); *Davidco Invs., LLC v. Anchor Glass Container Corp.*, 2006 WL 547989, at *23 (M.D. Fla. Mar. 6, 2006) (unpublished) ("[S]tanding cannot be based on a statistical tracing theory, i.e., by showing that there is a *very high probability* that the shares can be traced to the allegedly defective registration statement.").  Plaintiffs rely on one decision—*In re Snap Inc. Sec. Litig.*, 334 F.R.D. 209, 224 (C.D. Cal. 2019)—addressing statistical tracing in the context of class standing at the class certification stage, which as noted above is not relevant here.  In addition, in that case, "99.95% of the shares in the market during the relevant period [were] traceable to the IPO."  *Id.*  That is entirely distinguishable from here where millions of shares (and approximately half of all issued shares) not sold pursuant to relevant registration statements were outstanding when Plaintiffs made their relevant trades.

were registered pursuant to that S-8.  Plaintiffs attempt to equate the S-8, a separate registration

statement for securities sales from Gatos to employees, to the IPO Registration Statement (i.e., S-

1), and argue that these two registration statements are "part of the same registration package."

Opp. at 40-41.  Plaintiffs' argument is confusing and meritless.  Plaintiffs first make a critical

assumption that the shares Messrs. Pyle and Huerta sold had been shares registered pursuant to

the S-8, rather than *unregistered* shares these individuals received pre-IPO.  This assumption is

far from certain.[35]  Even accepting the assumption, Plaintiffs improperly conflate the S-1 and S-8

registration statements.  These documents serve different audiences (S-1s, the public, S-8s,

employees), register different securities for different offering periods,[36] and are subject to

different disclosure requirements, *compare* 17 C.F.R. §239.11 *with* 17 C.F.R. §239.16b.  Even

though, as Plaintiffs point out, the S-8 incorporates statements Gatos made in its *prospectus*,

Opp. at 40 n.32, the S-8 does not incorporate, and cannot be considered the same as, the *S-1*.

The one case Plaintiffs cite to support their conflation, Opp. at 41, provides no basis to conclude

that shares traceable to an S-8 can be deemed registered pursuant to an entirely distinct S-1.[37]

---

[35] For example, Mr. Pyle beneficially owned 57,754 shares of Gatos stock pre-IPO, which would not have been registered by the IPO Registration Statement or S-8.  *See* Reply Ex. 1, Gatos Silver, Inc., Prospectus (Form 424B4), 149 (Oct. 29, 2020) (66,218 shares beneficially owned, minus 8,464 shares to be issued in connection with the IPO).  Moreover, that Mr. Pyle exercised options and sold a quantity of shares equivalent to the options he exercised on a given day is not proof that he sold shares sourced from that option exercise.  None of the Form 4s summarizing Mr. Pyle's sales activity, on which the Complaint relies, ¶ 104 & n.7, identifies the *source* of shares Mr. Pyle sold.  *See, e.g.*, Reply Ex. 2, Gatos Silver, Inc., Statement of Changes in Beneficial Ownership – Pyle (Form 4) (May 12, 2021).

[36] *Compare* Reply Ex. 3, Gatos Silver, Inc., Amended Registration of Securities (Form S-1/A), PDF pp. 1–2 (Oct. 21, 2020), *with* Opp., Ex. H at 1, 5.

[37] The facts and posture of *Pirani v. Slack Techs., Inc*, are entirely distinguishable.  *Slack* related to a "direct listing," in which a company does not issue new shares but files a registration statement solely to allow existing shareholders to sell their shares.  13 F.4th 940, 944 (9th Cir. 2021).  In a direct listing, unregistered shares are eligible for sale on the day of the direct listing and not subject to a lock-up period.  *Id.*  The issue presented in *Slack* was whether the purchase

33

Finally, to the extent that Plaintiffs are arguing they purchased shares pursuant to the S-8,

and the *S-8* is therefore a *third* registration statement that is actionable under Section 11, this

does not show Plaintiffs have standing.  The Complaint makes no reference to the S-8, but even

if it did, Plaintiffs *still* do not allege under which registration statement they purchased shares.

As noted above, and as case law makes clear, it is insufficient for Plaintiffs to hedge and allege

that they purchased shares under *either* the IPO Registration Statement *or* the Secondary

Offering Registration Statement *or*, perhaps now, the S-8.

## IV.    THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Plaintiffs argue in a footnote that dismissal should be without prejudice because the

results of Gatos' restatement analysis and impairment testing may "lend additional support to

their claims."  Opp. at 41 n.34.  This argument is vague and insufficient as a basis for leave to

amend.  *See In re Gold Res. Corp. Sec. Litig.*, 776 F.3d at 1118 (finding dismissal with prejudice

---

of unregistered shares offered in a direct listing conferred standing to assert Section 11 claims
pursuant to the registration statement (an S-1) that supported the direct listing.  *Id.* at 946–47.
This was a matter of first impression for the court, and the court held that unregistered shares
purchased in the direct listing *did* confer Section 11 standing as to the direct listing S-1, because
under applicable SEC and NYSE rules the unregistered shares could not have been sold without
the S-1 being operative.  *Id.* at 947.  The court's holding was contrary to a half-century of
uniform case law, and the United States Supreme Court has now granted certiorari in the *Slack*
matter, subjecting the Ninth Circuit's decision to further review.  *See Slack Techs., LLC v.
Pirani*, 2022 WL 17586972 (U.S. Dec. 13, 2022).  Plaintiffs cite to *Slack* in their Opposition
because in a footnote to the opinion, the court noted that defendant Slack raised for the first time
at oral argument that it actually issued two registration statements for its direct listing, an S-1 and
an S-8, but did not supplement the record with the S-8.  *See* 13 F.4th at 947 n.5.  The court
observed that any argument that the plaintiff's shares were purchased under a different
registration statement was not before it, but it took judicial notice of the S-8, noted that it
incorporated the S-1 by reference, and stated that the S-1 and S-8 were "part of the same
registration package."  *Id*.  The court's footnote dicta regarding the sufficiency of a registration
*package* for standing is inapposite because it was context-specific to the one direct listing at
issue.  The court did not hold that a plaintiff asserting a Section 11 claim pursuant to a traditional
public offering need not specify under which registration statement they purchased shares.  Nor
have Defendants identified any case law supporting Plaintiffs' baseless assertion that S-8 and S-1
are in any sense the "same" registration statement, which, by definition, they are not.

34

proper where "only one sentence at the very end of [a] brief alternatively request[ed] leave to amend"); *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999) (same).  Moreover, Plaintiffs offer no support for their conclusory statement that leave to amend "would not be futile here" and do not identify how Defendants' forthcoming financial statements would make Plaintiffs' claims more viable.  *See Bauchman v. West High Sch.*, 132 F.3d 542 (10th Cir. 1997) (leave to amend "futile" where "proposed amended complaint would be subject to dismissal for any reason").  Plaintiffs had months to investigate their claims and opportunity to request further amendment of their Complaint before submitting their Opposition. They should not be given a third chance to rescue their claims based on speculative facts and financial statements that have not yet been issued.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be granted and the Complaint should be dismissed with prejudice.

December 23, 2022                                Respectfully submitted,

*/s/ Jason Spitalnick*                           */s/ Lawrence J. Portnoy*
Jason Spitalnick                                 Lawrence J. Portnoy
Foster Graham Milstein & Calisher, LLP           Michael Flynn
360 South Garfield Street, Suite 600             Isaac M. Gelbfish
Denver, Colorado 80209                           Danielle Mullery
(303) 333-9810                                   Davis Polk & Wardwell LLP
jspitalnick@fostergraham.com                     450 Lexington Avenue
                                                 New York, New York 10017
                                                 (212) 450-4874
                                                 lawrence.portnoy@davispolk.com

                                                 *Attorneys for Defendants*

35

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December, 2022, I caused the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Lawrence J. Portnoy*
Lawrence J. Portnoy
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Fax: (212) 701-5800
lawrence.portnoy@davispolk.com

36